Eric C. Rassbach (CA SBN 288041)
Daniel L. Chen (CA SBN 312576)
Laura Wolk Slavis (DC Bar No. 1643193)
    (pending *pro hac vice* admission)
Brandon L. Winchel* (CA SBN 344719)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave., Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax
erassbach@becketlaw.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHAYA LOFFMAN and JONATHAN LOFFMAN, on their own behalf and on behalf of their minor child M.L.; FEDORA NICK and MORRIS TAXON, on their own behalf and on behalf of their minor child K.T.; SARAH PERETS and ARIEL PERETS, on their own behalf and on behalf of their minor child N.P.; JEAN & JERRY FRIEDMAN SHALHEVET HIGH SCHOOL; and SAMUEL A. FRYER YAVNEH HEBREW ACADEMY, | No. 23-1832 |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| CALIFORNIA DEPARTMENT OF EDUCATION; TONY THURMOND, in his official capacity as Superintendent of Public Instruction; LOS ANGELES UNIFIED SCHOOL DISTRICT; and ANTHONY AGUILAR, in his official capacity as Chief of Special Education, Equity, and Access, | **JURY DEMAND** |
| Defendants. | |

* Not a member of the D.C. Bar; admitted in California. Practice limited to cases in federal court.

## <u>NATURE OF THE ACTION</u>

1. The State of California discriminates against Jewish children with disabilities and Jewish schools that seek to provide an education for children with disabilities. Plaintiffs bring this federal civil rights action under 42 U.S.C. § 1983 to vindicate their rights guaranteed by the First Amendment's Free Exercise Clause and the Fourteenth Amendment's Equal Protection Clause.

2. Plaintiff parents Chaya Loffman and Jonathan Loffman, Fedora Nick and Morris Taxon, and Sarah Perets and Ariel Perets reside within the boundaries of the Los Angeles Unified School District. They are Jewish parents who seek to send their children with disabilities to Orthodox Jewish schools with the help of generally available public funds.

3. Plaintiff schools Jean & Jerry Friedman Shalhevet High School and Samuel A. Fryer Yavneh Hebrew Academy are private Orthodox Jewish schools located in Los Angeles that seek the ability to obtain state certification to access generally available public funds and better serve Jewish students with disabilities.

4. The Individuals with Disabilities Education Act, a federal statute, provides funding to States to provide a special education and related services to students with disabilities.

5. IDEA provides that if certain conditions are met, a State may place children with disabilities in private schools, and generally available

public funds may be used to pay tuition and the special education and related services at those schools.

6. But California discriminates against religious children with disabilities and against religious schools.

7. The State will not allow a private school to access otherwise generally available funds for special education if the private school is religious. Under California law, only "nonsectarian" schools are welcome.

8. It is thus impossible for a child with a disability to be placed at a religious school and receive the same funding that he would otherwise be entitled to had his parents sent him to a nonreligious school.

9. It is similarly impossible for a private religious school to receive the public funding necessary to provide critical services to children with disabilities.

10. Since parents often cannot afford to pay for disability services themselves, California forces them to choose between accessing those services and giving their children a Jewish education.

11. Defendants California Department of Education and Superintendent of Public Instruction Tony Thurmond are responsible for administering and implementing California law governing nonpublic schools and special education funding, including IDEA funding. Defendants Los Angeles Unified School District and Anthony Aguilar, LAUSD's Chief of Special Education, Equity, and Access, administer

funding for children with disabilities within LAUSD, including those who are placed at nonpublic schools.

12. Defendants' administration and implementation of California law excludes Plaintiffs from the generally available public funding necessary to provide an education to students with disabilities.

13. Plaintiffs merely seek to educate and care for children with disabilities and practice their Jewish faith on an equal basis with other California citizens.

14. As the Supreme Court recently held, they are entitled to equal treatment because "religious schools and the families whose children attend them . . . 'are members of the community too.'" *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2262 (2020). Excluding Plaintiffs from government programs—for no other reason than the fact that they are religious—is "odious to our Constitution and cannot stand." *Id*. at 2263 (cleaned up).

## JURISDICTION AND VENUE

15. This action arises under the Constitution and laws of the United States. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

16. The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

17. Venue lies in this district under 28 U.S.C. § 1391(b)(1) because all Defendants reside in California and Defendants LAUSD and Aguilar reside in the Central District of California.

18. Venue also lies in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in the Central District of California.

## THE PARTIES

19. Plaintiffs Chaya Loffman and Jonathan Loffman are devout Orthodox Jews and reside in Los Angeles, California.

20. The Loffmans have an infant daughter and a 4-year-old son, M.L. M.L. is diagnosed with high functioning autism. He currently receives services at Maor Academy, an Orthodox Jewish learning center dedicated to supporting students with special needs and their families in the Los Angeles Jewish community.

21. California's unconstitutional laws discriminate against religious parents like the Loffmans by forbidding them from using otherwise generally available public funding for special education services at an Orthodox Jewish school.

22. The Loffmans are suing in their own right and on behalf of their minor son M.L.

23. Plaintiffs Fedora Nick and Morris Taxon are devout Orthodox Jews and reside in Los Angeles, California.

24. The Taxons have three sons and send all their children to Orthodox Jewish schools, except for their youngest, K.T. K.T., their 14-year-old son, is currently in eighth grade and attends a public charter school in LAUSD. K.T. is diagnosed with autism, which results in pronounced academic deficiencies.

25. California's unconstitutional laws discriminate against religious parents like the Taxons by forbidding them from using otherwise generally available public funding for special education services at an Orthodox Jewish school.

26. The Taxons are suing in their own right and on behalf of their minor son K.T.

27. Plaintiffs Sarah Perets and Ariel Perets are devout Orthodox Jews and reside in Los Angeles, California.

28. The Peretses have 6 children and have sent all their children to Orthodox Jewish schools, except for N.P. N.P., their 14-year-old son, is currently in seventh grade and attends a public school in LAUSD. N.P. is diagnosed with autism and a WAC gene mutation that results in speech delays, behavioral issues, and learning disabilities.

29. California's unconstitutional laws discriminate against religious parents like the Peretses by forbidding them from using otherwise generally available public funding to receive special education services at an Orthodox Jewish school.

30. The Peretses are suing in their own right and on behalf of their minor son N.P.

31. The Jean & Jerry Friedman Shalhevet High School is a private Orthodox Jewish high school in Los Angeles, California. Shalhevet offers a co-educational, Modern Orthodox education with a rigorous dual curriculum of Judaic and college preparatory studies.

32. Shalhevet seeks to qualify to provide a religious education to children with disabilities. But because California prohibits the use of generally available public funds for children to receive a free appropriate public education (FAPE) at private religious schools, Shalhevet currently cannot qualify to apply for special education funding, including IDEA funding.

33. The Samuel A. Fryer Yavneh Hebrew Academy is a private Orthodox Jewish school in Los Angeles, California. Yavneh offers a co-ed education to students from pre-kindergarten through eighth grade. Yavneh provides a rigorous modern Orthodox education alongside secular studies, enabling its students to flourish as community leaders and model American citizens.

34. Yavneh seeks to qualify to provide a religious education to children with disabilities. But because California prohibits the use of generally available public funds for children to receive a FAPE at private religious schools, Yavneh currently cannot qualify to apply for special education funding, including IDEA funding.

35. Defendant California Department of Education (CDE) is charged with overseeing the implementation and interpretation of California state law that makes up California's IDEA state plan, including the certification of nonpublic schools and the distribution of federal IDEA funds and state special education funds to LEAs.

36. Defendant Tony Thurmond is the State Superintendent of Public Instruction. Thurmond is responsible for overseeing the certification and renewal of nonpublic schools. *See* Cal. Educ. Code § 56366.1. Thurmond is sued in his official capacity only.

37. Defendant Los Angeles Unified School District (LAUSD) is a local educational agency that, under California law, contracts with certified nonpublic schools as possible placements for students with disabilities. *See* Cal. Educ. Code § 56366. Once a student with a disability is placed, LAUSD is responsible for reimbursing the nonpublic school the cost of tuition and special education and related services. *See* Cal. Educ. Code §§ 56365(a), (d), 56366.5(a). LAUSD receives its federal and state special education funding from CDE. *See* 20 U.S.C. § 1413(a).

38. Anthony Aguilar is Chief of Special Education, Equity and Access for LAUSD. The LAUSD's Division of Special Education has the authority to contract for nonpublic services under Cal. Educ. Code § 56366 and Cal. Code Regs. tit. 5, § 3065. Aguilar is responsible for the administration of special education funds within LAUSD. Aguilar is sued in his official capacity only.

# BACKGROUND

## *The Individuals with Disabilities Education Act*

39. The Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.*, was enacted in 1990 and offers federal funding to States to assist in educating children with disabilities.

40. The stated purpose of IDEA is "to ensure that *all* children with disabilities have available to them a free appropriate public education" and "to assist States, localities, educational service agencies, and Federal agencies to provide for the education of *all* children with disabilities." 20 U.S.C. §§ 1400(d)(1)(A), (C) (emphasis added).

41. In exchange for federal funding, a State must comply with a number of statutory conditions, including the requirement to provide a FAPE to all eligible "children with disabilities residing in the State between the ages of 3 and 21, inclusive." 20 U.S.C. § 1412(a)(1)(A).

42. The FAPE must be "provided in conformity with the [student's] individualized education program." 20 U.S.C. § 1401(9)(D). Individualized education programs are typically called IEPs.

43. A student's IEP is "a written statement for each child with a disability" that covers, inter alia, a "child's present levels of academic achievement and functional performance," "a statement of measurable annual goals, including academic and functional goals," and "a statement of the special education and related services and supplementary aids and

services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child." 20 U.S.C. § 1414(d).

44. A student's IEP is prepared with input by teachers, school officials, and a student's parents.

45. IDEA also permits children to receive funding in private schools under certain circumstances.

46. Specifically, the statute provides that:

> Children with disabilities in private schools and facilities are provided special education and related services, in accordance with an individualized education program, at no cost to their parents, if such children are placed in, or referred to, such schools or facilities by the State or appropriate local educational agency as the means of carrying out the [statute's] requirements[.]

20 U.S.C. § 1412(a)(10)(B)(i).

47. The "special education" provided under IDEA "means specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including- (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education." 20 U.S.C. § 1401(29); *see also* 34 C.F.R. 300.39(a) (defining "special education").

48. The "related services" provided under IDEA:

> [M]eans transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school

nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(26)(A); *see also* 34 C.F.R. 300.34(a) (defining "related services").

### *The California Education Code*

49. California, like every State, has chosen to participate in IDEA.

50. Every year, California receives millions of dollars in IDEA funding from the federal government. California supplements these federal funds with state funding for services to children with disabilities.

51. In order to comply with IDEA's requirements and enable California to receive federal funding, California adopted a state plan and enacted a series of statutes and regulations. Cal. Educ. Code §§ 56000 *et seq.*; Cal. Code Regs. tit. 5, §§ 3000 *et seq*.

52. As relevant here, this includes IDEA's requirements to provide a FAPE, and its provision that placement in private school is appropriate "if no appropriate public education program is available." Cal. Educ. Code § 56365(a).

53. When a student is placed in a nonpublic school, public funding reimburses "the full amount of the tuition," as well as the special

education and related services covered by the student's IEP. *See* Cal. Educ. Code § 56365(d); Cal. Educ. Code § 56365(a); Cal. Educ. Code § 56031(a) (defining "[s]pecial education" "in accordance with Section 1401(29) of Title 20 of the United States Code"); Cal. Educ. Code § 56363(a) (defining "'related services' as that term is defined in Section 1401(26) of Title 20 of the United States Code"); *see also* Cal. Educ. Code § 56363(b) (listing included services).

54. However, California's program for placing children in private schools categorically excludes religious schools.

55. To be eligible as a placement for a student with a disability, the CDE must "certify" an applicant school as a nonpublic school. *See* Cal. Educ. Code §§ 56366.1, 56366.8.

56. To meet those certification requirements, California law requires the school to be "nonsectarian." Cal. Educ. Code § 56365.

57. An NPS applicant must therefore "certify" that it is nonsectarian. Cal. Code Regs. tit. 5, § 3060(d)(6).

58. CDE regulations define "[n]onsectarian" as "a private, nonpublic school . . . that is not owned, operated, controlled by, or formally affiliated with a religious group or sect, whatever might be the actual character of the education program or the primary purpose of the facility and whose articles of incorporation and/or by-laws stipulate that the assets of such agency or corporation will not inure to the benefit of a religious group." Cal. Code Regs. tit. 5, § 3001(p).

59. As a result of these requirements, private religious schools are wholly excluded from becoming certified NPS's, meaning that children cannot be placed there as a means of receiving a FAPE, and private religious schools are incapable of receiving the public funding otherwise available to private secular schools.

60. Moreover, in order for students with disabilities to receive a FAPE outside of public school, a private school must meet a number of requirements. *See, e.g.*, Cal. Educ. Code §§ 56365, 56366, 56366.1.

61. Defendants, however, possess discretion to waive or request waiver of requirements necessary for a private school to receive public funds to educate students with disabilities. *See, e.g.*, Cal. Educ. Code § 56366.2(a), (b); Cal. Educ. Code § 56101.

62. But upon information and belief, Defendants have not waived and will not waive the "nonsectarian" requirement necessary for private religious schools to access otherwise generally available public funding.

63. Similarly, the California Education Code allows a nonpublic, nonsectarian school to petition for waiver of requirements to receive funding, but private religious schools cannot. *See, e.g.*, Cal. Educ. Code § 56366.2.

64. California law thus treats comparable secular conduct more favorably than religious conduct, and it allows individualized exemptions for secular private schools but not religious ones.

***Religious Beliefs***

65. Jewish parents have a duty to transmit Jewish religious beliefs and practices to their children.

66. The Torah and the Talmud repeatedly exhort parents to train their children in Jewish religious belief and practice.

67. For example, the Torah instructs "Take to heart these instructions with which I charge you this day. Impress them upon your children. Recite them when you stay at home and when you are away, when you lie down and when you get up." *Deuteronomy* 6:7-8; *see also Deuteronomy* 11:19 ("And you shall teach them to your children—reciting them when you stay at home and when you are away, when you lie down and when you get up").

68. Similarly, the Talmud instructs that parents must teach both Torah and rabbinic writings to their children. *See, e.g.,* Talmud Bavli, *Kiddushin* 29a ("The sages taught a father is obligated . . . to teach his son Torah"); *id*. at 29b ("From where do we know that a father is obligated to teach his son Torah? As it is written, 'and you shall teach them to your children' (*Deuteronomy* 11:19)"); *id*. at 30a (describing the Torah subjects encompassed within this obligation).

69. Likewise, the Jewish Code of Law, the Shulchan Aruch, explains that "there is an obligation upon each person to teach his son Jewish law; if the father does not teach him, the son is obligated to teach himself." Rabbi Joseph Caro, Shulchan Aruch, *Yoreh De'ah* 245:1.

70. As a result, civil courts have long recognized that "[r]eligious education is a matter of central importance in Judaism. . . . [T]he Torah is understood to require Jewish parents to ensure that their children are instructed in the faith." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2065 (2020).

71. The primary goal of Jewish education is the study of Torah. The study of Torah is itself a form of religious worship. *See* Chaim Saiman, *Halakhah: The Rabbinic Idea of Law* 6 (2018) ("For as the Talmud sees it, the study of Torah, a study often centered on picayune particulars of halakhah, is one of the most pristine forms of divine worship").

72. Study of Torah is not simply about the accumulation of knowledge or development of skill: "even if one has retained nothing, the experience itself—live contact with the epiphanous divine will manifested through Torah, and encounter with the divine Presence, which hovers over its student—is immeasurably important." Aharon Lichtenstein, *Study*, *in* 20th Century Jewish Religious Thought 931, 934 (A. Cohen & P. Mendes-Flohr eds., 2009).

73. Thus, "for modern Orthodox Jews, enrolling their children in a dual curriculum Jewish day school is 'virtually mandatory.'" *Westchester Day Sch. v. Vill. of Mamaroneck*, 417 F. Supp. 2d 477, 497 (S.D.N.Y. 2006), *aff'd*, 504 F.3d 338 (2d Cir. 2007); *id.* at 545 ("the religious education of children is in fact central to modern Orthodox Judaism: the religious education of children is a key religious obligation mandated by

the Torah, and for most modern Orthodox Jews, the enrollment of their children in a dual curriculum Jewish school . . . is virtually mandatory").

74. Parent Plaintiffs believe that enrolling their children in Orthodox Jewish schools is a religious obligation and are therefore committed to transmitting their Jewish religious beliefs and practices to their children, including their children with disabilities.

75. For this reason, the Loffmans, Taxons, and Peretses send their school-age non-disabled children to Orthodox Jewish religious schools.

76. The school Plaintiffs are dedicated to the same mission. Shalhevet and Yavneh help parents to meet their obligation to provide Jewish education to their children. Indeed, the inculcation and transmission of Jewish religious beliefs and practices to children is the very reason that Shalhevet and Yavneh exist.

### *The Loffman Family*

77. Plaintiffs Chaya and Jonathan Loffman are devout Orthodox Jews who reside in Los Angeles, California. They have an infant daughter and a four-year-old son, M.L.

78. M.L. currently receives services through Maor Academy, an Orthodox Jewish learning center dedicated to supporting students with disabilities and their families in the Los Angeles Jewish community.

79. At age 3, M.L. was diagnosed with autism after his parents began to notice speech delays.

80. M.L.'s condition means that he qualifies as a child with a disability as defined under 20 U.S.C. § 1401(3)(A)(i) and a child with exceptional needs as defined in Cal. Educ. Code § 56026. He is therefore entitled to receive special education and related services.

81. The Loffmans are Orthodox Jews. In accordance with their sincerely held religious beliefs, the Loffman family strive to observe the laws of *kashrut*, observe Jewish holidays, engage in Orthodox Jewish prayers, and generally carry out the tenets of their faith.

82. The Loffmans also believe that they are obligated to send their children to Orthodox Jewish schools to maintain and strengthen their family's Jewish religious beliefs, culture, and heritage.

83. Consistent with these beliefs, the Loffmans intend to enroll their infant daughter in Orthodox Jewish schools.

84. Due to their sincerely held religious beliefs, the Loffmans also desire to enroll M.L. in an Orthodox Jewish school. They wish for M.L. to receive both a religious and secular education, as well as receive the services necessary to support his disability.

85. The Loffmans therefore enrolled M.L. in pre-school at Yeshiva Toras Emes' pre-school, a Jewish school serving children from preschool to eighth grade.

86. At preschool, M.L. received behavioral, occupational, and speech therapy. Shortly after enrolling, however, the Loffmans were informed

that M.L.'s therapy would not be paid for unless M.L. attended public school and received an IEP.

87. Because the Loffmans wanted him to have an Orthodox Jewish education, they opted to pay out of pocket for M.L.'s costly therapies.

88. The Loffmans were eventually forced to discontinue M.L.'s speech therapy due to the exorbitant costs associated with paying for therapies out of pocket.

89. The Loffmans subsequently enrolled M.L. at Maor Academy, where they continue to pay weekly for his 25 hours of behavior therapy and 1 hour of occupational therapy out of pocket, as well as his tuition.

90. The Loffmans recognize that M.L. might be eligible for more services in public school as part of an IEP, but they have been forced to forgo those services due to California law and Defendants' practices.

### *The Taxon Family*

91. Plaintiffs Fedora Nick and Morris Taxon are devout Orthodox Jews who live in Los Angeles, California. The Taxons have three sons ranging in age from fourteen to twenty: S.T., A.T., and K.T.

92. S.T. and A.T. have attended Orthodox schools for the entirety of their primary education.

93. K.T. is fourteen years old and is currently in eighth grade. K.T. currently attends the City School, a charter school in the LAUSD.

94. At age 2, K.T. was diagnosed with autism, then known as pervasive developmental disorder, which results in pronounced cognitive deficiencies.

95. K.T. first showed signs of autism at 6 months old, when his parents began to notice developmental delays, such as an inability to sit up, walk, and roll over.

96. K.T.'s condition means that he qualifies as a child with a disability as defined under 20 U.S.C. § 1401(3)(A)(i) and a child with exceptional needs as defined in Cal. Educ. Code § 56026. He is therefore entitled to receive special education and related services.

97. The Taxons are Orthodox Jews. In accordance with their sincerely held religious beliefs, the Taxon family strive to observe the laws of *kashrut*, observe Jewish holidays, engage in Orthodox Jewish prayers, and generally carry out the tenets of their faith.

98. The Taxons also believe that they are obligated to send their children to Orthodox Jewish day schools to maintain and strengthen their family's Jewish religious beliefs, culture, and heritage.

99. Consistent with these beliefs, the Taxons sent S.T. and A.T. exclusively to Orthodox Jewish schools.

100. Due to their sincerely held religious beliefs, the Taxons also desire to enroll K.T. in an Orthodox Jewish school, as they have done with K.T.'s siblings. They wish for him to be educated at a school where

he can receive both a religious and secular education, as well as the services necessary to support his disability.

101. As soon as K.T. was in preschool, his parents began to seek out educational opportunities tailored to K.T.'s needs. But the Taxons have been unable to place K.T. in an Orthodox Jewish school due to California's prohibition on using generally available special-education funding at private religious schools.

102. As noted above, California prohibits the certification of religious nonpublic schools, meaning that private religious schools cannot receive public funding and work with the State to provide special-education services.

103. The Taxons are thus unable to utilize funds for K.T. that would otherwise be available to them—unless they decide to forgo a religious education for K.T.

104. The Taxons were therefore forced to enroll K.T. at Vine Elementary School and Melrose Magnet School, both public schools in LAUSD.

105. From kindergarten through eighth grade, K.T. has received a mainstreamed classroom education in public school. While K.T. is currently in the eighth grade, he performs below grade level academically.

106. K.T. has an IEP that includes 9 service providers, including a full-time aide, a supervisor for the aide, speech and occupational

therapists, adaptive physical education, resource specialists for English and math, and a private reading tutor.

107. These services are currently provided through LAUSD.

108. The Taxons do not believe K.T. is receiving a FAPE in public school.

109. K.T.'s faith imposes unique difficulties at his current public school.

110. Because K.T. observes Orthodox Jewish holidays, he fails to receive services not only when the public school is not in session, but also when he misses school for religious observance.

111. His academic development and therapeutic progress have been impacted by these extra absences, which would not occur if he were placed in an Orthodox school.

112. The Taxons must also repeatedly remind the school that K.T. cannot eat non-kosher food.

113. K.T.'s inability to obtain a Jewish education has also affected his other family members, including his older brother A.T.

114. A.T. has noticed that public schools do not fully include K.T. within the school environment, and that without a Jewish education, K.T. is unable to fully participate in many of the religious observances that are important to A.T. and their family.

115. A.T. has championed inclusive education programs for students with disabilities at his own Jewish school. A.T. has often explained that

K.T.'s experiences—as well as his own family's experiences—have inspired his efforts for inclusion.

### The Perets Family

116. Plaintiffs Sarah Perets and Ariel Perets are devout Orthodox Jews and reside in Los Angeles, California. The Peretses have six children ranging in age from two to twenty, including their son N.P.

117. All of the Perets children have attended Orthodox schools for the entirety of their primary education, except for N.P.

118. N.P. is fourteen years old and is currently in seventh grade. N.P. attends Sutter Middle School, a public school in the Los Angeles Unified School District.

119. At age 3, N.P. was diagnosed with autism, and at age 6, he was diagnosed with a WAC gene mutation that results in speech delays, behavioral issues, and learning disabilities.

120. N.P.'s condition means that he qualifies as a child with a disability as defined under 20 U.S.C. § 1401(3)(A)(i) and a child with exceptional needs as defined in Cal. Educ. Code § 56026. He is therefore entitled to receive special education and related services.

121. The Peretses are Orthodox Jews. In accordance with their sincerely held religious beliefs, the Perets family strive to observe the laws of *kashrut*, observe Jewish holidays, engage in Orthodox Jewish prayers, and generally carry out the tenets of their faith.

122. The Peretses also believe that they are obligated to send their children to Orthodox Jewish schools to maintain and strengthen their family's Jewish religious beliefs, culture, and heritage.

123. Consistent with these beliefs, the Peretses have sent their other five children exclusively to Orthodox Jewish schools.

124. Due to their sincerely held religious beliefs, the Peretses also desire to enroll N.P. in an Orthodox Jewish school, as they have done with N.P.'s five non-disabled siblings. They wish for N.P. to receive both a religious and secular education, as well as receive the services necessary to support his disability.

125. But the Peretses have been unable to seek placement for N.P. in an Orthodox Jewish school due to California's prohibition on using generally available special-education funding at private religious schools.

126. As noted above, California prohibits the certification of religious nonpublic schools, meaning that private religious schools cannot receive public funding and work with the State to provide special-education services. The Peretses are thus unable to utilize funds for N.P. that would otherwise be available to them—unless they decide to forgo a religious education for N.P.

127. After his diagnosis, Sarah and Ariel enrolled N.P. in a number of schools in an attempt to find an educational placement that best met N.P.'s needs.

128. They attempted to enroll him in Orthodox Jewish schools such as Emek Hebrew Academy and Adat Ari El, but because the public school district would not pay for his services, the costs of paying for his services out of pocket were prohibitive.

129. The Peretses were therefore forced to enroll N.P. in public school. He currently attends Sutter Middle School, a public middle school, where he has an IEP in place.

130. The Peretses do not believe N.P. is receiving a FAPE in public school.

131. To assist with his delayed speech, N.P. receives limited speech therapy, which is provided by Sutter Middle School.

132. But LAUSD's speech therapists are prohibited from administering therapy involving physical touch, which has slowed N.P.'s speech progression.

133. On information and belief, N.P. could receive prompted speech therapy in private schools.

134. N.P. also has learning disabilities and behavioral issues and is falling behind in his class.

135. Because of N.P.'s disabilities, he was taken off core curriculum after middle school and placed in classes with peers that the Peretses believe operate at a lower level of functioning than N.P.

136. Since N.P. was removed from a mainstream setting, his academic progress and his speech development has regressed.

137. The Peretses believe that the smaller class sizes available in private schools would better meet N.P.'s needs and would enable him to be placed in a classroom with peers who function at a similar level to N.P.

138. Additionally, on two occasions, N.P. was sent home early from school because the school did not have adequate staffing.

139. When Sarah Perets raised her concerns that N.P. was not being appropriately supervised and instructed, she was told by school officials that she should serve as N.P.'s aid.

140. The Peretses do not believe these problems would occur in private school.

141. N.P.'s faith also imposes unique difficulties in public school.

142. Because N.P. observes Orthodox Jewish holidays, he fails to receive services not only when the public school is not in session, but also when he misses school for religious observance.

143. His academic development has been impacted by these absences.

144. The Peretses' observance of Jewish holy days has even led to school officials instructing the Peretses on the right way to observe their religion.

145. On one occasion, a principal confronted Sarah Perets after N.P. missed school to observe Sukkot, a religious holiday spanning seven days. The teacher claimed that, according to an article she read, N.P. could have attended school on certain days during the holiday, and that the Peretses were wrong to have N.P. miss so much instructional time.

146. This interpretation of Sukkot observance is not in accordance with the Peretses' sincerely held religious beliefs, and issues of this nature would not arise if N.P. were placed at an Orthodox school.

147. Additionally, the Peretses must repeatedly remind the school that N.P. cannot eat non-kosher food. Still, teachers have provided non-kosher meals to N.P. despite his parents' pleas.

148. In one instance, a teacher (incorrectly) told Sarah Perets that the pizza was kosher because it was vegetarian.

149. The Peretses would like to send N.P. to an Orthodox Jewish private school that specializes in serving autistic children and aligns with their sincerely held religious beliefs, but they cannot afford to pay for N.P.'s private education out of pocket.

### *The Jean & Jerry Friedman Shalhevet High School*

150. The Jean & Jerry Friedman Shalhevet High School is a private Orthodox Jewish high school in Los Angeles, California. Shalhevet offers a co-educational Modern Orthodox Jewish education with a rigorous dual curriculum of Judaic and college preparatory studies.

151. Shalhevet's mission is to promote the values of Jewish heritage, to live Torah values, to stimulate Torah learning, and to develop a love of, and commitment to, the State of Israel.

152. Shalhevet seeks the opportunity to qualify to provide a distinctively Orthodox Jewish education to children with disabilities.

153. Shalhevet believes that the Torah commands members of the Jewish community to care for the most vulnerable, including those with disabilities. For Shalhevet, this means working to ensure that children who are in need obtain the individualized support that each child requires.

154. In this way, Shalhevet hopes to foster a religious educational environment where Jewish children with disabilities can feel welcomed and included in the Jewish community, as well as receive the best education and services possible.

155. Due to its limited resources, however, Shalhevet cannot welcome all students with disabilities, particularly those with more complex needs.

156. On information and belief, Shalhevet either otherwise meets or is capable of meeting California's other certification requirements to become an NPS.

157. Because it is "formally affiliated with a religious group or sect," Cal. Code Regs. tit. 5, § 3001(p), Shalhevet does not meet California's definition of "nonsectarian."

158. Thus, California law categorically prohibits Shalhevet from becoming certified as a NPS solely because it is religious.

159. As a result, Shalhevet cannot be considered for placement as part of a student's FAPE for the sole reason that it is religious, nor can it receive the reimbursement that would result from such a placement.

160. Because California law prohibits the use of generally available public funds at private religious schools, Shalhevet is currently unable to provide its services and religious education to all children with disabilities.

### The Samuel A. Fryer Yavneh Hebrew Academy

161. The Samuel A. Fryer Yavneh Hebrew Academy is a private Orthodox Jewish day school located in Los Angeles, California. Yavneh offers a co-educational Orthodox Jewish education for students from early childhood through eighth grade.

162. Yavneh is committed to the pursuit of knowledge, intellectual honesty, and scholarship. It seeks to foster in its students a passion for Torah, learning, hard work, joy, a respect for tradition, and a desire to be positive members of the community.

163. Yavneh also seeks to create an inclusive learning community where all students thrive. To that end, Yavneh strives to provide testing accommodations, small-group learning settings, behavioral specialists, assistive technology, and other resources and tools that will facilitate a child's educational progress.

164. Due to its limited resources, however, Yavneh cannot welcome all students with disabilities, particularly those with more complex needs.

165. In order to foster opportunities for the greatest number of students possible, Yavneh seeks the ability to qualify as a certified NPS.

166. On information and belief, Yavneh either otherwise meets or is capable of meeting California's other certification requirements to become an NPS.

167. Because it is "formally affiliated with a religious group or sect," Cal. Code Regs. tit. 5, § 3001(p), Yavneh does not meet California's definition of "nonsectarian."

168. Thus, California law categorically prohibits Yavneh from becoming certified as a NPS solely because it is religious.

169. As a result, Yavneh cannot be considered for placement as part of a student's FAPE for the sole reason that it is religious, nor can it receive the reimbursement that would result from such a placement.

170. Because California law prohibits the use of generally available public funds at private religious schools, Yavneh is currently unable to provide its services and religious education to all children with disabilities.

## CLAIMS FOR RELIEF

### Count I
### Violation of U.S. Const. Amend. I:
### Free Exercise Clause Categorical Exclusion from Otherwise Available Government Benefits

171. All preceding paragraphs are realleged and incorporated herein by reference.

172. The Free Exercise Clause of the First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

173. The Free Exercise Clause applies to states and their subdivisions and municipalities through the Fourteenth Amendment to the U.S. Constitution.

174. Under the Free Exercise Clause, imposing "special disabilities on the basis of religious views or religious status" triggers strict scrutiny. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019-21 (2017).

175. Thus, a "categorical ban" excluding religious entities from generally available state benefits solely because of an organization's religious character is unconstitutional unless the government can satisfy strict scrutiny. *Espinoza*, 140 S. Ct. at 2261. This is because "religious schools and the families whose children attend them" "are members of the community too, and their exclusion from [government benefit] program[s] is odious to our Constitution and cannot stand." *Id*. at 2261-63 (cleaned up).

176. Here, Parent Plaintiffs sincerely believe that sending their children to Orthodox Jewish schools is crucial to express and maintain their religious beliefs, heritage, and identity.

177. Similarly, Shalhevet's and Yavneh's religious beliefs and identity permeate their entire school and mission.

178. California Education Code §§ 56361 and 56365 violate Parent Plaintiffs' right to free exercise of religion by categorically "exclud[ing] some members of the community from an otherwise generally available public benefit because of their religious exercise." *Carson v. Makin*, 142 S. Ct. 1987, 1998 (2022).

179. California Education Code §§ 56361 and 56365 similarly require Shalhevet and Yavneh to choose between exercising their religious beliefs and the receipt of crucial funding needed to educate students with disabilities.

180. California Education Code §§ 56361 and 56365's prohibition against granting funding to any religious school as a means of providing a FAPE, and an LEA's refusal to contract with such school to provide these services, is "discrimination against religion" because "[t]he State [provides funding] for certain students at private schools—so long as the schools are not religious." *Carson*, 142 S. Ct. at 1998.

181. Categorically excluding schools because of their religious exercise furthers no governmental interest.

182. The discrimination against religious schools is not the least restrictive means of furthering a compelling governmental interest.

183. Plaintiffs have suffered and will suffer harm absent relief.

**Count II**
**Violation of U.S. Const. Amend. I:**
**Free Exercise Clause Categorical Exemptions**

184. All preceding paragraphs are realleged and incorporated herein by reference.

185. State action "burdening religious practice must be of general applicability." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993).

186. A law is not generally applicable if it treats "*any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam); *see also Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021); *Lukumi*, 508 U.S. at 542-46.

187. Under this rule, California's Education Code's exclusion of private religious schools from public funds is not generally applicable.

188. The California Education Code provides that nonsectarian private schools may receive public funding to provide a special education and related services to students with disabilities while their religious counterparts may not.

189. Additionally, while nonsectarian private schools may petition for the waiver of certain statutory requirements, private religious schools may not. By its very terms, a religious school cannot even apply for a waiver, as only "nonsectarian school[s]" may petition for a waiver. *See, e.g.*, Cal. Educ. Code § 56366.2(a).

190. Thus, California law treats "comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296.

191. The California Education Code is therefore subject to strict scrutiny, requiring the State to have a compelling interest in discriminating against religious schools in the NPS process, and this policy must be the least-restrictive means of achieving that end. *Lukumi*, 508 U.S. at 531-32.

192. Conditioning access to government funding on a school's "nonsectarian" status furthers no governmental interest.

193. Conditioning petitions for waivers of statutory requirements on a school's "nonsectarian" status furthers no governmental interest.

194. The discrimination against religious schools is not the least restrictive means of furthering a compelling governmental interest.

195. Plaintiffs have suffered and will suffer harm absent relief.

### Count III
### Violation of U.S. Const. Amend. I:
### Free Exercise Clause Individualized Exemptions

196. All preceding paragraphs are realleged and incorporated herein by reference.

197. State action "burdening religious practice must be of general applicability." *Lukumi*, 508 U.S. at 542.

198. A law is not generally applicable if it allows for "individualized exemptions." *Id.* at 537; *see also Fulton*, 141 S. Ct. at 1876-77.

199. Under the California Education Code, Defendants possess discretion under the law to make individualized exemptions because they can waive one or more of the requirements necessary for a private school to receive public funds to educate students with disabilities. Cal. Educ. Code § 56366.2(a), (b).

200. Yet, upon information and belief, Defendants have refused to waive the "nonsectarian" requirement for the NPS process.

201. Defendants' actions thus trigger strict scrutiny, requiring Defendants to have a compelling interest in discriminating against religious schools, and this policy must be the least-restrictive means of achieving that end. *Lukumi*, 508 U.S. at 531-32.

202. Conditioning access to government funding on a school's "nonsectarian" status furthers no governmental interest.

203. The discrimination against religious schools is not the least restrictive means of furthering a compelling governmental interest.

204. Plaintiffs have suffered and will suffer harm absent relief.

**Count IV**
**Violation of U.S. Const. Amend. XIV:**
**Equal Protection Discrimination Based on Religion**

205. All preceding paragraphs are realleged and incorporated herein by reference.

206. California's Education Code prohibits Plaintiffs from utilizing generally available, public funds to send their children to private

religious schools merely because those schools are religious. That prohibition denies Plaintiffs equal protection.

207. Defendants do not have a compelling interest in discriminating on the basis of religion and denying Plaintiffs equal protection.

208. Defendant's religious discrimination is not the least restrictive means to further any governmental interest.

209. Plaintiffs have suffered and will suffer harm absent relief.

**Count V**
**Violation of U.S. Const. Amend. I:**
**Free Exercise Clause Unconstitutional Conditions**

210. All preceding paragraphs are realleged and incorporated herein by reference.

211. The "unconstitutional conditions doctrine . . . vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).

212. "The 'unconstitutional conditions' doctrine limits the government's ability to exact waivers of rights as a condition of benefits, even when those benefits are fully discretionary." *United States v. Scott*, 450 F.3d 863, 866 (9th Cir. 2006) (citations omitted); *see also Koontz*, 570 U.S. at 608 ("[W]e have repeatedly rejected the argument that if the government need not confer a benefit at all, it can withhold the benefit because someone refuses to give up constitutional rights." (citations omitted)).

213. In order to participate in California's special education regime (including contracting with an LEA), private religious schools must give up their religious identity and certify themselves as "nonsectarian" in order to participate.

214. Such a requirement violates the unconstitutional conditions doctrine.

215. Plaintiffs have suffered and will suffer harm absent relief.

**Count VI**
**Violation of U.S. Const. Amend. I:**
**Free Exercise Clause Right to Religious Education**

216. All preceding paragraphs are realleged and incorporated herein by reference.

217. "[T]he traditional interest of parents with respect to the religious upbringing of their children" is a "fundamental right[] and interest[]" and is "specifically protected by the Free Exercise Clause of the First Amendment." *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972); see also *Emp. Div. v. Smith*, 494 U.S. 872, 881 (1990) ("the right of parents . . . to direct the education of their children" receives heightened scrutiny) (citing *Yoder* and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925)).

218. Government actions that interfere with parents' ability to direct the religious upbringing of their children are subject to strict scrutiny. *Yoder*, 406 U.S. at 214 (when government action "interferes with the practice of a legitimate religious belief, . . . the State [must] not deny the free exercise of religious belief by its requirement" or the State must

demonstrate an "interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause").

219. By prohibiting the use of otherwise generally available public funding for special-education services at religious schools and refusing to contract with such schools, Defendants have interfered with Plaintiffs' right to direct the religious upbringing of their children and the vital role that religious schools such as Shalhevet and Yavneh "play in the continued survival of [Orthodox Jewish] communities." *Yoder*, 406 U.S. at 235.

220. Without that otherwise available funding, Plaintiffs are unable to send their children to religious schools or offer their religious curriculum to children with disabilities.

221. Defendants do not have a compelling reason for its actions, and Defendants have not selected the means least restrictive of religious exercise in order to further a compelling governmental interest.

222. Plaintiffs have suffered and will suffer harm absent relief.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs request that the Court:

a. Declare that the California Education Code's prohibition on providing funding to "nonsectarian" schools violates the Free Exercise Clause of the First Amendment to the United States Constitution;

b. Declare that the California Education Code's prohibition on providing funding to "nonsectarian" schools violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

c. Declare that the California Education Code's prohibition on providing funding to "nonsectarian" schools is unconstitutional both on its face and as applied to Plaintiffs.

d. Issue preliminary and permanent injunctive relief prohibiting Defendants from excluding religious schools from eligibility as nonpublic schools and denying religious options to students for purposes of receiving generally available public funds;

e. Issue preliminary and permanent injunctive relief prohibiting Defendants from requiring schools seeking NPS status to indicate whether they have a religious affiliation or not;

f. Award actual damages in an amount to be determined;

g. Award nominal damages;

h. Award Plaintiffs reasonable attorney's fees and costs; and

i. Award all such other relief as the Court may deem proper.

## **JURY DEMAND**

Plaintiffs request a trial by jury on all issues so triable.

Dated: March 13, 2023

Respectfully submitted,

/s/ *Eric C. Rassbach*
Eric C. Rassbach (CA SBN 288041)
Daniel L. Chen (CA SBN 312576)
Laura Wolk Slavis (DC Bar No. 1643193)
  (pending *pro hac vice* admission)
Brandon L. Winchel* (CA SBN 344719)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave., Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax
erassbach@becketlaw.org

* Not a member of the D.C. Bar; admitted in California. Practice limited to cases in federal court.

*Attorneys for Plaintiffs*