Eric C. Rassbach (CA SBN 288041)
erassbach@becketlaw.org
Daniel L. Chen (CA SBN 312576)
Laura Wolk Slavis (DC Bar No. 1643193)
Brandon L. Winchel* (CA SBN 344719)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave., Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAYA LOFFMAN and JONATHAN LOFFMAN, on their own behalf and on behalf of their minor child M.L.; FEDORA NICK and MORRIS TAXON, on their own behalf and on behalf of their minor child K.T.; SARAH PERETS and ARIEL PERETS, on their own behalf and on behalf of their minor child N.P.; JEAN & JERRY FRIEDMAN SHALHEVET HIGH SCHOOL; and SAMUEL A. FRYER YAVNEH HEBREW ACADEMY,<br><br>        Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF EDUCATION; TONY THURMOND, in his official capacity as Superintendent of Public Instruction; LOS ANGELES UNIFIED SCHOOL DISTRICT; and ANTHONY AGUILAR, in his official capacity as Chief of Special Education, Equity, and Access,<br><br>        Defendants. | Case No.:<br>2:23-cv-01832-JLS-MRW<br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: July 21, 2023<br>Time: 10:30 AM<br>Courtroom: 8A<br>Judge: Hon. Josephine L. Staton |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .............................................................................................iii

INTRODUCTION................................................................................................................1

FACTUAL AND LEGAL BACKGROUND .......................................................................2

   A. The Individuals with Disabilities Education Act .................................................2

   B. California's special-education regime ...................................................................4

   C. Parent Plaintiffs' attempts to obtain a religious education for their
      Plaintiff children with disabilities..........................................................................7

   D. School Plaintiffs' attempts to support students with disabilities ......................11

   E. This lawsuit .........................................................................................................12

STANDARD OF REVIEW ...............................................................................................12

ARGUMENT .....................................................................................................................13

   I.     California's nonsectarian requirement violates the First Amendment. ........13

       A. California's nonsectarian restriction violates the Free Exercise
          Clause by excluding individuals and institutions from
          a public benefit solely because they are religious. ..................................14

       B. California's nonsectarian requirement violates the First
          Amendment because it is not generally applicable.................................17

       C. California's restriction fails strict scrutiny .............................................19

   II.    California's nonsectarian requirement imposes an
       unconstitutional condition..................................................................................20

   III.   Plaintiffs easily satisfy the remaining preliminary injunction factors. .........21

CONCLUSION ..................................................................................................................24

CERTIFICATE OF SERVICE.......................................................................25

CERTIFICATE OF COMPLIANCE ...........................................................26

EXHIBITS

Exhibit 1: Loffman Declaration

Exhibit 2: Perets Declaration

Exhibit 3: Nick Declaration

Exhibit 4: Rabbi Block Declaration

Exhibit 5: Rabbi Einhorn Declaration

Exhibit 6: Shuchatowitz Declaration

Exhibit 7: Dr. Nagel Declaration

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011)................................................................. 12

*Associated Press v. Otter*,
    682 F.3d 821 (9th Cir. 2012).................................................................. 22

*Brown v. Cal. Dep't of Transp.*,
    321 F.3d 1217 (9th Cir. 2003)................................................................ 22

*Cal. Chamber of Com. v. Council for Educ. and Rsch. on Toxics*,
    29 F.4th 468 (9th Cir. 2022).................................................................. 22

*Calvary Chapel Dayton Valley v. Sisolak*,
    982 F.3d 1228 (9th Cir. 2020)........................................................... 13, 19

*Carson v. Makin*,
    142 S. Ct. 1987 (2022) ..................................................................*passim*

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ...................................................................... 13, 15

*City of Boerne v. Flores*,
    521 U.S. 507 (1997) ............................................................................ 19

*Cmty. House, Inc. v. City of Boise*,
    490 F.3d 1041 (9th Cir. 2007)................................................................ 23

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
    321 F.3d 878 (9th Cir. 2003).................................................................. 23

*Dahl v. Bd. of Trs.*,
    15 F.4th 728 (6th Cir. 2021).................................................................. 18

*Doe v. Harris*,
    772 F.3d 563 (9th Cir. 2014)............................................................ 22, 23

*Emp't Div. v. Smith*,
    494 U.S. 872 (1990) ............................................................................ 18

*Espinoza v. Mont. Dep't of Revenue,*
   140 S. Ct. 2246 (2020) .................................................................. 15, 16, 20

*Everson v. Bd. of Educ.,*
   330 U.S. 1 (1947) ...................................................................................... 15

*Foothill Church v. Watanabe,*
   2022 WL 3684900 (E.D. Cal. Aug. 25, 2022) ......................................... 19

*Fulton v. City of Philadelphia,*
   141 S. Ct. 1868 (2021) ..................................................... 14, 17, 18, 19

*Honig v. Doe,*
   484 U.S. 305 (1988) ................................................................................... 3

*Johnson v. Couturier,*
   572 F.3d 1067 (9th Cir. 2009) ................................................................ 12

*Kennedy v. Bremerton Sch. Dist.,*
   142 S. Ct. 2407 (2022) ....................................................................... 17, 19

*Klein v. City of San Clemente,*
   584 F.3d 1196 (9th Cir. 2009) ........................................................... 12, 22

*Koontz v. St. Johns River Water Mgmt. Dist.,*
   570 U.S. 595 (2013) ............................................................................ 20-21

*Kreisner v. City of San Diego,*
   1 F.3d 775 (9th Cir. 1993) ...................................................................... 20

*L.A. Cnty. Off. of Educ. v. C.M.,*
   2011 WL 1584314 (C.D. Cal. Apr. 22, 2011) ......................................... 4

*McDaniel v. Paty,*
   435 U.S. 618 (1978) ........................................................................... 15, 16

*Melendres v. Arpaio,*
   695 F.3d 990 (9th Cir. 2012) .................................................................. 23

*Rubin ex rel. NLRB v. Vista Del Sol Health Servs. Inc.,*
   80 F. Supp. 3d 1058 (C.D. Cal. 2015) .................................................. 12

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
  140 S. Ct. 2049 (2020) ...................................................................................... 7

*Porretti v. Dzurenda,*
  11 F.4th 1037 (9th Cir. 2021) ......................................................................... 23

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
  141 S. Ct. 63 (2020) ........................................................................................ 22

*Sherbert v. Verner,*
  374 U.S. 398 (1963) ................................................................................. 13, 18

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
  582 U.S. 449 (2017) .................................................................................. *passim*

*United States v. Scott,*
  450 F.3d 863 (9th Cir. 2006) .......................................................................... 21

*Warsoldier v. Woodford,*
  418 F.3d 989 (9th Cir. 2005) ............................................................... 12-13, 22

*Westchester Day Sch. v. Vill. of Mamaroneck,*
  417 F. Supp. 2d 477 (S.D.N.Y. 2006) .............................................................. 7

*Zelman v. Simmons-Harris,*
  536 U.S. 639 (2002) ........................................................................................ 20

**Statutes**

20 U.S.C. § 1400 ............................................................................................. 2, 3

20 U.S.C. § 1401 ................................................................................................. 3

20 U.S.C. § 1412 ............................................................................................. 4, 5

20 U.S.C. § 1413 ................................................................................................. 4

20 U.S.C. § 1414 ................................................................................................. 3

Cal. Educ. Code § 56028.5 ................................................................................. 7

Cal. Educ. Code § 56031 ..................................................................................... 5

Cal. Educ. Code § 56034 ..................................................................................... 5

Cal. Educ. Code § 56040 ............................................................................... 4

Cal. Educ. Code § 56101 ...................................................................... 6, 7, 19

Cal. Educ. Code § 56363 ............................................................................... 5

Cal. Educ. Code § 56365 .............................................................. 5, 6, 18, 24

Cal. Educ. Code § 56366 ......................................................................... 5, 24

Cal. Educ. Code § 56366.1 ....................................................................... 5, 6

Cal. Educ. Code § 56366.2 ..................................................................... 6, 19

Cal. Educ. Code § 56366.4 ........................................................................... 6

Cal. Educ. Code § 56366.8 ........................................................................... 5

Cal. Educ. Code § 56505.2 ........................................................................... 5

**Other Authorities**

34 C.F.R. § 300.34 ....................................................................................... 3

34 C.F.R. § 300.39 ....................................................................................... 3

34 C.F.R. § 300.146 ..................................................................................... 4

Cal. Code Regs. tit. 5, § 3001 ............................................................... 6, 16

Cal. Code Regs. tit. 5, § 3060 ............................................................... 6, 18

*Deuteronomy* ......................................................................................... 7, 8

Fed. R. Civ. P. 65(c) ................................................................................. 24

Rabbi Joseph Caro, Shulchan Aruch, *Yoreh De'ah* 245:1 ........................... 8

Talmud Bavli, *Kiddushin* ............................................................................ 8

**INTRODUCTION**

This case poses a very simple question: May the government exclude religious individuals and institutions from a public benefit for no other reason than that they are religious? The Supreme Court has recently and repeatedly answered that question in the negative, holding in *Carson v. Makin*, *Espinoza v. Montana Department of Revenue*, and *Trinity Lutheran v. Comer* that "the exclusion of [a religious party] from a public benefit for which it is otherwise qualified, solely because it is [religious], is odious to our Constitution." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 467 (2017).

The Supreme Court's answer is both the beginning and the end of this case. Under California's implementation of the Individuals with Disabilities Education Act, all private schools who meet certain eligibility criteria may become certified to receive children with disabilities as alternatives to a public school education—but only so long as they are "nonsectarian." But binding Supreme Court precedent declares such a restriction to be a clear-cut violation of the First Amendment, functioning to coerce religious individuals and schools into choosing between their faith and a public benefit to which they would otherwise be entitled.

This is precisely the effect that California's "nonsectarian" restriction has had on Plaintiffs. Plaintiffs are Orthodox Jewish parents and their children with disabilities who seek placement in Jewish schools, as well as two Orthodox Jewish schools who wish to explore becoming certified for such placements. Plaintiffs hold the sincere religious conviction that providing a religious education to children with disabilities is imperative, just as it is for nondisabled children. Yet California's regime forces Jewish

parents to the choice of either following their faith or self-funding the often exorbitant costs of the tools and services needed to allow their children with disabilities to thrive. If they cannot absorb these costs, day by day and year by year, their children are irreparably deprived of a religious education. And if they can somehow manage the burden, they must labor under a unique penalty imposed on them by the government solely because they have chosen to exercise their faith. Meanwhile, the Orthodox Jewish schools who feel compelled by faith to explore certification are told in no uncertain terms by the government that, because they are religious, they need not apply.

California's explicit discrimination toward religious families and schools simply cannot be reconciled with the First Amendment and Supreme Court precedent. This Court should grant a preliminary injunction against California's constitutional violation, allowing parent Plaintiffs to obtain the religious education their Plaintiff children with disabilities deserve, and Plaintiff schools the right to serve them.

## FACTUAL AND LEGAL BACKGROUND

### A. The Individuals with Disabilities Education Act

Congress passed the Individuals with Disabilities Education Act (IDEA) in 1990 as part of our "national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." 20 U.S.C. § 1400(c)(1). Building off the 1975 Education for All Handicapped Children Act, IDEA served as the latest in a twenty-five-year-long legislative effort to strengthen programs that would "provide for the education of all children with disabilities" and eradicate the historical discrimination preventing children with disabilities from receiving a mainstream education—or any education at all. *See* 20 U.S.C. § 1400(c)(2),

(d)(1)(C). To achieve these goals, IDEA offers federal funding to States under the expectation that such funding will be used to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." *Id.* § 1400(d)(1)(A).

Part B of IDEA concerns the provision of this substantive right to a free and appropriate public education (FAPE) to school-aged children with disabilities. The FAPE, in turn, is guaranteed in large part through the provision of an "individualized education program," 20 U.S.C. § 1401(9)(D), which is called an IEP. A student's IEP is "a written statement for each child with a disability" that covers, *inter alia*, a "child's present levels of academic achievement and functional performance," "a statement of measurable annual goals, including academic and functional goals," and "a statement of the special education and related services and supplementary aids and services . . . to be provided to the child, or on behalf of the child." 20 U.S.C. § 1414(d); *see* 20 U.S.C. § 1401(29); 34 C.F.R. § 300.39(a) (2006) (defining "special education"); 20 U.S.C. § 1401(26)(A); 34 C.F.R. § 300.34(a) (2006) (defining "related services"). A student's IEP is prepared with input by her parents, teachers, and school officials, and has been described by the Supreme Court as "the centerpiece of the statute's education delivery system for disabled children." *Honig v. Doe*, 484 U.S. 305, 311 (1988).

As the FAPE acronym implies, students typically receive a FAPE (and therefore also an IEP) in a public school. However, IDEA explicitly contemplates instances where a FAPE can—and must—be provided in private schools. Specifically, the statute states: "Children with disabilities in private schools and facilities are provided special

education and related services, in accordance with an individualized education program, at no cost to their parents, if such children are placed in, or referred to, such schools or facilities by the State or appropriate local educational agency as the means of carrying out the [statute's] requirements[.]" 20 U.S.C. § 1412(a)(10)(B)(i). In those instances, IDEA requires the state education agency to ensure such children "ha[ve] all of the rights of a child with a disability who is served by a public agency," including the provision of an IEP and special education and related services "[a]t no cost to the parents." 34 C.F.R. § 300.146 (2017).

**B. California's special-education regime**

California, like every other State, has chosen to participate in IDEA. It therefore "submit[ted] a plan that provides assurances to the Secretary" that IDEA's requirements will be met, including the requirement to provide a FAPE to all eligible "children with disabilities residing in the State between the ages of 3 and 21, inclusive." 20 U.S.C. § 1412(a)(1)(A). IDEA then charges the "state education agency" with ensuring IDEA compliance at the state level, including through assurances that local educational agencies (LEAs) comply with IDEA. *See* 20 U.S.C. §§ 1412(a)(11)(A), 1413(a). In California, that responsibility lies with the California Department of Education (CDE), which also "administer[s] funds to the local [education] agencies." *L.A. Cnty. Off. of Educ. v. C.M.*, 2011 WL 1584314 (C.D. Cal. Apr. 22, 2011). In return for these assurances, California receives millions of dollars in IDEA Part B funding every year to supplement its state special-education funding.

Consistent with IDEA's requirements, California law guarantees the substantive right to a FAPE for all eligible students. Cal. Educ. Code § 56040. And like IDEA, it

1  acknowledges that placement in a "nonpublic school" (NPS) is appropriate "if no

2  appropriate public education program is available." Cal. Educ. Code § 56365(a). Thus,

3  in appropriate circumstances, students may be placed in an NPS "pursuant to an

4  individualized education program." Cal. Educ. Code § 56034. Students can be placed

5  in an NPS located either in California or in other States, so long as the NPS meets all

6  state-law requirements. *See* Cal. Educ. Code § 56365(f)-(i).

7      NPS placement is facilitated via a "master contract" between the NPS and a LEA

8  such as LAUSD. Cal. Educ. Code § 56366(a). This master contract governs a host of

9  procedural and substantive requirements to which the NPS and LEA must adhere,

10  including "an individual services agreement for each pupil placed by a local educational

11  agency." *Id.* § 56366(a)(2)(A). Once placed, and in keeping with IDEA's clear

12  instruction that students placed in NPS's receive services "at no cost to their parents,"

13  20 U.S.C. § 1412(a)(10)(B)(i), California requires the LEA to use public funding to

14  reimburse "the full amount of the tuition" for NPS students, as well as the special

15  education and related services covered by the student's IEP, Cal. Educ. Code

16  § 56365(a), (d); *see also* Cal. Educ. Code § 56031(a) (defining special education); Cal.

17  Educ. Code § 56363(a) (defining related services); Cal. Educ. Code § 56363(b) (listing

18  included services).

19      However, though IDEA places no restriction on the types of private schools in which

20  students may be placed, California's program categorically deems all religious schools

21  ineligible for such placement. Under California law, students cannot be placed in a NPS

22  "if the school . . . has not been certified" by the CDE and the Superintendent. Cal. Educ.

23  Code § 56505.2(a); *see also* Cal. Educ. Code §§ 56366.1, 56366.8. But California will

only consider the certification of schools that are "nonsectarian." *See, e.g.*, Cal. Educ. Code § 56365. CDE regulations define "nonsectarian" as "a private, nonpublic school . . . that is not owned, operated, controlled by, or formally affiliated with a religious group or sect, whatever might be the actual character of the education program or the primary purpose of the facility and whose articles of incorporation and/or by-laws stipulate that the assets of such agency or corporation will not inure to the benefit of a religious group." Cal. Code Regs. tit. 5, § 3001(p). Consistent with these regulations, the application to become a "nonpublic, nonsectarian school" requires the applicant to "submit a signed assurance statement that the nonpublic school will maintain compliance with . . . [n]onsectarian status (as defined by 5 CCR § 3001(p)[.]" Ex. 6 (Shuchatowitz Decl.), Ex. A at 13; *see also* Cal. Code Regs. tit. 5, § 3060(d)(6) (containing the same requirement). The "Superintendent may revoke or suspend the certification of a nonpublic, nonsectarian school" for failing to meet this requirement. Shuchatowitz Decl. Ex. A at 22; Cal Educ. Code § 56366.4(a)(1). As a result of this "nonsectarian" requirement, private religious schools are wholly excluded from becoming a certified NPS, and children cannot be placed at such schools as a means of receiving a FAPE.

An NPS applicant is incapable of petitioning for a waiver of the nonsectarian status. *See* Cal. Educ. Code § 56366.2 (permitting waiver of certain requirements, but not the certification requirements contained in § 56366.1). However, an LEA like LAUSD may do so. Under Section 56366.2(b), certification requirements may be waived if "approved by the board pursuant to Section 56101." Cal. Educ. Code § 56366.2(b). Section 56101 in turn permits a "public agency" to "request the board to grant a waiver

of any provision of this code or regulations adopted pursuant to that provision if the waiver is necessary or beneficial to the content and implementation of the pupil's individualized education program and does not abrogate any right provided individuals with exceptional needs and their parents or guardians under [IDEA]." *Id.* § 56101(a). The definition of "public agency" includes "special education local plan area[s]" like LAUSD. *Id.* § 56028.5.

**C. Parent Plaintiffs' attempts to obtain a religious education for their Plaintiff children with disabilities**

Civil courts have long recognized that "[r]eligious education is a matter of central importance in Judaism." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2065 (2020). Indeed, "for modern Orthodox Jews, enrolling their children in a dual curriculum Jewish day school is 'virtually mandatory.'" *Westchester Day Sch. v. Vill. of Mamaroneck*, 417 F. Supp. 2d 477, 497 (S.D.N.Y. 2006). This is because the Torah, the Talmud, and the *Shulchan Aruch* (the Jewish Code of Law) repeatedly exhort parents to train their children in Jewish religious belief and practice. Ex. 1 (Loffman Decl.) ¶¶ 5-8; Ex. 2 (Perets Decl.) ¶¶ 5-8; Ex. 3 (Nick Decl.) ¶¶ 5-8; *Our Lady*, 140 S. Ct. at 2065.

For example, the Torah instructs, "Take to heart these instructions with which I charge you this day. Impress them upon your children. Recite them when you stay at home and when you are away, when you lie down and when you get up." *Deuteronomy* 6:7-8; *see also Deuteronomy* 11:19 ("And you shall teach them to your children—reciting them when you stay at home and when you are away, when you lie down and when you get up."). The Talmud instructs that parents must teach both Torah and

rabbinic writings to their children. *See*, *e.g.*, Talmud Bavli, *Kiddushin* 29a ("The sages taught a father is obligated . . . to teach his son Torah."); *id.* at 29b ("From where do we know that a father is obligated to teach his son Torah? As it is written, 'and you shall teach them to your children'" (quoting (*Deuteronomy* 11:19)); *id.* at 30a (describing the Torah subjects encompassed within this obligation). And the *Shulchan Aruch* explains that "there is an obligation upon each person to teach his son Jewish law; if the father does not teach him, the son is obligated to teach himself." Rabbi Joseph Caro, Shulchan Aruch, *Yoreh De'ah* 245:1.

The primary goal of Jewish education is the study of Torah, which is itself a form of religious worship. *See* Ex. 4 (Block Decl.) ¶ 4; Ex. 5 (Einhorn Decl.) ¶ 4. When engaged in study of Torah, students concern themselves with more than the accumulation of knowledge or development of skill; rather, study of Torah is about "live contact with the epiphanous divine will manifested through Torah, and encounter with the divine Presence, which hovers over its student." Block Decl. ¶ 5; Einhorn Decl. ¶ 5.

Parent Plaintiffs Chaya and Jonathan Loffman, Fedora Nick and Morris Taxon, and Sarah and Ariel Perets are Orthodox Jews who sincerely believe that the Torah, Talmud, and the *Shulchan Aruch* obligate them to send their children to Orthodox Jewish schools, where they can receive an education both in secular subjects and in the faith. Loffman Decl. ¶¶ 4-9; Nick Decl. ¶¶ 4-9; Perets Decl. ¶¶ 4-9. Parent Plaintiffs each have multiple children, one of whom has a disability and is a Plaintiff. Loffman Decl. ¶¶ 2, 10; Nick Decl. ¶¶ 2, 12; Perets Decl. ¶¶ 2, 12. But though parent Plaintiffs have been able to fulfill their religious obligation to provide a Jewish education to their nondisabled children, California's nonsectarian prohibition has forced them to make a

choice between exercising their religion and accessing critical funding needed to provide adequate services to their children with disabilities. This Hobson's choice has long-term negative developmental and psychological effects on Jewish children, as well as their families and their community. Ex. 7 (Nagel Decl.) ¶¶ 4-11.

*The Loffmans.* The Loffmans have two children, including their four-year-old son Plaintiff M.L., who was diagnosed with autism at age 3. Loffman Decl. ¶¶ 2, 10. M.L. requires many costly services, including speech, occupational, and behavioral therapies. *Id.* ¶ 11. After his diagnosis, the Loffmans enrolled M.L. in an Orthodox Jewish preschool, where they hoped he would receive an education "that nourished his Jewish faith while also providing the support necessary for him to progress developmentally." *Id.* ¶ 12. Soon after, the Loffmans learned that due to California's nonsectarian restriction, they would be responsible for the full cost of M.L.'s services if he remained in an Orthodox Jewish school. *Id.* ¶¶ 13-16. Put to the "stark choice" between exercising their religion and receiving crucial special-education funding, *id.* ¶ 17, the Loffmans made the "difficult decision" to keep M.L. enrolled at an Orthodox Jewish school "at considerable personal cost." *Id.* ¶¶ 10,18. They are therefore responsible for paying for M.L.'s 25 hours of weekly therapy and were even forced to discontinue his speech therapy "solely due to financial strain." *Id.* ¶ 21.

*The Taxons.* The Taxons have three children, including their 14-year-old son Plaintiff K.T., who was diagnosed with autism around age 2. Nick Decl. ¶¶ 2, 12. Consistent with their religious beliefs, the Taxons sent their two nondisabled children exclusively to Orthodox Jewish schools. *Id.* ¶ 10. The Taxons wished for K.T. "to have the same educational and religious opportunities as his brothers," *id.* ¶ 14, but the

nonsectarian requirement forced the Taxons not to follow their beliefs as to K.T. because they could not afford to fund all of his services themselves, *id.* ¶¶ 14-18. Thus, unlike their other two children, "who have been educated exclusively at Orthodox Jewish schools, K.T. has been educated exclusively at public schools." *Id.* ¶ 19.

The Taxons do not believe K.T. is receiving a FAPE in public school, but that he would receive one in an Orthodox Jewish school. *Id.* ¶ 21. K.T. misses out on needed special education and related services both for secular and religious holidays and is repeatedly served nonkosher food. *Id.* ¶¶ 21-25. But California's law prohibits them from advocating for placement in an Orthodox Jewish school, and thus they must continue not to follow their religious beliefs for him to receive needed funding. *Id.* ¶ 25. Every day K.T. spends in public school is a lost opportunity to receive the religious education and disability services his parents believe are necessary to his faith. *Id.* ¶ 26.

*The Peretses.* The Peretses have six children, including their 14-year-old son Plaintiff N.P., who was diagnosed with autism at age 3 and a WAC gene mutation at age 6. Perets Decl. ¶¶ 2, 12. Consistent with their religious beliefs, the Peretses sent their five nondisabled children exclusively to Orthodox Jewish schools. *Id.* ¶ 10. But like the Taxons, the Peretses have been prevented from following those beliefs with respect to N.P., because they cannot afford the cost of providing for his special education and related services without California's funding. *Id.* ¶¶ 13-19. Thus, unlike his five siblings, N.P. has received an education mainly in public school. *Id.* ¶ 19.

The Peretses do not believe that N.P. is receiving a FAPE in public school, but that he would receive one in an Orthodox Jewish school. *Id.* ¶ 21. N.P. misses out on special education and related services both for secular and religious holidays and is repeatedly

given nonkosher food to eat. *Id.* ¶¶ 22-25. School officials have even explicitly questioned the Peretses' interpretation of Jewish law, instructing them to send N.P. to school during the Jewish holiday Sukkot. *Id.* ¶¶ 26-28. But like the Taxons, California's nonsectarian requirement prohibits the Peretses from advocating that N.P. be placed in an Orthodox Jewish school. *Id.* ¶ 30. Instead, he remains in public school, where day by day he loses the opportunity to receive an education crucial to nurturing his faith and supporting his disability. *Id.* ¶ 31.

## D. School Plaintiffs' attempts to support students with disabilities

The Jean & Jerry Friedman Shalhevet High School and the Samuel A. Fryer Yavneh Hebrew Academy are co-educational, dual-curriculum Orthodox Jewish schools located in Los Angeles, California. Block Decl. ¶¶ 2-3; Einhorn Decl. ¶¶ 2-3. They are committed to helping Orthodox Jewish parents fulfill their duty to provide an Orthodox Jewish education to their children. Block Decl. ¶¶ 4-7; Einhorn Decl. ¶ 5. As such, alongside secular studies, Shalhevet and Yavneh emphasize a "deep commitment to Torah." Block Decl. ¶ 6; *see also* Einhorn Decl. ¶¶ 3-6.

Shalhevet and Yavneh both believe it is important to create a learning environment that includes as many in the Jewish community as possible, including students with disabilities. Block Decl. ¶¶ 9-10; Einhorn Decl. ¶ 9. As Shalhevet explains, "the Torah commands members of the Jewish community to care for the most vulnerable, including those with disabilities. The Torah further commands us to go and seek out the most vulnerable among us and to welcome them into our community, rather than waiting for them to approach us." Block Decl. ¶ 10. However, accommodating the needs of students with disabilities often requires considerable financial resources, which Shalhevet and

Yavneh lack. Block Decl. ¶ 12; Einhorn Decl. ¶ 11. To obtain these needed resources, Shalhevet and Yavneh would like to explore NPS certification. But they cannot even begin the process without being put to an "impossible choice": attest that they are nonsectarian (and so give up their religious identity) or forgo altogether the opportunity to provide these services. Block Decl. ¶¶ 14-15; Einhorn Decl. ¶¶ 13-14. Shalhevet and Yavneh refuse to "disavow [their] religious character as a Jewish educational institution," and so they are categorically prohibited from exploring NPS certification. Block Decl. ¶¶ 15-16; Einhorn Decl. ¶¶ 14-15.

**E. This lawsuit**

On March 13, 2023, Plaintiffs filed this lawsuit. Dkt. 1. Plaintiffs now seek preliminary relief on Counts I, III, and V of the Complaint.

## STANDARD OF REVIEW

Preliminary injunctions are appropriate where a plaintiff "establish[es] that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Klein v. City of San Clemente*, 584 F.3d 1196, 1199 (9th Cir. 2009). The Ninth Circuit employs a "version of the sliding scale approach" where "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). In considering the likely success on the merits, "[i]t is well established that trial courts can consider otherwise inadmissible evidence in deciding whether or not to issue a preliminary injunction." *Rubin ex rel. NLRB v. Vista Del Sol Health Servs. Inc.*, 80 F. Supp. 3d 1058, 1072 (C.D. Cal. 2015); *see Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009). And "a party

seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury . . . by demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005).

**ARGUMENT**

**I.  California's nonsectarian requirement violates the First Amendment.**

The Free Exercise Clause "'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws" that disfavor religion. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017); *accord Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228, 1232 (9th Cir. 2020). To avoid strict scrutiny, "laws burdening religious practice must" be both neutral and generally applicable. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993).

Here, there is no doubt that California's nonsectarian requirement burdens the free exercise rights of all Plaintiffs. As the Supreme Court has long held, "condition[ing] the availability of benefits upon [an individual's] willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties." *Sherbert v. Verner*, 374 U.S. 398, 406 (1963). That's precisely what California's nonsectarian requirement does. California forces parent Plaintiffs to abandon the "cardinal principle" that obligates them to send their children to Orthodox Jewish schools if they wish to receive necessary funding for that child's education. *Id.* And it forces Jewish schools like Shalhevet and Yavneh to forgo their religious obligation to welcome all students unless they "disavow [their] religious character." *Trinity Lutheran*, 582 U.S. at 463.

Nor is there any doubt that California's nonsectarian requirement flunks the neutrality and general applicability tests. It is not neutral because it facially "single[s] out the religious for disfavored treatment" by excluding them from an otherwise generally available public benefit simply because they are religious. *Id.* at 460. And it is not generally applicable because it creates a system of discretionary individualized exemptions. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876-77 (2021). Both flaws are fatal, and Plaintiffs are likely to succeed on the merits of their Free Exercise claims.

**A. California's nonsectarian restriction violates the Free Exercise Clause by excluding individuals and institutions from a public benefit solely because they are religious.**

A trilogy of Supreme Court precedents—*Carson*, *Espinoza*, and *Trinity Lutheran*—places beyond dispute that the Free Exercise Clause prohibits California's exclusion of religious people and organizations from its disability benefits program. In each, the Supreme Court assessed a law like California's, which withheld otherwise-available funding from individuals and institutions "solely because of their religious character." *Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022). And in each, the Supreme Court concluded that the law violated the First Amendment's most "basic principle" that "the exclusion of [a religious party] from a public benefit for which it is otherwise qualified, solely because it is [religious], is odious to our Constitution." *Trinity Lutheran*, 582 U.S. at 458, 467. *Carson*, *Espinoza*, and *Trinity Lutheran* thus render this an open-and-shut case.

In *Carson*, the Supreme Court evaluated the constitutionality of Maine's educational-assistance program, which allowed a private school to receive tuition payments as a means of fulfilling the statutory right to "a free public education" in

---

school districts with no public secondary schools. 142 S. Ct. at 1993. But just like California, Maine "approved" only "nonsectarian" private schools for the program. *Id.* at 1993, 1994. Holding the "nonsectarian" restriction unconstitutional, the Supreme Court "deemed it 'unremarkable'" that the First Amendment prohibits States from "expressly discriminat[ing] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." *Id.* at 1996 (quoting *Trinity Lutheran*, 582 U.S. at 462). Under decades-old precedent, a program that "excludes religious observers from otherwise available public benefits" because of their religion amounts to a "indirect coercion or penalt[y] on the free exercise of religion." *Id.* at 1996; *see, e.g.*, *Lukumi*, 508 U.S. at 533; *McDaniel v. Paty*, 435 U.S. 618, 627 (1978) (plurality op.); *Everson v. Bd. of Educ.*, 330 U.S. 1, 16 (1947) (States "cannot exclude" individuals "because of their faith, or lack of it, from receiving the benefits of public welfare legislation").

As this long line of precedent indicates, *Carson*'s holding was hardly novel; indeed, *Carson* itself stated that the Supreme Court has "repeatedly held" the same in recent years. 142 S. Ct. at 1996. And so it has. In *Espinoza v. Montana Department of Revenue*, the Supreme Court struck down as unconstitutional a Montana scholarship program that allowed scholarships to be used at any private school so long as the school was not "owned or controlled in whole or in part by any church, religious sect, or denomination." 140 S. Ct. 2246, 2252 (2020). Such a law could not stand, the Court explained, because it "impose[d] special disabilities on the basis of religious status" in violation of the Free Exercise Clause. *Id.* at 2254 (quoting *Trinity Lutheran*, 582 U.S.

at 461). Because Montana's "provision plainly exclude[d] schools from government aid solely because of religious status," it could not survive. *Id.* at 2255.

The same was true in *Trinity Lutheran*, where Missouri had "categorically disqualif[ied] . . . religious organizations from receiving grants" to resurface playgrounds. 582 U.S. at 454. Just as in *Carson* and *Espinoza*, the Court noted that "denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of the highest order,'" a test Missouri failed to meet. *Id.* at 458 (quoting *McDaniel*, 435 U.S. at 628). That's because such a "policy puts [a religious organization] to a choice: It may participate in an otherwise available benefit program or remain a religious institution." *Id.* at 462. But the First Amendment places such choices beyond States' ability to impose: "when the State conditions a benefit in this way, [precedent] says plainly that the State has punished the free exercise of religion." *Id.*

California's "rule" that "no [religious organizations] need apply" is indistinguishable from the laws found "odious to our Constitution" in *Carson*, *Espinoza*, and *Trinity Lutheran*. *Id.* at 465, 467. Indeed, California's law uses nearly identical language to the Montana statute struck down in *Espinoza*. *Compare* Cal. Code Regs. tit. 5, § 3001(p), *with Espinoza*, 140 S. Ct. at 2252. And as with those laws, California offers "its citizens a benefit" in the form of special-education funding and makes a "wide range of private schools"—including out-of-state schools—eligible to receive that funding. *Carson*, 142 S. Ct. at 1997. And as was the case with those programs, California's nonsectarian requirement "single[s] out the religious for disfavored treatment" by facially excluding religious private schools from eligibility.

1    *Trinity Lutheran*, 582 U.S. at 460. Just like those laws, California's restriction fails

2    under the "now-familiar refrain" at play in each case: "The Free Exercise Clause

3    protects against laws that impose special disabilities on the basis of religious status."

4    *Id.* at 461 (cleaned up).

5    **B. California's nonsectarian requirement violates the First Amendment because it is not generally applicable.**

6

7    "A government policy will fail the general applicability requirement" if, among

8    other things, "it provides 'a mechanism for individualized exemptions.'" *Kennedy v.*

9    *Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022) (quoting *Fulton*, 141 S. Ct. at 1877).

10   The Supreme Court's decision in *Fulton* is controlling and shows that California's

11   law is not generally applicable. In *Fulton*, Philadelphia argued that a religious foster

12   care agency's refusal to certify same-sex couples violated a non-discrimination

13   provision in the City's standard foster care contract with the agency. 141 S. Ct. at 1875.

14   But the City's contracts incorporated "a system of individual exemptions, made . . . at

15   the 'sole discretion' of the Commissioner," which allowed the Commissioner to exempt

16   agencies from the contract's non-discrimination requirements. *Id.* at 1878. This "formal

17   system of entirely discretionary exceptions" rendered the "non-discrimination

18   requirement not generally applicable." *Id.* This was so, the Court reasoned, even though

19   the Commissioner had never granted an exemption under the disputed contractual

20   provision because "[t]he creation of a formal mechanism for granting exceptions . . .

21   'invite[s]' the government to decide which reasons for not complying with the policy

22   are worthy of solicitude." *Id.* at 1879.

23

1     *Fulton*'s general applicability analysis has deep roots. In reaching its conclusion, the

2     Court pointed to *Sherbert*, where an employee was fired because she refused to work

3     on Saturdays—"the Sabbath Day of her faith." 374 U.S. at 399. When she applied for

4     unemployment benefits, South Carolina denied her application under a law prohibiting

5     eligibility to claimants who "failed, without good cause . . . to accept available suitable

6     work." *Id.* at 401. As the Court later explained, South Carolina's law "was not generally

7     applicable because the 'good cause' standard permitted the government to grant

8     exemptions based on the circumstances underlying each application." *Fulton*, 141 S. Ct.

9     at 1877 (citing *Emp't Div. v. Smith*, 494 U.S. 872, 884 (1990)). "[W]here the State has

10    in place a system of individual exemptions, it may not refuse to extend that system to

11    cases of 'religious hardship' without compelling reason." *Id.* (quoting *Smith*, 494 U.S.

12    at 884); *see also Dahl v. Bd. of Trs.*, 15 F.4th 728, 733 (6th Cir. 2021) (university policy

13    was "not generally applicable" because the "University retains discretion to extend

14    exemptions in whole or in part").

15    Here, just like *Fulton* and *Sherbert*, California's laws governing NPS certification

16    are not generally applicable because they establish a system of individualized

17    exemptions. As explained above, to become a certified NPS, an applicant must satisfy

18    numerous requirements, including attesting to its "nonsectarian status." *See*

19    Shuchatowitz Decl. Ex. A at 13; Cal. Educ. Code § 56365; Cal. Code Regs. tit. 5,

20    § 3060(d)(6). But similar to the regimes at issue in *Fulton* and *Sherbert*, California law

21    grants discretion to the State Board of Education to waive any NPS certification

22    requirement—or "any provision of this code or regulations adopted pursuant to that

23    provision" more broadly—upon the request of a public agency, provided the waiver is

---

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

18

beneficial to implementing a student's IEP, does not abrogate the rights of parents or their children with disabilities, and is compliant with IDEA. Cal. Educ. Code §§ 56101(a), 56366.2(b). In other words, California has created "a system of individual exemptions, made . . . at the 'sole discretion' of the [State Board of Education]." *Fulton*, 141 S. Ct. at 1878. It does not matter whether the State Board of Education has ever received a petition to waive the "nonsectarian" requirement; rather, the mere existence of the exemption scheme shows that the State's law is not generally applicable. *Fulton*, 141 S. Ct. at 1879; *Kennedy*, 142 S. Ct. at 2422.

**C. California's restriction fails strict scrutiny.**

Because California's nonsectarian restriction is neither neutral nor generally applicable, it must survive "the strictest scrutiny," *Trinity Lutheran*, 582 U.S. at 458, which is "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Indeed, California has elsewhere "concede[d] that the existence of a 'system of individual exemptions'" renders the decision "not to expand the . . . exemption framework to [religious entities] to strict scrutiny." *Foothill Church v. Watanabe*, 2022 WL 3684900, at *10 (E.D. Cal. Aug. 25, 2022). To survive, laws must serve "interests of the highest order,'" *Fulton*, 141 S. Ct. at 1881, and "must be narrowly tailored" to achieve that interest. *Calvary Chapel*, 982 F.3d at 1234 (cleaned up). California's scheme fails at the outset because it has no compelling interest in discriminating against religious individuals and institutions.

Defendants may seek to justify the nonsectarian requirement by arguing that to do otherwise would violate the Establishment Clause of the Federal Constitution. But this argument founders on Supreme Court precedent, which has repeatedly held that "a

neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause." *Carson*, 142 S. Ct. at 1997 (citing *Zelman v. Simmons-Harris*, 536 U.S. 639, 652-53 (2002)). So binding precedent forecloses any argument that California possesses an antiestablishment interest under the Federal Constitution.

Nor may California argue that its State constitution requires it to discriminate against religious schools and individuals. The Supreme Court has consistently rejected this precise argument, holding that, as "explained in both *Trinity Lutheran* and *Espinoza*, such an interest in separating church and state more fiercely than the Federal Constitution cannot qualify as compelling in the face of the infringement of free exercise." *Carson*, 142 S. Ct. at 1998 (quoting *Espinoza*, 140 S. Ct. at 2260 (quoting *Trinity Lutheran*, 582 U.S. at 466)); *accord Kreisner v. City of San Diego*, 1 F.3d 775, 778 n.2 (9th Cir. 1993). Any anti-establishment interest cannot "justify [an enactment] that exclude[s] some members of the community from an otherwise generally available public benefit because of their religious exercise." *Carson*, 142 S. Ct. at 1998. Put differently, California possesses no compelling interest in "discriminat[ing] against religion." *Id.* at 1998. Defendants therefore fail strict scrutiny, and Plaintiffs have established that they are likely to succeed on the merits of their claims under the Free Exercise Clause.

**II. California's nonsectarian requirement imposes an unconstitutional condition.**

California's nonsectarian requirement also imposes an unconstitutional condition on Plaintiffs' religious exercise and is therefore an independent violation warranting preliminary relief. The unconstitutional conditions doctrine "vindicates the

Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). And the "'unconstitutional conditions' doctrine . . . limits the government's ability to exact waivers of rights as a condition of benefits, even when those benefits are fully discretionary." *United States v. Scott*, 450 F.3d 863, 866 (9th Cir. 2006).

Here, private religious schools must obtain certification through the State to access generally available public funding to educate students with disabilities. But California extracts a surrender of Plaintiffs' First Amendment rights by forcing them to give up their religious identities as a condition of accessing those otherwise generally available public funds. The unconstitutional conditions doctrine squarely forecloses this forced choice. Once California creates a special-education funding scheme, it cannot "abuse its power by attaching strings strategically" to discriminate against religious institutions and individuals. *Id*. Where, as here, the constitutional right of free exercise of religion "functions to preserve spheres of autonomy, [the] unconstitutional conditions doctrine protects that sphere by preventing governmental end-runs around the barriers to direct commands." *Id.* (cleaned up).

In short, this case is a prime example of why the unconstitutional conditions doctrine exists. This Court should grant Plaintiffs' preliminary injunction and hold that California law violates the unconstitutional conditions doctrine by forcing Plaintiffs to disavow their religious identity as a prerequisite to accessing special-education funding.

**III. Plaintiffs easily satisfy the remaining preliminary injunction factors.**

Finally, a preliminary injunction is warranted when plaintiffs demonstrate that they are likely to suffer irreparable harm in the absence of a preliminary injunction, and that

the balance of equities and the public interest tip in their favor. *Doe v. Harris*, 772 F.3d 563, 582 (9th Cir. 2014). Plaintiffs satisfy these remaining factors.

**Irreparable harm.** "Irreparable harm is relatively easy to establish in a First Amendment case," *Cal. Chamber of Com. v. Council for Educ. and Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) (cleaned up), requiring only a "colorable" showing of a First Amendment infringement, *Warsoldier*, 418 F.3d at 1001. That is because—as both the Supreme Court and this Court have repeatedly emphasized—"[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *See, e.g.*, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (cleaned up); *Warsoldier*, 418 F.3d at 1002; *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012).

Here, Plaintiffs more than satisfy this low bar. California categorically excludes religious families and schools from an otherwise-available public benefit solely because they are religious. Under *Trinity Lutheran*, *Espinoza*, and *Carson*, that is a clear-cut First Amendment violation that remains ongoing so long as the nonsectarian requirement exists. Plaintiffs have thus established that they will suffer irreparable harm. *See, e.g., Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1225 (9th Cir. 2003) ("[Plaintiffs] have not only stated a colorable First Amendment claim, but one that is likely to prevail[.]").

Indeed, the harm to the individual Plaintiffs is "particularly irreparable" because "timing is of the essence." *Klein*, 584 F.3d at 1208. Every day, every week, and every year California's unconstitutional restriction is allowed to stand deprives parent Plaintiffs of crucial time to advocate for their children's education that can never be

1  recovered. And every day their children spend in educational environments that fail to

2  provide a FAPE inflicts lasting harm on their educational and spiritual development.

3  Nick Decl. ¶ 26; Perets Decl. ¶ 31. Similarly, the school Plaintiffs are unable even to

4  explore providing special-education services as long as the nonsectarian requirement is

5  enforced. Block Decl. ¶¶ 12-16; Einhorn Decl. ¶¶ 11-15.

6  ***Balance of equities and public interest***: "The 'balance of equities' concerns the

7  burdens or hardships to [Plaintiffs] compared with the burden on Defendants if an

8  injunction is ordered." *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). "The

9  'public interest' mostly concerns the injunction's impact on nonparties rather than

10 parties." *Id.* (cleaned up). When the government is the party opposing a preliminary

11 injunction, these two factors "merge into one inquiry." *Id.*

12 Here, this inquiry favors the entry of a preliminary injunction. When plaintiffs raise

13 "serious First Amendment questions," that "compels a finding that . . . the balance of

14 hardships tips sharply in the plaintiffs' favor." *Cmty. House, Inc. v. City of Boise*, 490

15 F.3d 1041, 1059 (9th Cir. 2007) (cleaned up). Similarly, "it is always in the public

16 interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*,

17 695 F.3d 990, 1002 (9th Cir. 2012); *accord Doe*, 772 F.3d at 583 (noting the "significant

18 public interest in upholding First Amendment principles"). Accordingly, because

19 California law violates Plaintiffs' rights under the Free Exercise Clause, the balance of

20 equities and the public interest strongly supports granting a preliminary injunction.

21 ***Bond not required.*** The Court should not require a bond. *See Conn. Gen. Life Ins.*

22 *Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (court has "wide

23 discretion" in this area). Defendants will suffer no damages even if it were later

determined that they were "wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The relevant "amount" required to preserve Defendants' interests is thus zero. *Id.*

**CONCLUSION**

The Court should grant a preliminary injunction barring defendants from enforcing the "nonsectarian" requirement in Cal. Educ. Code §§ 56365 and 56366.


Dated: May 22, 2023                    Respectfully submitted,

                                       /s/ *Eric C. Rassbach*
                                       Eric C. Rassbach (CA SBN 288041)
                                       erassbach@becketlaw.org
                                       Daniel L. Chen (CA SBN 312576)
                                       Laura Wolk Slavis (DC Bar No. 1643193)
                                       Brandon L. Winchel* (CA SBN 344719)
                                       The Becket Fund for Religious Liberty
                                       1919 Pennsylvania Ave., Suite 400
                                       Washington, DC 20006
                                       202-955-0095 tel. / 202-955-0090 fax

                                       * Not a member of the DC Bar; admitted in
                                       California. Practice limited to cases in federal
                                       court.

                                       *Attorneys for Plaintiffs*

| | |
|---|---|
| 1 | **CERTIFICATE OF SERVICE** |
| 2 | On May 22, 2023, I filed the foregoing document with the Court via ECF. I |
| 3 | hereby certify that I have served the document on all counsel by a manner authorized |
| 4 | by the Federal Rules of Civil Procedure. |

/s/ *Eric C. Rassbach*
Eric C. Rassbach

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the Plaintiffs, certifies that this brief contains 24 pages, which complies with this Court's 25-page limit for memoranda of points and authorities.

Dated: May 22, 2023

/s/ *Eric C. Rassbach*
Eric C. Rassbach
