Eric C. Rassbach (CA SBN 288041)
erassbach@becketlaw.org
Nicholas R. Reaves (DC Bar No. 1044454)
Daniel L. Chen (CA SBN 312576)
Laura Wolk Slavis (DC Bar No. 1643193)
Brandon L. Winchel* (CA SBN 344719)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave., Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAYA LOFFMAN and JONATHAN LOFFMAN, on their own behalf and on behalf of their minor child M.L.; FEDORA NICK and MORRIS TAXON, on their own behalf and on behalf of their minor child K.T.; SARAH PERETS and ARIEL PERETS, on their own behalf and on behalf of their minor child N.P.; JEAN & JERRY FRIEDMAN SHALHEVET HIGH SCHOOL; and SAMUEL A. FRYER YAVNEH HEBREW ACADEMY, <br><br>    Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF EDUCATION; TONY THURMOND, in his official capacity as Superintendent of Public Instruction; LOS ANGELES UNIFIED SCHOOL DISTRICT; and ANTHONY AGUILAR, in his official capacity as Chief of Special Education, Equity, and Access, <br><br>    Defendants. | Case No.: <br> 2:23-cv-01832-JLS-MRW <br><br> **PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** <br><br> Date: July 21, 2023 <br> Time: 10:30 AM <br> Courtroom: 8A <br> Judge: Hon. Josephine L. Staton |

* Not a member of the DC Bar; admitted in California. Practice limited to cases in federal court.

1

**TABLE OF CONTENTS**

2

**Page**

3
4

TABLE OF AUTHORITIES ................................................................. iii

5

INTRODUCTION ..............................................................................1

6

FACTUAL AND LEGAL BACKGROUND ........................................2

7

   A. The Individuals with Disabilities Education Act ...........................2

8
9

   B. California's special-education regime ..........................................4

   C. Parent Plaintiffs attempt to obtain a religious education
      for their Children Plaintiffs with disabilities ...............................7

10
11

   D. School Plaintiffs attempt to support students with disabilities .........10

12

   E. This lawsuit ............................................................................11

13

STANDARD OF REVIEW .................................................................11

14

ARGUMENT .....................................................................................12

15
16

   I. Plaintiffs possess Article III standing.........................................12

17

     A. Plaintiffs have suffered an injury in fact. ..............................13

18
19

       1. *Plaintiffs have sufficiently pleaded a discriminatory*
         *classification constituting an injury in fact*...........................13

20
21

       2. *Defendants' standing arguments fail.* ...................................15

22
23

         a. Plaintiffs need not prove their case in advance to
           demonstrate standing. ......................................................16

24
25

         b. School Plaintiffs are able and ready to seek NPS certification. ........16

26

         c. Parent and Children Plaintiffs need not go through the
           IDEA process before challenging California's facially
           discriminatory exclusion. ................................................18

27
28

CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

i

   B.  Plaintiffs' injury is traceable to Defendants' conduct
       and redressable by this Court. ..................................................19

II.  Defendants violate the Free Exercise Clause. ...................................20

   A.  Defendants violate the Free Exercise Clause under *Carson*,
       *Espinoza*, and *Trinity Lutheran* by categorically excluding
       Plaintiffs because of their religion (Count I)................................21

       1.  *California's exclusion of religious schools cannot be
           reconciled with Supreme Court precedent*...............................21

       2.  *Defendants' counterarguments are meritless.* ........................23

   B.  Defendants violate the Free Exercise Clause under *Lukumi*,
       *Fulton* and *Tandon* by permitting individualized and categorical
       exemptions (Counts II and III). ......................................................27

   C.  Defendants violate the Free Exercise Clause under *Yoder*
       and *Smith* by infringing on Plaintiffs' right to direct the
       education of children (Count VI). .................................................28

   D.  Defendants cannot satisfy strict scrutiny.....................................30

III.  Defendants violate the Equal Protection Clause (Count IV)..........33

IV.  Defendants violate the unconstitutional conditions doctrine (Count V). .......36

CONCLUSION .................................................................................................38

CERTIFICATE OF SERVICE ........................................................................40

CERTIFICATE OF COMPLIANCE..................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ........................................................................ 37-38

*Al Saud v. Days*,
50 F.4th 705 (9th Cir. 2022)..............................................................34

*Amanda J. Ex rel. Annette J. v. Clark Cnty. Sch. Dist.*,
267 F.3d 877 (9th Cir. 2001)................................................................3

*Ball v. Massanari*,
254 F.3d 817 (9th Cir. 2001)........................................................ 33-34

*Bd. Of Cnty. Comm'rs v. Umbehr*,
518 U.S. 668 (1996) ..................................................................... 36-37

*Bellflower Unified Sch. Dist. v. Lua*,
832 F. App'x 493 (9th Cir. 2020) ..........................................................4

*Bingham v. Holder*,
637 F.3d 1040 (9th Cir. 2011)..............................................................37

*Blaisdell v. Frappiea*,
729 F.3d 1237 (9th Cir. 2013)..............................................................37

*Bras v. Cal. Pub. Utilities Comm'n*,
59 F.3d 869 (9th Cir. 1995)..............................................14, 15, 16

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ............................................................................33

*Cal. Parents for the Equalization of Educ. Materials v. Torlakson*,
973 F.3d 1010 (9th Cir. 2020)..............................................................24

*Carney v. Adams*,
141 S. Ct. 493 (2020) .................................................................... 17-18

*Carson v. Makin*,
142 S. Ct. 1987 (2022) .................................................................*passim*

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ..................................................................22, 27, 28, 33

*City of Boerne v. Flores*,
   521 U.S. 507 (1997) ..................................................................................30

*City of Los Angeles v. Barr*,
   929 F.3d 1163 (9th Cir. 2019).......................................................14, 15, 16

*Colo. Christian Univ. v. Weaver*,
   534 F.3d 1245 (10th Cir. 2008)................................................................36

*Corp. of Presiding Bishop v. Amos*,
   483 U.S. 327 (1987) ................................................................................36

*Davis v. Guam*,
   785 F.3d 1311 (9th Cir. 2015)..................................................................19

*Dep't of Com. v. New York*,
   139 S. Ct. 2551 (2019) ............................................................................13

*Doug C. v. Haw. Dep't of Educ.*,
   720 F.3d 1038 (9th Cir. 2013)................................................................ 2-3

*Droz v. C.I.R.*,
   48 F.3d 1120 (9th Cir. 1995)....................................................................36

*Duronslet v. County of Los Angeles*,
   266 F. Supp. 3d 1213 (C.D. Cal. 2017) ............................................30, 36

*Emp. Div. v. Smith*,
   494 U.S. 872 (1990) ................................................................................28

*Espinoza v. Montana Dep't of Revenue*,
   140 S. Ct. 2246 (2020) ......................................................................*passim*

*Everson v. Bd. of Educ.*,
   330 U.S. 1 (1947) ....................................................................................22

*Fazaga v. FBI*,
   965 F.3d 1015 (9th Cir. 2020)..................................................................23

*FEC v. Cruz*,
    142 S. Ct. 1638 (2022) ........................................................................13

*Foothill Church v. Watanabe*,
    623 F. Supp. 3d 1079 (E.D. Cal. 2022)..................................................28

*Freeman v. City of Santa Ana*,
    68 F.3d 1180 (9th Cir. 1995)..................................................................35

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ..............................................................................19

*Fulton v. City of Philadelphia*,
    141 S. Ct. 1868 (2021) ..........................................................25, 27, 28

*Gary S. and Sylvie S. v. Manchester Sch. Dist.*,
    374 F.3d 15 (1st Cir. 2004) ....................................................................25

*Glenn v. Cal. Dep't of Educ.*,
    709 F. App'x 499 (9th Cir. 2018) ..........................................................12

*Gratz v. Bollinger*,
    539 U.S. 244 (2003) ......................................................................... 16-17

*Groff v. DeJoy*,
    --- S. Ct. ---, 2023 WL 4239256 (June 29, 2023) ..................................30

*Gurrola v. Duncan*,
    519 F. Supp. 3d 732 (E.D. Cal. 2021)....................................................16

*Harrison v. Kernan*,
    971 F.3d 1069 (9th Cir. 2020)........................................................ 18-19

*Honig v. Doe*,
    484 U.S. 305 (1988) ..........................................................................2, 18

*Johnson v. Robison*,
    415 U.S. 361 (1974) ........................................................................34, 35

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022) ....................................................................30, 31

*Kerr Ctr. Parents Ass'n v. Charles*,
    897 F.2d 1463 (9th Cir. 1990)...................................................................18

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013) .................................................................................37, 38

*L.A. Cnty. Off. of Educ. v. C.M.*,
    No. 10-cv-4702, 2011 WL 1584314 (C.D. Cal. Apr. 22, 2011) ................5

*Larson v. Valente*,
    456 U.S. 228 (1982) ...................................................................................35

*Lemon v. Kurtzman*,
    403 U.S. 602 (1971) ...................................................................................30

*S.L. ex rel. Loof v. Upland Unified Sch. Dist.*,
    747 F.3d 1155 (9th Cir. 2014).....................................................................4

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
    519 F.3d 1025 (9th Cir. 2008)...................................................................20

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011)..............................................................13, 17

*McDaniel v. Paty*,
    435 U.S. 618 (1978) ...................................................................................22

*Mecinas v. Hobbs*,
    30 F.4th 890 (9th Cir. 2022)......................................................................13

*Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*,
    508 U.S. 656 (1993) ...........................................................................*passim*

*Norwood v. Harrison*,
    413 U.S. 455 (1973) ...................................................................................25

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020) .................................................................................7

*Perry v. Sindermann*,
    408 U.S. 593 (1972) ...................................................................................36

*Pierce v. Soc'y of Sisters*,
  268 U.S. 510 (1925) .................................................................29

*Platt v. Moore*,
  15 F.4th 895 (9th Cir. 2021).....................................................12

*Prince v. Jacoby*,
  303 F.3d 1074 (9th Cir. 2002)...................................................34

*Real v. City of Long Beach*,
  852 F.3d 929 (9th Cir. 2017).....................................................17

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) .................................................................30

*Regents of Univ. of Cal. v. Bakke*,
  438 U.S. 265 (1978) .................................................................14

*Renee v. Duncan*,
  686 F.3d 1002 (9th Cir. 2012)...................................................20

*Rosen v. Amazon.com*,
  No. 14-cv-2115, 2014 WL 12597073 (C.D. Cal. May 28, 2014)............................20

*S.F. Cnty. Democratic Cent. Comm. v. Eu*,
  826 F.2d 814 (9th Cir. 1987).....................................................37

*Sato v. Orange County Dep't of Educ.*,
  861 F.3d 923 (9th Cir. 2017).....................................................12

*Seeboth v. Allenby*,
  789 F.3d 1099 (9th Cir. 2015)...................................................33

*Sherbert v. Verner*,
  374 U.S. 398 (1963) ................................................... 23-24, 38

*Snyder & Assocs. Acquisitions LLC v. United States*,
  859 F.3d 1152 (9th Cir. 2017)...................................................11

*St. John's United Church of Christ v. City of Chicago*,
  502 F.3d 616 (7th Cir. 2007).....................................................36

*Tandon v. Newsom*,
   141 S. Ct. 1294 (2021) ...........................................................................28

*Tawfilis v. Allergan, Inc.*,
   157 F. Supp. 3d 853 (C.D. Cal. 2015) ...................................................11

*Teen Ranch, Inc. v. Udow*,
   479 F.3d 403 (6th Cir. 2007)..................................................................25

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
   309 F.3d 144 (3d Cir. 2002).....................................................................23

*Thomas v. Rev. Bd.*,
   450 U.S. 707 (1981) .................................................................................38

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
   582 U.S. 449 (2017) ...........................................................................*passim*

*Turner v. Fouche*,
   396 U.S. 346 (1970) .................................................................................14

*United States v. Scott*,
   450 F.3d 863 (9th Cir. 2006)...................................................................37

*Valle Del Sol Inc. v. Whiting*,
   709 F.3d 808 (9th Cir. 2013)...................................................................33

*Waln v. Dysart Sch. Dist.*,
   54 F.4th 1152 (9th Cir. 2022)............................................................30, 33

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) .................................................................................29

*Westchester Day Sch. v. Vill. of Mamaroneck*,
   417 F. Supp. 2d 477 (S.D.N.Y. 2006).......................................................7

*Williams S. Hart Sch. Dist. v. Antillon*,
   No. 19-cv-8328, 2021 WL 3086146 (C.D. Cal. July 1, 2021)..................4

*Wilson v. Hewlett-Packard Co.*,
   668 F.3d 1136 (9th Cir. 2012).................................................................11

---

CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

*Wilson v. Lynch*,
   835 F.3d 1083 (9th Cir. 2016) ................................................................... 34

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) ......................................................................... 28-29

**Statutes**

20 U.S.C. § 1400 ................................................................................... 2

20 U.S.C. § 1401 ................................................................................... 2

20 U.S.C. § 1412 .......................................................................... 3, 4, 5

20 U.S.C. § 1413 ................................................................................... 5

20 U.S.C. § 1414 ................................................................................... 2

Cal. Educ. Code § 56028.5 ...................................................................... 7

Cal. Educ. Code § 56031 .................................................................... 5-6

Cal. Educ. Code § 56034 ................................................................. 5, 26

Cal. Educ. Code § 56040 ........................................................................ 5

Cal. Educ. Code § 56101 ..................................................................... 6-7

Cal. Educ. Code § 56363 ........................................................................ 6

Cal. Educ. Code § 56365 ..................................................................... 5, 6

Cal. Educ. Code § 56366 ........................................................................ 5

Cal. Educ. Code § 56366.1 ................................................................. 6, 19

Cal. Educ. Code § 56366.2 ...................................................................... 6

Cal. Educ. Code § 56366.4 ...................................................................... 6

Cal. Educ. Code § 56366.8 ...................................................................... 6

Cal. Educ. Code § 56505.2 ...................................................................... 6

1

**Other Authorities**

2

34 C.F.R. § 300.34 ...................................................................................2

34 C.F.R. § 300.39 ...................................................................................2

34 C.F.R. § 300.132 .................................................................................3

34 C.F.R. § 300.133 .................................................................................3

34 C.F.R. § 300.137 .................................................................................4

34 C.F.R. § 300.146 .................................................................................3

34 C.F.R. § 300.148 .................................................................................4

34 C.F.R. § 300.325 .................................................................................4

Cal. Code Regs. tit. 5, § 3001 .................................................................6

Cal. Code Regs. tit. 5, § 3060 .................................................................6

Cal. Const. art. IX, § 8 ...........................................................................22

*Deuteronomy* ...........................................................................................7

Mont. Const. art. X, § 6 .........................................................................22

Rabbi Joseph Caro, Shulchan Aruch, *Yoreh De'ah* 245:1 ........................ 7-8

Talmud Bavli, *Kiddushin* ..........................................................................7

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

Defendants do not dispute that they are excluding Jewish children and Jewish schools from a generally available public benefits program *because they are religious*. In fact, Defendants think this facially discriminatory rule is just fine. They say Plaintiffs have suffered no injury and that their religious exclusion does not fall afoul of the Free Exercise Clause or the Equal Protection Clause. In Defendants' view, Jewish children—including those with profound disabilities—need not apply.

But a law that on its face categorically excludes a group of people from a public benefit because of who they are is the textbook definition of an injury in fact for standing purposes. And Plaintiffs do not have to prove their entire civil rights case in advance in order to bring suit, as Defendants propose. Plaintiffs have standing.

On the merits, Defendants offer up their own set of facts, and ask the Court to rule on the basis of those alternative facts rather than the allegations in the complaint. That is not how a motion to dismiss works. Taking Plaintiffs' allegations as true, as the Court ought, there can be no doubt that Defendants' exclusion of Plaintiffs separately violates the rule of *Carson v. Makin*, the rule of general applicability under the Free Exercise Clause, the Equal Protection Clause, and the unconstitutional conditions doctrine. That is more than enough to survive a 12(b)(6) motion.

Defendants' sordid embrace of their categorical exclusion of Jewish children from disability benefits does have one silver lining: it makes the stakes in this lawsuit crystal clear. Defendants are discriminating and they fully intend to continue discriminating. Unless this Court or a higher court intervenes, these children will remain excluded from full and equal participation in American life indefinitely.

The Court should deny the motions to dismiss and grant the pending preliminary injunction motion.

## FACTUAL AND LEGAL BACKGROUND

### A. The Individuals with Disabilities Education Act

Congress passed the Individuals with Disabilities Education Act (IDEA) in 1990 as part of our "national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." 20 U.S.C. § 1400(c)(1). Building off the 1975 Education for All Handicapped Children Act, IDEA served as the latest in a twenty-five-year-long legislative effort to strengthen programs that would "provide for the education of all children with disabilities" and eradicate the historical discrimination preventing children with disabilities from receiving a mainstream education—or any education at all. *See id.* § 1400(c)(2), (d)(1)(C). To achieve these goals, IDEA offers federal funding to States under the expectation that such funding will be used to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." *Id.* § 1400(d)(1)(A).

Part B of IDEA concerns the provision of this substantive right to a free and appropriate public education (FAPE) to school-aged children with disabilities. The FAPE, in turn, is guaranteed in large part through the provision of an "individualized education program," *id.* § 1401(9)(D), or IEP. A student's IEP is "a written statement for each child with a disability" that covers, *inter alia*, a "child's present levels of academic achievement and functional performance," "a statement of measurable annual goals, including academic and functional goals," and "a statement of the special education and related services and supplementary aids and services . . . to be provided to the child, or on behalf of the child." *Id.* § 1414(d); *see id.* § 1401(29); 34 C.F.R. § 300.39(a) (2006) (defining "special education"); 20 U.S.C. § 1401(26)(A); 34 C.F.R. § 300.34(a) (2006) (defining "related services"). The IEP is "the centerpiece of the statute's education delivery system for disabled children." *Honig v. Doe*, 484 U.S. 305, 311 (1988). Parents play a "critical" role in its development and implementation. *Doug*

1    *C. v. Haw. Dep't of Educ.*, 720 F.3d 1038, 1043 (9th Cir. 2013). They "not only represent
2    the best interests of their child in the IEP development process, they also provide
3    information about the child critical to developing a comprehensive IEP and which only
4    they are in a position to know." *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*,
5    267 F.3d 877, 882 (9th Cir. 2001).

6        As the FAPE acronym implies, students typically receive a FAPE (and therefore also
7    an IEP) in a public school. However, IDEA explicitly contemplates instances where a
8    FAPE can—and must—be provided in private schools. Specifically, the statute states:
9    "Children with disabilities in private schools and facilities are provided special education
10   and related services, in accordance with an individualized education program, at no cost
11   to their parents, if such children are placed in, or referred to, such schools or facilities by
12   the State or appropriate local educational agency as the means of carrying out the
13   [statute's] requirements[.]" 20 U.S.C. § 1412(a)(10)(B)(i). In those instances, IDEA
14   requires the state education agency to ensure such children have "all of the rights of a
15   child with a disability who is served by a public agency," including the provision of an
16   IEP and special education and related services "[a]t no cost to the parents." 34 C.F.R.
17   § 300.146 (2017).

18       As State and District Defendants note, placement in a private school as a means of
19   receiving a FAPE is not the only way children with disabilities can receive publicly
20   funded assistance in private schools. Dkt. 31-1 at 2-5, 20-21; Dkt. 29 at 13-15. Indeed,
21   through IDEA's "parental placement" and "unilateral placement" options, children with
22   disabilities in California already can, and do, receive publicly funded services or tuition
23   reimbursement in religious private schools.

24       Through its "parental placement" scheme, IDEA requires States, including
25   California, to spend a proportionate amount of their IDEA funding on children with
26   disabilities whose parents have directly enrolled them in "private, including religious,
27   schools." 20 U.S.C. § 1412(a)(10)(A)(i)(III); 34 C.F.R. § 300.132(a) (2006); *id.*
28   § 300.133(a) (2006). This IDEA program provides "equitable services" to these students

through "employees of a public agency" or "through contract by the public agency with an individual, association, agency, organization, or other entity." 20 U.S.C. § 1412(a)(10)(A)(vi)(I)(aa)-(bb). Like the provision of a FAPE, the government remains responsible for the provision and execution of the program. *Compare id.* § 1412(a)(10)(A)(vii) (parental placement), *with* 34 C.F.R. § 300.325(c) (2006) (FAPE). Because this program requires only an "equitable" distribution of funds, parentally placed children have no individualized entitlement to services, and may not receive any services at all. *See* 34 C.F.R. § 300.137 (2007); Dkt. 29 at 14.

Finally, and through still another IDEA program sometimes known as "unilateral placement," 20 U.S.C. § 1412(a)(10)(C), if parents believe the public school district is not providing their child a FAPE, they may place that child in a private school and then seek reimbursement from an LEA through an administrative process. *See* 34 C.F.R. § 300.148(c) (2006). "A court or hearing officer can even order an LEA to reimburse parents for religious school placements through this process." Dkt. 29 at 14; *see, e.g., Bellflower Unified Sch. Dist. v. Lua*, 832 F. App'x 493, 496 (9th Cir. 2020) (awarding tuition reimbursement for unilateral placement and holding that "[t]he fact that [the school] is a parochial school does not change this analysis"); *S.L. ex rel. Loof v. Upland Unified Sch. Dist.*, 747 F.3d 1155, 1160 (9th Cir. 2014) (upholding tuition and transportation reimbursement for unilateral placement at a parochial school); *Williams S. Hart Sch. Dist. v. Antillon*, No. 19-cv-8328, 2021 WL 3086146, at *5 (C.D. Cal. July 1, 2021) (collecting cases).

Thus, through both the "parental placement" and "unilateral placement" programs, public funds flow to religious schools and religious students.

### B. California's special education regime

California, like every other State, has chosen to participate in IDEA. It therefore "submit[ted] a plan that provides assurances to the Secretary" that IDEA's requirements will be met, including the requirement to provide a FAPE to all eligible "children with disabilities residing in the State between the ages of 3 and 21, inclusive." 20 U.S.C.

---

CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

4

§ 1412(a)(1)(A). IDEA then charges the "[s]tate education agency" with ensuring IDEA compliance at the state level, including through assurances that local educational agencies (LEAs) comply with IDEA. *See* 20 U.S.C. §§ 1412(a)(11)(A), 1413(a). In California, that responsibility lies with the California Department of Education (CDE), which also "administer[s] funds to the local [education] agencies." *L.A. Cnty. Off. of Educ. v. C.M.*, No. 10-cv-4702, 2011 WL 1584314, at *3 (C.D. Cal. Apr. 22, 2011). In return for these assurances, California receives from the federal government millions of dollars in IDEA Part B funding every year to supplement its state special education funding.

Consistent with IDEA's requirements, California law implementing IDEA guarantees the substantive right to a FAPE for all eligible students. Cal. Educ. Code § 56040. And like IDEA, California law provides that a FAPE may be provided outside the public-school setting "if no appropriate public education program is available." *Id.* § 56365(a). California calls this alternative placement a nonpublic school (NPS), which is a "private" school that "enrolls individuals with exceptional needs pursuant to an individualized education program." *Id.* § 56034. Thus, in certain circumstances, students may be placed in an NPS "pursuant to an individualized education program." *Id.* Students can be placed in an NPS located either in California or in other States, so long as the NPS meets all state-law requirements. *See id.* § 56365(f)-(i).

NPS placement is facilitated via a "master contract" between the NPS and a LEA such as LAUSD. *Id.* § 56366(a). This master contract governs a host of procedural and substantive requirements to which the NPS and LEA must adhere, including "an individual services agreement for each pupil placed by a local educational agency." *Id.* § 56366(a)(2)(A). Once placed, and in keeping with IDEA's clear instruction that students placed in a NPS receive services "at no cost to their parents," 20 U.S.C. § 1412(a)(10)(B)(i), California requires the LEA to use public funding to reimburse "the full amount of the tuition" for NPS students, as well as the special education and related services covered by the student's IEP, Cal. Educ. Code § 56365(a), (d); *see also id.*

---

CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

5

§ 56031(a) (defining special education); *id.* § 56363(a) (defining related services); *id.* § 56363(b) (listing included services).

However, though IDEA places no restriction on the types of private schools in which students may be placed, California's program categorically deems all religious schools ineligible for such placement. Under California law, students cannot be placed in a NPS "if the school . . . has not been certified" by the CDE and the Superintendent. *Id.* § 56505.2(a); *see also id.* §§ 56366.1, 56366.8. But California will only consider certifying schools that are "nonsectarian." *See, e.g.*, *id.* § 56365; *see* Dkt. 31-1 at 7; Dkt. 29 at 16. CDE regulations define "nonsectarian" as "a private, nonpublic school . . . that is not owned, operated, controlled by, or formally affiliated with a religious group or sect, whatever might be the actual character of the education program or the primary purpose of the facility and whose articles of incorporation and/or by-laws stipulate that the assets of such agency or corporation will not inure to the benefit of a religious group." Cal. Code Regs. tit. 5, § 3001(p). Consistent with these regulations, the application to become a certified NPS requires the applicant to "submit a signed assurance statement that the nonpublic school will maintain compliance with . . . [n]onsectarian status." *Id.* § 3060(d)(6). And the "Superintendent may revoke or suspend the certification of a nonpublic, nonsectarian school" for failing to meet this requirement. Cal. Educ. Code § 56366.4(a)(1). As a result of this "nonsectarian" requirement, private religious schools are wholly excluded from becoming a certified NPS, and children cannot be placed at such schools as a means of receiving a FAPE.

Nor can a religious school interested in becoming an NPS petition for a waiver of the nonsectarian status requirement. *See id.* § 56366.2 (permitting waiver of certain requirements, but not the certification requirements contained in § 56366.1). However, an LEA like LAUSD may do so. Under Section 56366.2(b), certification requirements may be waived if "approved by the board pursuant to Section 56101." *Id.* § 56366.2(b). Section 56101 in turn permits a "public agency" to "request the board to grant a waiver of any provision of this code or regulations adopted pursuant to that provision if the

1   waiver is necessary or beneficial to the content and implementation of the pupil's

2   individualized education program and does not abrogate any right provided individuals

3   with exceptional needs and their parents or guardians under [IDEA]." *Id.* § 56101(a).

4   The definition of "public agency" includes "special education local plan area[s]" like

5   LAUSD. *Id.* § 56028.5.

6   ### C. Parent Plaintiffs attempt to obtain a religious education for their Children Plaintiffs with disabilities

7   Civil courts have long recognized that "[r]eligious education is a matter of central

8   importance in Judaism." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct.

9   2049, 2065 (2020). Indeed, "for modern Orthodox Jews, enrolling their children in a

10   dual curriculum Jewish day school is 'virtually mandatory.'" *Westchester Day Sch. v.*

11   *Vill. of Mamaroneck*, 417 F. Supp. 2d 477, 497 (S.D.N.Y. 2006). This is because the

12   Torah, the Talmud, and the *Shulchan Aruch* (the Jewish Code of Law) repeatedly exhort

13   parents to train their children in Jewish religious belief and practice. Dkt. 1 ¶¶ 65-69;

14   *Our Lady*, 140 S. Ct. at 2065.

15   For example, the Torah instructs, "Take to heart these instructions with which I

16   charge you this day. Impress them upon your children. Recite them when you stay at

17   home and when you are away, when you lie down and when you get up." *Deuteronomy*

18   6:7-8; *see also Deuteronomy* 11:19 ("And you shall teach them to your children—

19   reciting them when you stay at home and when you are away, when you lie down and

20   when you get up."). The Talmud instructs that parents must teach both Torah and

21   rabbinic writings to their children. *See*, *e.g.*, Talmud Bavli, *Kiddushin* 29a ("The sages

22   taught a father is obligated . . . to teach his son Torah."); *id.* at 29b ("From where do we

23   know that a father is obligated to teach his son Torah? As it is written, 'and you shall

24   teach them to your children'" (quoting (*Deuteronomy* 11:19)); Talmud Bavli, *Kiddushin*

25   30a (describing the Torah subjects encompassed within this obligation). And the

26   *Shulchan Aruch* explains that "there is an obligation upon each person to teach his son

27   

28

Jewish law; if the father does not teach him, the son is obligated to teach himself." Rabbi Joseph Caro, Shulchan Aruch, *Yoreh De'ah* 245:1; *see generally* Dkt. 1 ¶¶ 65-69.

The primary goal of Jewish education is the study of Torah, which is itself a form of religious worship. Dkt. 1 ¶ 71. When engaged in study of Torah, students concern themselves with more than the accumulation of knowledge or development of skill; rather, study of Torah is about "live contact with the epiphanous divine will manifested through Torah, and encounter with the divine Presence, which hovers over its student." *Id.* ¶ 72.

Parent Plaintiffs Chaya and Jonathan Loffman, Fedora Nick and Morris Taxon, and Sarah and Ariel Perets are Orthodox Jews who sincerely believe that the Torah, Talmud, and the *Shulchan Aruch* obligate them to send all their children to Orthodox Jewish schools, where they can receive an education both in secular subjects and in the faith. *Id.* ¶¶ 74-75. Parent Plaintiffs each have multiple children, one of whom has a disability and is also a Plaintiff. *Id.* ¶¶ 77-80, 91-96, 116-20. But though Parent Plaintiffs have been able to fulfill their religious obligation to provide a Jewish education to their nondisabled children, California's nonsectarian prohibition has forced them to choose between exercising their religion and accessing critical funding needed to provide adequate services to their children with disabilities. *Id.* ¶¶ 82-90, 98-103, 122-26.

*The Loffmans*. The Loffmans have two children, including their four-year-old son, Plaintiff M.L., who was diagnosed with autism at age 3. *Id.* ¶¶ 77, 79. M.L. requires many costly services, including speech, occupational, and behavioral therapies. *Id.* ¶ 86. After his diagnosis, the Loffmans enrolled M.L. in an Orthodox Jewish preschool, where they hoped he would receive an education that nourished his Jewish faith while also providing the support necessary for him to progress developmentally. *Id.* ¶¶ 84-85. Soon after, the Loffmans learned that due to California's nonsectarian restriction, they would be responsible for the full cost of M.L.'s services if he remained in an Orthodox Jewish school. *Id.* ¶¶ 86-87. Put to the stark choice between exercising their religion and receiving crucial special-education funding, *id.* ¶ 17, the Loffmans made the difficult

1   decision to keep M.L. enrolled at an Orthodox Jewish school at considerable personal
2   cost. *Id.* ¶ 87. They are therefore responsible for paying for M.L.'s 25 hours of weekly
3   therapy and were even forced to discontinue his speech therapy solely "due to the
4   exorbitant costs associated with paying for therapies out of pocket." *Id.* ¶¶ 88-89.

5   *The Taxons*. The Taxons have three children, including their 14-year-old son,
6   Plaintiff K.T., who was diagnosed with autism around age 2. *Id.* ¶¶ 91, 94. Consistent
7   with their religious beliefs, the Taxons sent their two nondisabled children exclusively
8   to Orthodox Jewish schools. *Id.* ¶¶ 92, 98. The Taxons wished for K.T. to have the same
9   educational and religious opportunities as his brothers, *id.* ¶ 100, but the nonsectarian
10  requirement forced the Taxons not to follow their beliefs as to K.T. because they could
11  not afford to fund all of his services themselves, *id.* ¶¶ 101-03. Thus, unlike their other
12  two children who have been educated exclusively at Orthodox Jewish schools, K.T. has
13  been educated exclusively at public schools. *Id.* ¶¶ 92, 100, 105.

14  The Taxons do not believe K.T. is receiving a FAPE in public school, but that he
15  would receive one in an Orthodox Jewish school. *Id.* ¶ 108. K.T. misses out on needed
16  special education and related services both for secular and religious holidays and is
17  repeatedly served nonkosher food. *Id.* ¶¶ 109-14. But California's law prohibits them
18  from advocating for placement in an Orthodox Jewish school, and thus they must
19  continue not to follow their religious beliefs so that K.T. can receive needed services. *Id.*
20  ¶ 103. Every day K.T. spends in public school is a lost opportunity to receive both the
21  religious education and disability services his parents believe are necessary to his faith
22  and development. *Id.* ¶¶ 101-07.

23  *The Peretses*. The Peretses have six children, including their 14-year-old son,
24  Plaintiff N.P., who was diagnosed with autism at age 3 and a WAC gene mutation at age
25  6. *Id*. ¶¶ 116, 119. Consistent with their religious beliefs, the Peretses sent their five
26  nondisabled children exclusively to Orthodox Jewish schools. *Id.* ¶¶ 117, 122-23. But
27  like the Taxons, the Peretses have been prevented from following those beliefs with
28  respect to N.P. because they cannot afford the cost of providing for his special education

---

CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

9

and related services without California's funding. *Id.* ¶¶ 124-29, 149. Thus, unlike his five siblings, N.P. has received an education mainly in public school. *Id.* ¶¶ 123-29.

The Peretses do not believe that N.P. is receiving a FAPE in public school, but they believe he would receive one in an Orthodox Jewish school. *Id.* ¶¶ 130, 137. N.P. misses out on special education and related services both for secular and religious holidays and is repeatedly given nonkosher food to eat. *Id.* ¶¶ 141-48. School officials have even explicitly questioned the Peretses' interpretation of Jewish law, instructing them to send N.P. to school during the Jewish holiday Sukkot. *Id.* ¶¶ 144-46. But like the Taxons, California's nonsectarian requirement prohibits the Peretses from advocating that N.P. be placed in an Orthodox Jewish school. *Id.* ¶¶ 126, 149. Instead, he remains in public school, where day by day he loses the opportunity to receive an education crucial to nurturing his faith and supporting his disability. *Id.* ¶¶ 140, 149.

**D. School Plaintiffs attempt to support students with disabilities**

The Jean & Jerry Friedman Shalhevet High School and the Samuel A. Fryer Yavneh Hebrew Academy are co-educational, dual-curriculum Orthodox Jewish schools located in Los Angeles, California. *Id.* ¶¶ 150, 161. They are committed to helping Orthodox Jewish parents fulfill their duty to provide an Orthodox Jewish education to their children. *Id.* ¶¶ 151-52, 162-63. As such, alongside secular studies, Shalhevet and Yavneh emphasize "Torah values" and "a passion for Torah." *Id.* ¶¶ 151, 162.

Shalhevet and Yavneh both believe it is important to create a learning environment that includes as many in the Jewish community as possible, including students with disabilities. *Id.* ¶¶ 153-54, 163-64. As Shalhevet explains, "the Torah commands members of the Jewish community to care for the most vulnerable, including those with disabilities." *Id.* ¶ 153. "[T]his means working to ensure that children who are in need obtain the individualized support that each child requires." *Id.* However, accommodating the needs of students with disabilities often requires considerable financial resources, which Shalhevet and Yavneh lack. *Id.* ¶¶ 155, 164-65. To obtain these needed resources, Shalhevet and Yavneh feel compelled by their faith to explore NPS certification. *Id.*

¶¶ 156, 159, 165-66, 169. But they cannot even begin the process without being put to an impossible choice: attest that they are nonsectarian (and so give up their religious identity) or forgo altogether the opportunity to provide these services. *Id*. ¶¶ 157-60, 167-70. Shalhevet and Yavneh refuse to disavow their religious character as Jewish educational institutions, and so Defendants have categorically prohibited them from exploring NPS certification. *Id.*

### E. This lawsuit

On March 13, 2023, Plaintiffs filed this lawsuit. Dkt. 1. On May 22, Plaintiffs moved for a preliminary injunction on Counts I, III, and V of the complaint. Dkt. 28. On May 23, District Defendants LAUSD and Anthony Aguilar filed a motion to dismiss. Dkt. 29. On May 24, State Defendants CDE and Tony Thurmond did the same. Dkt. 31.

### STANDARD OF REVIEW

"When evaluating a Rule 12(b)(6) motion, the Court must accept as true all allegations of material facts that are in the complaint and must construe all inferences in the light most favorable to the non-moving party." *Tawfilis v. Allergan, Inc.*, 157 F. Supp. 3d 853, 860 (C.D. Cal. 2015). "A complaint need not state 'detailed factual allegations,' but must contain sufficient factual matter to 'state a claim to relief that is plausible on its face.'" *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A court resolves a motion under Rule 12(b)(1) "as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor." *Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d 1152, 1157 (9th Cir. 2017) (quoting *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014)).

**ARGUMENT**

Plaintiffs have standing and have stated claims upon which relief can be granted.

As an initial matter, Plaintiffs have standing to bring claims under the Free Exercise Clause, the Equal Protection Clause, and the unconstitutional conditions doctrine because they have suffered an injury in fact that is fairly traceable to Defendants' actions and can be redressed by this Court. Defendants' contrary arguments are meritless. Those arguments are premised on alleged "facts" directly contrary to allegations in the complaint. And they run headlong into binding precedent holding that Plaintiffs suffer an injury in fact when they are subjected to an unconstitutional process, regardless of whether they would ultimately obtain a benefit.

As to the merits, Defendants violate the Free Exercise Clause in a multitude of ways: first, by discriminating against religious institutions and families in violation of *Carson*, *Espinoza*, and *Trinity Lutheran*; second, by applying a statutory regime that is not generally applicable; and third, by violating Parent and School Plaintiffs' religious education rights under *Yoder*. And to top it all off, Defendants' actions are also unlawful under the Equal Protection Clause and the unconstitutional conditions doctrine. Accordingly, the Court should deny Defendants' motions to dismiss.[1]

**I.  Plaintiffs possess Article III standing.**

Defendants claim that Plaintiffs lack standing. Dkt. 31-1 at 14-22; Dkt. 29 at 19-27. Defendants are wrong.

---

[1] Plaintiffs acknowledge that under Ninth Circuit precedent, sovereign immunity applies to Plaintiffs' claims against Defendants California Department of Education and Los Angeles Unified School District. *See, e.g., Glenn v. Cal. Dep't of Educ.*, 709 F. App'x 499 (9th Cir. 2018); *Sato v. Orange Cnty. Dep't of Educ.*, 861 F.3d 923 (9th Cir. 2017). Plaintiffs also acknowledge that the Ninth Circuit has held that nominal damages are not available in official-capacity claims. *Platt v. Moore*, 15 F.4th 895, 910 (9th Cir. 2021). While recognizing that this Court is bound by those rulings, Plaintiffs preserve the issue of whether LAUSD is entitled to sovereign immunity for consideration by the Ninth Circuit or the Supreme Court.

To establish standing, Plaintiffs must show "(1) that they have suffered an injury in fact, (2) that their injury is fairly traceable to a defendant's conduct, and (3) that their injury would likely be redressed by a favorable decision." *Mecinas v. Hobbs*, 30 F.4th 890, 896 (9th Cir. 2022) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Each of these three elements "must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (quoting *Lujan*, 504 U.S. at 561) (alteration in original). At the pleading stage, courts "must accept as true all material allegations of the complaint and must construe the complaint in favor of the" party claiming standing. *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). "For standing purposes, [courts] accept as valid the merits of [plaintiffs'] legal claims[.]" *FEC v. Cruz*, 142 S. Ct. 1638, 1647 (2022). Where multiple plaintiffs bring a lawsuit, standing exists where "at least one plaintiff [has] standing to sue." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019). Here, viewing the complaint in the light most favorable to Plaintiffs demonstrates that each has standing.

## A. Plaintiffs have suffered an injury in fact.

### 1. Plaintiffs have sufficiently pleaded a discriminatory classification constituting an injury in fact.

Plaintiffs challenge California's nonsectarian restriction because, by explicitly discriminating on the basis of religion, it prevents Plaintiffs from accessing special-education benefits on an equal basis with nonreligious individuals and institutions. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017) ("The express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow the Church—solely because it is a church—to compete with secular organizations for a grant."). The Supreme Court and the Ninth Circuit have made clear time and again that "allegation[s] that some discriminatory classification prevent[s] the plaintiff from competing on an equal footing in its quest for a benefit" suffice to show injury in fact. *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City*

1  *of Jacksonville*, 508 U.S. 656, 667 (1993) (*AGC*); *see also City of Los Angeles v. Barr*,

2  929 F.3d 1163, 1173 (9th Cir. 2019) ("[The] inability to compete on an even playing

3  field constitutes a concrete and particularized injury.").

4      The identification of a discriminatory barrier in a benefits scheme suffices to

5  demonstrate standing, even if Plaintiffs cannot show they ultimately would receive that

6  benefit. "When the government erects a barrier that makes it more difficult for members

7  of one group to obtain a benefit than it is for members of another group, a member of

8  the former group seeking to challenge the barrier need not allege that he would have

9  obtained the benefit but for the barrier in order to establish standing." *Bras v. Cal. Pub.*

10  *Utilities Comm'n*, 59 F.3d 869, 873 (9th Cir. 1995) (quoting *AGC*, 508 U.S. at 666); *see*

11  *also Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280-281 n.14 (1978) ("[E]ven if

12  Bakke had been unable to prove that he would have been *admitted* in the absence of the

13  special program, it would not follow that he lacked standing."). This is because, even

14  "assum[ing]" that Plaintiffs will not ultimately obtain the benefit, courts must recognize

15  the "federal constitutional right to be considered . . . without the burden of invidiously

16  discriminatory disqualifications." *Turner v. Fouche*, 396 U.S. 346, 362 (1970). Thus, the

17  injury flows from the "denial of equal treatment resulting from the imposition of the

18  barrier, not the ultimate inability to obtain the benefit." *Bras*, 59 F.3d at 873.

19      Numerous decisions from the Supreme Court and this Court are instructive. For

20  instance, in *AGC*, plaintiffs challenged on constitutional grounds a program that set aside

21  10 percent of city contracts each year for "minority-owned businesses." 508 U.S. at 658.

22  Plaintiffs alleged that they "would have . . . bid on . . . designated set aside contracts but

23  for the restrictions imposed" *Id.* at 659. The court of appeals found the associational

24  plaintiff failed to demonstrate injury in fact "because it failed to allege that one or more

25  of its members would have been awarded a contract but for the challenged ordinance."

26  *Id.* at 664. But the Supreme Court roundly rejected this conclusion, holding that such a

27  rigid interpretation of injury in fact "cannot be reconciled with our precedents." *Id.* at

28  664. Surveying decades of decisions, the Supreme Court concluded that when plaintiffs

CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

14

challenge laws that erect discriminatory "obstacle[s]" to benefits or positions, or where they contend they are "excluded from consideration for a certain portion of benefits," standing does "not require any allegation that the plaintiffs would actually have" ultimately obtained the benefit. *Id.* at 664-67.

Likewise, in *Barr*, Los Angeles challenged a federal grant program that "permit[ted] DOJ to give 'preferential consideration, where feasible,' on specified grounds." 929 F.3d at 1170. Los Angeles believed two such grounds were unconstitutional, and so would not include them in its application. *Id.* at 1172. Arguing that the City had no standing, DOJ contended that "Los Angeles would not have received funding regardless of whether" it included the grounds in its application, but the Ninth Circuit held that "Los Angeles need not prove that it would have received funding absent the challenged considerations." *Id.* at 1173. And in *Bras*, the Ninth Circuit concluded that contractors challenging preferential programs "did not have to prove that they would lose any bids or identifiable contracts in order to sustain actual injury." 59 F.3d at 873.

Plaintiffs' challenge is on all fours with these cases. California's religious discrimination erects a categorical barrier that forces Plaintiffs to participate in the state's special-education program "on an unequal basis." *Bras*, 59 F.3d at 873. While parents who believe that a secular NPS provides the best placement for their children are free to advocate for that choice, Parent Plaintiffs—who believe a religious NPS would best serve Children Plaintiffs' needs—cannot. And while a secular private school may compete "on an even playing field" with every other private secular school—including out-of-state schools—to become certified as an NPS, religious schools cannot. *Barr*, 929 F.3d at 1173. Under binding precedent, this "denial of equal treatment resulting from the imposition of the barrier" is more than enough for standing. *Bras*, 59 F.3d at 873.

### 2. *Defendants' standing arguments fail.*

For their part, Defendants never contest that California's nonsectarian restriction operates precisely as Plaintiffs contend, barring all religious families from advocating for their children to be sent to religious schools as a means of receiving a FAPE, and

---

CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

15

barring all religious schools from applying for NPS certification. *See, e.g.*, Dkt. 31-1 at 7-8; Dkt. 29 at 12-13. Instead, they raise a series of arguments to evade clear and binding precedent holding that Plaintiffs have suffered an injury in fact. Each argument fails.

### a. Plaintiffs need not prove their case in advance to demonstrate standing.

First, Defendants argue that unless Parent Plaintiffs and Children Plaintiffs can prove in advance that they will eventually be placed in an NPS, they lack standing. Dkt. 31-1 at 20-24; Dkt. 29 at 19-24. Defendants similarly contend that unless School Plaintiffs can prove in advance that they would meet all other NPS qualifications and comply with all federal regulations—such that they would receive NPS certification *with certainty* absent the nonsectarian restriction—they, too, lack standing. Dkt. 31-1 at 15-19; Dkt. 29 at 24-26.

In essence, Defendants apply a "but-for" test to Plaintiffs' standing, asking this Court to decide whether, but-for California's nonsectarian restriction, they would ultimately prevail in NPS placement and certification, respectively. But as just explained, the Ninth Circuit and Supreme Court have rejected this exact argument time and again. *Bras*, 59 F.3d at 873; *AGC*, 508 U.S. at 666; *Barr*, 929 F.3d at 1173; *see also Trinity Lutheran*, 582 U.S. at 463. Defendants do not cite any of these cases, let alone attempt to distinguish them. That's because they can't: the holdings of these cases plainly apply here and doom Defendants' argument. *See also Gurrola v. Duncan*, 519 F. Supp. 3d 732, 738 (E.D. Cal. 2021) (rejecting argument that prospective EMTs could not challenge one aspect of EMT certification without proving they met all other requirements because "Plaintiffs do not have to show they would ultimately receive EMT certification without the challenged regulations.").

### b. School Plaintiffs are able and ready to seek NPS certification.

Second, Defendants contend that School Plaintiffs lack standing because they are not "able and ready" to pursue NPS certification, Dkt. 31-1 at 17-18; Dkt. 29 at 24-26; *see AGC*, 508 U.S. at 666. The "able and ready" inquiry focuses on the plaintiff's "intent," which ensures the presence of a sufficient injury in fact. *Gratz v. Bollinger*, 539 U.S.

244, 261-62 (2003). In the *pleading* context, the Supreme Court has already held that general allegations stating that a discriminatory barrier prevented a plaintiff from even applying to a governmental program met this test. *See AGC*, 508 U.S. at 659. This makes sense, since when "ruling on a motion to dismiss for want of standing," courts "must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Maya*, 658 F.3d at 1068. And "general factual allegations of injury resulting from the defendant's conduct may suffice" because courts "presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* It also makes sense given the injury: it would be illogical to force a plaintiff to demonstrate, in the face of a categorical barrier to entry, that it had complied with all the other requirements to obtain an impossible outcome. *See, e.g.*, *Real v. City of Long Beach*, 852 F.3d 929, 932-34 (9th Cir. 2017) (plaintiff did not need to, for standing purposes, jump through hoops of "rent[ing] a location, pay[ing] a large, nonrefundable application fee," and "wait[ing] while the permit was reviewed," all to submit an application that would ultimately be denied).

Under this low bar, School Plaintiffs have demonstrated they are able and ready to apply. They desire and intend to explore the NPS process as a means of meeting their religious obligations to serve children with disabilities. Dkt. 1 ¶¶ 152-55, 163-65. They are aware of the NPS requirements and, upon information and belief, believe they are capable of satisfying them. *Id.* ¶¶ 156, 166. But they know that pursuing certification is currently futile because of California's nonsectarian restriction. *Id.* ¶¶ 157-60; 167-70. Nothing more is required at this stage.

Defendants attempt to evade this conclusion by relying on *Carney v. Adams*, 141 S. Ct. 493 (2020). *See* Dkt. 31-1 at 15-18; Dkt. 29 at 24-26. But *Carney* was decided on *summary judgment*, not a motion to dismiss. 141 S. Ct. at 497. *Id.* at 496-97. After engaging in a "fact-specific" examination of the summary-judgment record, which "largely centered on [the plaintiff's] history and intentions in seeking a judgeship," the Supreme Court concluded that the plaintiff lacked standing because he was not "able and

ready" to pursue judicial candidacy. *Id.* at 497, 500-01. This case is different—it comes to the Court not on summary judgment, but at the pleadings stage. Defendants' invitation to scrutinize Plaintiffs' complaint with the type of granularity at issue in *Carney* is therefore wholly inappropriate. *AGC*, not *Carney*, controls this case, and School Plaintiffs have met its standard.

### c. Parent and Children Plaintiffs need not go through the IDEA process before challenging California's facially discriminatory exclusion.

Finally, Defendants contend that, because Parent and Children Plaintiffs' claims arise from California's implementation of IDEA, they are required to proceed through that statute's administrative process before bringing suit. Dkt. 31-1 at 20-21; Dkt. 29 at 24. But Plaintiffs are not bringing an IDEA claim; they are bringing a constitutional challenge to California state law, and Defendants cite no case where administrative exhaustion is required in this circumstance. And in any event, the Supreme Court and Ninth Circuit have made clear that "parents may bypass the administrative process where exhaustion would be futile or inadequate." *Honig*, 484 U.S. at 327; *Kerr Ctr. Parents Ass'n v. Charles*, 897 F.2d 1463, 1469 (9th Cir. 1990).

That is unquestionably the case here, where all parties agree the religious exclusion prohibits NPS certification for religious schools, State Defendants have doubled down on defending the categorical nonsectarian requirement, and District Defendants have given no indication they would petition for the requirement to be waived, *see also supra* at 5-7. Thus, the obvious conclusion is that forcing Plaintiffs to petition for NPS placement in a religious school through IDEA's labyrinthine administrative process before bringing suit would be the ultimate exercise in futility. *See Harrison v. Kernan*, 971 F.3d 1069, 1073-74 (9th Cir. 2020) (finding male inmate had standing to challenge prison's gender-specific property guidelines, even though "he has never sought access to any specific item of property," because "[t]o conclude otherwise could lead to the absurd result that an imprisoned man seeking to challenge the regulation would first need to place futile orders for every women-only product listed in the Department's vendor

catalogs before his challenge could proceed."); *Davis v. Guam*, 785 F.3d 1311, 1315 (9th Cir. 2015) ("[E]qual treatment under law is a judicially cognizable interest that satisfies the case or controversy requirement of Article III, even if it brings no tangible benefit to the party asserting it.").

**B. Plaintiffs' injury is traceable to Defendants' conduct and redressable by this Court.**

Plaintiffs also satisfy the remaining standing elements. Plaintiff's injury in fact consists of being subject to the unconstitutional NPS certification process that discriminates against their religious status and exercise. That injury is "fairly traceable" to Defendants' actions enforcing the religious exclusion, and Plaintiffs' requested relief—a declaration and injunction against the religious exclusion—would redress the injury alleged. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185-86 (2000) ("[A] sanction that effectively abates that conduct and prevents its recurrence provides a form of redress.").

State Defendants don't dispute causation or redressability. Nor could they, since they are the reason the nonsectarian restriction continues to be enforced against Plaintiffs. *See AGC*, 508 U.S. at 666 n.5. District Defendants, however, contend that School Plaintiffs lack standing to bring claims against them because the challenged conduct cannot be traced to them and because this Court cannot redress any injury. They claim causation is lacking by pointing their fingers at State Defendants: "School Plaintiffs' alleged injury . . . is not traceable to any LAUSD action and [is] instead the result of the independent action of the state Superintendent and CDE." Dkt. 29 at 26. Not so. The District is heavily involved in the certification process, including through a required "opportunity to provide input on all required components of the application." Cal. Educ. Code § 56366.1(b)(1). District Defendants thus participate in enforcing California's unconstitutional law as part of the certification process. Moreover, as described *supra* at 6-7, District Defendants may petition for a waiver of the unconstitutional requirement, which they are unwilling to do.

Far from being mere bystanders, then, District Defendants are active participants in California's scheme of excluding religious children and schools from IDEA benefits. And District Defendants could remedy the harm by refusing to enforce it in its contracts with an NPS. An example explains why District Defendants cannot stand idly by: Were CDE to implement a policy requiring race-based discrimination in violation of the Constitution, LAUSD would not, and could not, escape liability by pleading unquestioning obedience to the law. "Sorry about the segregation, but there's nothing we can do" would be no excuse. The Constitution obligates LAUSD not to discriminate. It cannot do so here, either.

As for redressability, District Defendants assert that an order from the Court cannot redress School Plaintiffs' injury because LAUSD and the School Plaintiffs must first negotiate master contracts, and "LAUSD cannot compel a private entity to contract with it." Dkt. 29 at 26. But this argument again misunderstands the School Plaintiffs' injury. School Plaintiffs are not asking for the Court to "compel" the parties to enter into a contract; they simply ask this Court to remove the unconstitutional barrier that prevents them from negotiating a contract with *any* LEA, including LAUSD, merely because they are religious. Removing that barrier would result in a "'change in a legal status,' and . . . a 'practical consequence of that change would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) (citing *Utah v. Evans*, 536 U.S. 452, 464 (2002)). That is all that redressability requires.

## II. Defendants violate the Free Exercise Clause.

As this Court has previously recognized, "[a] motion under Rule 12(b)(6) is not the proper vehicle for seeking a ruling on the merits of claims." *Rosen v. Amazon.com*, No. 14-cv-2115, 2014 WL 12597073, at *1 (C.D. Cal. May 28, 2014). Yet Defendants seek exactly that. They refuse to "accept factual allegations in the complaint as true," *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008), and instead improperly ask this Court to resolve numerous factual disputes at the motion-to-

---

dismiss stage. But this Court need not wade into complex factual and constitutional issues to resolve this motion. Well-settled law and the well-pleaded complaint confirm Plaintiffs have alleged sufficient facts to easily satisfy the 12(b)(6) hurdle.

### A. Defendants violate the Free Exercise Clause under *Carson, Espinoza, and Trinity Lutheran* by categorically excluding Plaintiffs because of their religion (Count I).

Plaintiffs' first claim under the Free Exercise Clause (Count I) alleges that Parent Plaintiffs have been excluded from advocating for Children Plaintiffs to receive a FAPE at an Orthodox Jewish NPS, Dkt. 1 ¶ 178, and School Plaintiffs have been categorically excluded from participating in the NPS program, *id.* ¶ 179. As Plaintiffs' complaint confirms, Parent Plaintiffs wish to advocate for their children to receive a FAPE in an Orthodox Jewish school, but they cannot do so because of California's nonsectarian restriction. *See id.* ¶¶ 90, 100-103, 124-26. California's nonsectarian restriction thus coerces Parent and Children Plaintiffs by forcing them to choose between their religious beliefs and needed services. *Id.* ¶¶ 90, 103, 126. And School Plaintiffs are private Jewish schools that "seek[] to qualify to provide a religious education to children with disabilities," *id.* ¶¶ 32, 34, but are deemed ineligible at the very outset because they are "sectarian." *Id.* ¶¶ 58, 157, 167. In other words, any religiously affiliated school—*regardless of the content of its educational curriculum*—is categorically excluded from the NPS program. Thus, California's nonsectarian restriction coerces School Plaintiffs by forcing them to choose between their religious beliefs and NPS certification. *See id.* ¶¶ 159-60, 169-70, 179.

#### 1. *California's exclusion of religious schools cannot be reconciled with Supreme Court precedent.*

The well-pleaded facts in Plaintiffs' complaint more than suffice to show that California's categorical exclusion of religious families and institutions from its NPS program violates well-established Supreme Court precedent. Just last term, the Supreme Court in *Carson* held that Maine's exclusion of sectarian schools from its tuition funding program violated the First Amendment. *Carson v. Makin*, 142 S. Ct. 1987, 1997 (2022).

---

CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

21

In *Carson*, the Supreme Court evaluated the constitutionality of Maine's educational-assistance program, which allowed a private school to receive tuition payments as a means of fulfilling the statutory right to "a free public education" in school districts with no public secondary schools. *Id.* at 1993. But just like California, Maine "approved" only "nonsectarian" private schools for the program. *Id.* at 1993, 1994. Holding the "nonsectarian" restriction unconstitutional, the Supreme Court "deemed it 'unremarkable'" that the First Amendment prohibits States from "expressly discriminat[ing] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." *Id.* at 1996 (quoting *Trinity Lutheran*, 582 U.S. at 462). Under decades-old precedent, a program that "excludes religious observers from otherwise available public benefits" because of their religion amounts to a "indirect coercion or penalt[y] on the free exercise of religion." *Id.*; *see, e.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993); *McDaniel v. Paty*, 435 U.S. 618, 627 (1978) (plurality op.); *Everson v. Bd. of Educ.*, 330 U.S. 1, 16 (1947) (States "cannot exclude" individuals "because of their faith, or lack of it, from receiving the benefits of public welfare legislation"). Nor could Maine escape this conclusion by repackaging its discrimination as necessary to provide a "free public education." *Carson,* 142 S. Ct. at 1998. As the Court explained, "Maine may provide a strictly secular education in its public schools," but the private schools receiving funds "are not public schools." *Id.* at 2000.

*Carson* is the third case in a string of recent Supreme Court precedent confirming this point. In *Espinoza*, the Supreme Court held unconstitutional "Montana's no-aid provision," which, like California's constitution, "bar[red] religious schools from public benefits solely because of the religious character of the schools." *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2255 (2020); *compare* Mont. Const. art. X, § 6(1) with Cal. Const. art. IX, § 8. "The provision also bar[red] parents who wish to send their children to a religious school from those same benefits, again solely because of the religious character of the school." *Espinoza*, 140 S. Ct. at 2255. The Court further

explained that this restriction was "apparent from the plain text" of the law, which excluded "aid to any school 'controlled in whole or in part by any church, sect, or denomination.'" *Id.* And in *Trinity Lutheran*, the Supreme Court held that Missouri violated the First Amendment by excluding sectarian schools from a competitive grant program, explaining that Missouri's "policy expressly discriminates against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." 582 U.S. at 462.

Just as in *Carson, Espinoza*, and *Trinity Lutheran*, California has created a program by which it makes available IDEA and state special-education funds to certain certified private schools, so long as they are not religious. That facially discriminatory exclusion—which no Defendant disputes is in fact an exclusion—imposes a "special disabilit[y]" on Plaintiffs in violation of the First Amendment. *Id.* at 461.

### 2. Defendants' counterarguments are meritless.

Defendants do not (and cannot) dispute either the law or the allegations outlined above. Instead, they attempt to recharacterize the law and the complaint, litigate the merits of Plaintiffs' constitutional claims based on *their* factual allegations, and point to irrelevant alternative government programs. None of these arguments have merit, but more importantly, they cannot succeed at the motion to dismiss stage.

**Substantial burden.** Laws that are not "neutral and generally applicable" may be challenged "[r]egardless of the magnitude of the burden imposed." *Fazaga v. FBI*, 965 F.3d 1015, 1058 (9th Cir. 2020), *rev'd on other grounds,* 142 S. Ct. 1051 (2022); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 170 (3d Cir. 2002) ("[T]here is no substantial burden requirement when government discriminates against religious conduct."). That's because "a law targeting religious beliefs as such is never permissible." *Trinity Lutheran*, 582 U.S. at 466 n.4.

Even so, Plaintiffs have alleged a substantial burden. As the Supreme Court has long held, "condition[ing] the availability of benefits upon [an individual's] willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise

---

CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

23

of her constitutional liberties." *Sherbert v. Verner*, 374 U.S. 398, 406 (1963). That's precisely what California's religious exclusion does. California forces Parent Plaintiffs to abandon the "cardinal principle" that obligates them to send their children to Orthodox Jewish schools if they wish to receive necessary funding for that child's education. *Id.* And it forces Jewish schools like Shalhevet and Yavneh to forgo their religious obligation to welcome all students unless they "disavow [their] religious character." *Trinity Lutheran*, 582 U.S. at 463.

State Defendants argue that Plaintiffs merely allege "offen[se]" at "government actions that address religion in some way," rather than a substantial burden. Dkt. 31-1 at 24. But the only case State Defendants cite for this proposition, *Cal. Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1019-20 (9th Cir. 2020), is far removed from the facts of this case and instead confirms Plaintiffs have alleged a substantial burden on their religious exercise. *Torlakson* involved a claim that certain curricula "denigrates Hinduism and is therefore not neutral with respect to religion." *Id.* at 1015. The plaintiffs in *Torlakson* cited *Trinity Lutheran* and *Espinoza*, but the court found those cases inapposite because "[w]e are not dealing with a state program that provides financial or other similar benefits," and "[t]he state has not carved out any exclusion for religious education." *Id.* at 1019. But of course, a program that provides benefits is precisely what this lawsuit concerns, and as *Torlakson* confirms, "the exclusion of religious institutions from beneficial programs amounted to a financial penalty, and . . . the Free Exercise clause prohibits such 'indirect coercion or penalties on the free exercise of religion.'" *Id.*

***Public benefit.*** Defendants make multiple arguments that Plaintiffs have not challenged any public benefit. All fail.

First, District Defendants assert that Parent and Children Plaintiffs "cannot point to exclusion from public benefits" because "[c]ourts have . . . held that the availability of public benefits to children with disabilities attending public schools versus private religious schools does not violate the Free Exercise Clause[.]" Dkt. 29 at 28-29 (citing

1    *Norwood v. Harrison*, 413 U.S. 455 (1973); *Gary S. and Sylvie S. v. Manchester Sch.*
2    *Dist.*, 374 F.3d 15 (1st Cir. 2004)). These citations show Defendants' understanding of
3    the jurisprudence in this area to be a half-century out-of-date. *Norwood* rested on the
4    premise that "[t]he Religion Clauses of the First Amendment strictly confine state aid to
5    sectarian education," 413 U.S. at 462—a proposition flatly contradicted by *Carson* and
6    *Espinoza* (among others). And *Gary S.* dealt with a challenge to IDEA's parental
7    placement scheme, which "provid[es] to all disabled attendees at private schools, both
8    sectarian and secular, fewer benefits than those granted to public school attendees." *Id.*
9    at 19. Unlike California's nonsectarian restriction, then, it did not involve explicit
10   exclusion of religious adherents from a government program.

11       Second, all Defendants argue that because the NPS certification involves a contract
12   and an ongoing relationship with the government, it is not a public benefit and "cannot
13   reasonably be compared to [the] one-and-done" funding at issue in *Trinity Lutheran*,
14   *Espinoza*, and *Carson*. Dkt. 29 at 31; *see also* Dkt. 31-1 at 26. But as with its other
15   attempts to turn back the clock on the First Amendment, this tack also fails.

16       *Fulton v. City of Philadelphia* confirms that the government *can* be required to
17   contract with religious entities if its decision not to do so is based on the religious
18   exercise of the organization. 141 S. Ct. 1868, 1878 (2021). In *Fulton*, the City of
19   Philadelphia claimed that even though a provision in its contract for foster services was
20   not generally applicable, "[it] should have a freer hand when dealing with contractors."
21   *Id.* The Court rejected that argument and made explicit that it "ha[s] never suggested that
22   the government may discriminate against religion when acting in its managerial role."
23   141 S. Ct. 1868, 1878 (2021).

24       No Defendant cites *Fulton*. State Defendants cite only *Teen Ranch, Inc. v. Udow*, 479
25   F.3d 403 (6th Cir. 2007). Dkt. 31-1 at 26. But not only did *Teen Ranch* predate *Fulton*,
26   it also relied on *Locke v. Davey*, 479 F.3d at 409-10, which the Supreme Court has all
27   but confined to its facts. *See Carson*, 142 S. Ct. at 2002 ("*Locke* cannot be read beyond
28   its narrow focus on vocational religious degrees to generally authorize the State to

---

exclude religious persons from the enjoyment of public benefits on the basis of their anticipated religious use of the benefits."); *Espinoza*, 140 S. Ct. at 2257 (similar); *Trinity Lutheran*, 137 S. Ct. at 2023 (similar). *Teen Ranch*'s conclusion that a government may discriminate against religion in its contracts is no longer good law, nor is it binding or even persuasive authority here.

Third, State Defendants argue that NPS certification is not a public benefit but rather a means by which California provides children with disabilities a public education. Dkt. 31-1 at 24-27. According to State Defendants, the mere fact that *nonpublic* schools are "deemed" public schools for purposes of certain funding streams, treated "in the same manner" as public schools for purposes of accountability, and utilize certain state-approved curricula, converts these nonpublic schools into public schools. *See* Dkt. 31-1 at 8-10. This argument is belied by the very name "nonpublic, nonsectarian school"— which is defined as "a *private*, nonsectarian school that enrolls individuals with exceptional needs pursuant to an individualized education program and is certified by the department." Cal. Educ. Code § 56034 (emphasis added); *see also Carson*, 142 S. Ct. at 1998 (looking to statutory language to determine whether private schools provided a public education). In State Defendants' topsy-turvy view, public is the same thing as private. That conclusion cannot be credited.

Nor can California repackage its NPS program as a means to provide "the state's public (and secular) education" so it can exclude religious schools. Dkt. 31-1 at 27. Maine tried the same "public education" gambit in *Carson* and the Supreme Court roundly rejected it. *Carson*, 142 S. Ct. at 1998. There, Maine argued that its public benefit was "a free public education," and paid for private school tuition only when it could not provide an adequate public school education. *Carson*, 142 S. Ct. at 1993, 1998. But the fact that this benefit was only made available to parents for whom a Maine public school education was not available didn't change the analysis. *Id*. As the Court explained, if States were permitted to impose disabilities on religious entities merely by invoking the "magic words" of "public education," then the "substance of free exercise

protections" would be eviscerated. *Id.* at 2000. That is precisely what State Defendants seek to do here.

California has not chosen to use the public school system to provide a FAPE to all students with disabilities; instead, it contracts with private schools to provide this service. A "State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious." *Carson*, 142 S. Ct. at 2000. And School Plaintiffs have alleged that they could otherwise satisfy the NPS requirements—the reason they are ineligible is not the content of their education (even wholly secular education at a "sectarian" school would be barred). Dkt. 1 ¶¶ 156, 166. "Regardless of how the benefit and restriction are described, the program operates to identify and exclude otherwise eligible schools on the basis of their religious exercise." *Carson*, 142 S. Ct. at 2002.

***Parental placement.*** Finally, Defendants suggest that the religious exclusion doesn't harm Plaintiffs because Parent Plaintiffs can still "parentally place" their Children Plaintiffs in a private religious school, and School Plaintiffs can still receive funding through this program. Dkt. 31-1 at 27; Dkt. 29 at 27, 30. But parents who use parental placement to put their children in a private school lose access to the comprehensive benefits otherwise available to children with disabilities who are placed in an NPS, most crucially the support of an IEP. *See* Dkt. 1 ¶¶ 46-48 (describing services provided under IDEA); *see supra* at 2-3; Dkt. 31-1 at 3-5 (describing difference between parental placement and placement as a means of receiving a FAPE). The theoretical availability of an inferior alternative in which children with disabilities have no substantive right to guaranteed services does not absolve California of its decision to completely deny Parent Plaintiffs the opportunity to place their Plaintiff Children in a religious NPS.

**B. Defendants violate the Free Exercise Clause under *Lukumi*, *Fulton* and *Tandon* by permitting individualized and categorical exemptions (Counts II and III).**

Under the Free Exercise Clause, laws that are not neutral and generally applicable are subject to strict scrutiny. *See Lukumi*, 508 U.S. at 542-46; *Fulton*, 141 S. Ct. at 1877.

And a law is not generally applicable if it either allows for "individualized exemptions," *Lukumi*, 508 U.S. at 538, or "treats comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). Indeed, California has elsewhere "concede[d] that the existence of a 'system of individual exemptions'" subjects the decision "not to expand the . . . exemption framework to [religious entities] to strict scrutiny." *Foothill Church v. Watanabe*, 623 F. Supp. 3d 1079, 1093 (E.D. Cal. 2022) (quoting *Fulton*, 141 S. Ct. at 1877).

California's law is not generally applicable because it permits District Defendants to petition for a waiver of the NPS certification requirements, which the Board of Education has discretion to approve. Dkt. 1 ¶¶ 199, 200; *supra* at 6-7. But it categorically excludes all religious schools from being able even to seek a waiver. Dkt. 1 ¶ 189. On top of that, this system of individualized exemptions grants Defendants discretion to waive any requirements, yet they have refused to do so for the nonsectarian requirement. *Id.* ¶¶ 199-200. This case is thus controlled by *Fulton*, where the Supreme Court held that governmental discretion to waive a contractual nondiscrimination requirement triggered strict scrutiny. 141 S. Ct. at 1878.

Tellingly, neither the State nor District Defendants contest this waiver process, cite *Fulton*, or directly address either Count II or III of Plaintiffs' complaint. *See generally,* Dkt. 31-1 at 23-36; Dkt. 29 at 27-31. Nor do District Defendants contend that they have ever petitioned for a waiver of the nonsectarian requirement or would be willing to do so here. They thus provide no basis for this Court to ignore the undisputed allegations in Plaintiffs' complaint.

**C. Defendants violate the Free Exercise Clause under *Yoder* and *Smith* by infringing on Plaintiffs' right to direct the education of children (Count VI).**

When a law restricts the "right of parents . . . to direct the [religious] education of their children," strict scrutiny applies. *Emp. Div. v. Smith*, 494 U.S. 872, 881 (1990). This right "reflect[s] a strong tradition of parental concern for the nurture and upbringing of their children," as well as the role that religious schools "play in the continuing

survival of [religious] communities." *Wisconsin v. Yoder*, 406 U.S. 205, 232, 235 (1972); *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925). Count VI of the complaint is premised on this claim.

District Defendants offer no argument regarding the merits of Count VI and thus concede it. In their 12(b)(6) arguments, State Defendants assert that the parental right is limited to 'the right to choose a private education (which may cost money) instead of the state's free public education[.]" Dkt. 31-1 at 30-31. They are wrong, and their assertion also misunderstands Plaintiffs' claims. Plaintiffs are not seeking to "dictate the [public] school's policies" or "modify . . . curriculum"—they are seeking the right to send their child to a private religious school and to provide a religious education with the aid of otherwise generally available public funds. *Id*. As Parent Plaintiffs alleged in their complaint, they "believe they are obligated" to send their children to "Orthodox Jewish schools" but are "unable" to do so for their children with disabilities because these schools lack the "otherwise available funding" necessary to make this a viable choice. Dkt. 1 ¶¶ 68, 82, 86-90, 98, 101, 122, 125-26, 220. And School Plaintiffs similarly alleged that they are unable to "offer their religious curriculum to children with disabilities" due to California's discriminatory law. *Id*. ¶¶ 219-20. Defendants' decision to limit funds for disability services to nonreligious schools forecloses Plaintiffs' ability to choose or offer a religious education for children with disabilities. That is the core right protected by the *Meyer-Pierce* line of cases. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (affirming the right "to direct the education and upbringing of one's children"); *Yoder*, 406 U.S. at 211 (emphasizing the importance of parents' ability to ensure that their children are not "away from their community, physically and emotionally, during the crucial and formative adolescent period of life"). And regardless, when the sole dispute raised by Defendants regards "the scope of the substantive 'right' asserted in Plaintiffs' final Count," Dkt. 31-1 at 30, there is no question Plaintiffs have alleged more than a plausible right to relief.

**D. Defendants cannot satisfy strict scrutiny.**

Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). "[W]hether the [government's] policy can withstand such scrutiny . . . [is a] fact-dependent inquir[y] that [is] unsuitable for resolution at the pleading stage." *Duronslet v. County of Los Angeles*, 266 F. Supp. 3d 1213, 1223 (C.D. Cal. 2017). But regardless, none of Defendants' arguments satisfy "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

***Compelling governmental interest.***[2] The primary compelling interest Defendants claim is an alleged interest in avoiding "direct governmental oversight of a religious entity" that would supposedly occur if the LEA were required to monitor a religious NPS's compliance with the NPS program, the IDEA, and a student's IEP. Dkt. 31-1 at 32, 36; Dkt. 29 at 32-35. But Defendants' theory is as outdated as the authority they cite. While State Defendants cite no cases that oversight equates to entanglement, Dkt. 31-1 at 36, District Defendants rely on *Lemon v. Kurtzman*, 403 U.S. 602 (1971), and a host of its progeny from the 1970s and 1980s to support this conclusion. Dkt. 29 at 33-34. District Defendants' theory faces a critical problem, however: *Lemon* was "long ago abandoned" by the Supreme Court and explicitly overruled in favor of a test focusing on "historical practices and understandings" in *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2427-28 (2022); *Groff v. DeJoy*, --- S. Ct. ---, 2023 WL 4239256, at *7 n.7 (June 29, 2023) (unanimously recognizing *Lemon* as "now abrogated" by *Kennedy*); *see also Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1164 (9th Cir. 2022) ("As the Supreme Court emphasized in *Kennedy*, the Establishment Clause does not compel the government to purge from the public sphere anything an objective observer could reasonably infer endorses or partakes of the religious." (cleaned up)). These cases thus provide District

---

[2]   District Defendants incorrectly assert that strict scrutiny only requires the government to present a "[l]egitimate" interest, not a compelling one. Dkt. 29 at 32.

1   Defendants with no aid. Moreover, Defendants do not explain how any of the
2   supervisory functions they identify would, on their face, require any entanglement
3   between California and a religious NPS's beliefs or doctrine. They thus have not
4   demonstrated that entanglement exists at all, let alone entanglement sufficient to survive
5   strict scrutiny.

6       The same error infects Defendants' other entanglement argument: that the NPS
7   funding would violate the Establishment Clause because it does not reach schools
8   "wholly" through "genuine[ly]" independent private choice. *See* Dkt. 31-1 at 32-34; *see
9   also* Dkt. 29 at 33-34 (quoting *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002); *Mitchell
10  v. Helms*, 530 U.S. 793, 810 (2000)). But as the Supreme Court explained in *Carson* just
11  a year ago, the rule of *Zelman* is that "a neutral benefit program in which public funds
12  flow to religious organizations through the independent choices of private benefit
13  recipients does not offend the Establishment Clause." *Carson*, 142 S. Ct. at 1997. Here,
14  private individuals make independent choices concerning a child's placement that
15  determine where IDEA funds flow, so the program comes easily within the rule of
16  *Carson* and *Zelman*. Nothing in *Carson* says that government bodies must be *entirely*
17  uninvolved. In fact, in *Carson*, Maine had to "approve[ ]" any school where tuition funds
18  would be used—just like Defendants have to certify nonpublic schools in California.
19  *Carson*, 142 S. Ct. at 1993.

20      Moreover, Defendants' position rests on an error of logic. *Carson* and *Zelman* hold
21  that a system of independent choice means there is no Establishment Clause violation.
22  But it does not follow that that proposition's logical inverse is also true: if there were no
23  system of independent choice, that would not necessarily mean that the Establishment
24  Clause had been violated. Instead, "the Establishment Clause must be interpreted by
25  reference to historical practices and understandings" and in a way that will "faithfully
26  reflect the understanding of the Founding Fathers." *Kennedy*, 142 S. Ct. at 2428 (cleaned
27  up). Defendants make no effort to meet this standard.

28

---

1    Defendants also allege an interest in "heightened protection against indoctrination
2    and coercion" in K-12 students. Dkt. 31-1 at 35; Dkt. 29 at 35. Aside from being
3    premised on the now-defunct *Lemon* test, this "concern" is wholly misplaced—
4    certifying Plaintiffs Schools as NPS's in California does not require any LEA or family
5    to send a child to a religious school against the parents' wishes. Any family would
6    remain free to advocate for their child to be placed in a different institutional setting,
7    which is precisely what Parent Plaintiffs desire to do for Children Plaintiffs.

8    At bottom, all of Defendants' justifications rely on outdated—or in some cases
9    explicitly overruled—precedent. Defendants make no attempt to ground their fears of
10   entanglement in history, let alone modern jurisprudence. That's because they can't.
11   Modern Establishment Clause jurisprudence does not treat all government funding of
12   religious entities as excessively entangling, and Defendants have wholly failed to carry
13   their burden of demonstrating that such entanglement exists.

14   What is more, Defendants' arguments overlook that California's alleged interests in
15   not allowing public funds to flow to religious schools cannot be compelling because it
16   *already* provides funding to religious schools when children with disabilities are
17   parentally or unilaterally placed in those schools. Dkt. 31-1 at 2; Dkt. 29 at 14
18   (describing programs). If California is willing to fund private religious schools in this
19   way (which it even touts as an alternative for Plaintiffs here, *id.*), it can hardly have a
20   compelling interest in excluding all religious schools from its NPS certification program.
21   *Espinoza*, 140 S. Ct. at 2261 ("A law does not advance 'an interest of the highest order
22   when it leaves appreciable damage to that supposedly vital interest unprohibited.'"
23   (citation omitted)).

24   ***Narrow tailoring.*** Rather than mount any argument that California has chosen the
25   least-restrictive means necessary to achieve its interests, Defendants simply claim,
26   without any support, that "the nonsectarian requirement is narrowly tailored to serve
27   compelling state interests." Dkt. 31-1 at 36; Dkt. 29 at 35. That alone is enough to find
28   that Defendants have not carried their burden of proving strict scrutiny and to deny their

motions. *See, e.g., Waln*, 54 F.4th at 1163 & n.8; *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 823 n.4 (9th Cir. 2013). Nor is it surprising that they offer no argument: If entanglement or religious indoctrination were a real concern, California could enact targeted limitations on their NPS certification program to prevent funding of religious activity. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 804 (2011) ("vastly overinclusive" statute not narrowly tailored); *Lukumi*, 508 U.S. at 578 (1993) (Blackmun, J. & O'Connor, J., concurring) ("A State may no[t] . . . create an overinclusive statute, one that encompasses more protected conduct than necessary to achieve its goal. . . . [T]he broad scope of the statute is unnecessary to serve the interest, and the statute fails for that reason."). Defendants have not done that, instead excluding all religious schools "whatever might be the actual character of the education program." Dkt. 1 ¶ 58.

Defendants' purported interest in avoiding "steering" parents to particular religious schools, Dkt. 31-1 at 31; Dkt. 29 at 35; exemplifies this over-inclusiveness: the complete exclusion of *all* "sectarian" schools from the NPS program is not a narrowly tailored response to this purely hypothetical concern. *See Espinoza*, 140 S. Ct. at 2252 (rejecting Montana's attempt to avoid funding religious schools through scholarships by invalidating the scholarship program altogether).

While assessing strict scrutiny isn't even appropriate at the 12(b)(6) stage, Defendants nevertheless lack a compelling government interest and fail narrow tailoring. Plaintiffs' Free Exercise claims are not only plausible but meritorious.

## III.  Defendants violate the Equal Protection Clause (Count IV).

The Equal Protection Clause "guarantees that the government will not classify individuals on the basis of impermissible criteria." *Seeboth v. Allenby*, 789 F.3d 1099, 1104 (9th Cir. 2015). "The first question courts must ask when conducting an equal protection analysis is whether the legislative or administrative classification at issue burdens a 'suspect' or 'quasi-suspect' class." *Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001). "If the statute employs a suspect class (such as race, religion, or national origin) or burdens the exercise of a constitutional right, then courts must apply strict

scrutiny, and ask whether the statute is narrowly tailored to serve a compelling governmental interest." *Id.*; *see also Al Saud v. Days*, 50 F.4th 705, 710 (9th Cir. 2022) ("Religion is a suspect class[.]").

Here, Count IV of the complaint clearly alleges an Equal Protection Clause violation in two ways. First, California's law draws facial distinctions based on religion because it permits certification for nonsectarian schools, but categorically prohibits the same for religious schools. Dkt. 1 ¶¶ 55-59, 205-06. Religious parents are therefore also unable to advocate for their children to be placed in a religious NPS due to a facially discriminatory religious classification. *Id.* ¶¶ 8, 21, 25, 29, 205-06. The law at issue here is thus subject to strict scrutiny, which Defendants cannot satisfy. *See supra* 30-33. Second, California law also burdens Plaintiffs' free exercise rights, and because the free exercise of religion is a "fundamental right," strict scrutiny is independently warranted. *Prince v. Jacoby*, 303 F.3d 1074, 1078 (9th Cir. 2002); *see also Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974) (same).

Defendants argue that no religious discrimination takes place because religious parents are not excluded from the provision of a FAPE or the IEP process. Dkt. 31-1 at 38-39; Dkt. 29 at 32. That, of course, is not Parent Plaintiffs' argument. Their argument is that the facial discrimination against religious schools prevents Parent Plaintiffs, because they are religious, from advocating for their children to be placed in the NPS that they believe will meet the FAPE requirement—a right available to every other parent. That is a clear-cut violation of the Equal Protection Clause, where courts merely ask whether a government's "classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Wilson v. Lynch*, 835 F.3d 1083, 1098 (9th Cir. 2016).

State Defendants' arguments to dismiss Plaintiff Schools' claims are even further afield. They argue that any discrimination against religion is not invidious because (1) religious private schools are not similarly situated to nonreligious private schools (Dkt. 31-1 at 38-39) and (2) the law discriminates only *against* religion and not *between*

religions and is subject only to rational basis review (*id.* at 39-40). It is notable that District Defendants make neither of these arguments. *See* Dkt. 29 at 31-32 (moving only to dismiss count with respect to Parent Plaintiffs and Children Plaintiffs).

The "similarly situated" argument is not only meritless, it proves Plaintiffs' point. The "objective" of the NPS statute is to educate children with disabilities in nonpublic schools. *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974). The "persons" regulated by the statute are NPS applicants. Religious private school applicants are similarly situated to secular private school applicants for purposes of providing an education in all ways relevant to the statute's objective—in their ability to obtain credentialing, provide services, abide by legal requirements, and every other aspect of the NPS process. The only distinction between the two groups is their religious status and exercise, which makes nonsectarian schools the ideal control group to "isolate the factor allegedly subject to impermissible discrimination"—religion. *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995). Indeed, every one of State Defendants' distinctions between private nonsectarian schools and private religious schools *rests on religion*, proving that religion is the only factor that underlies California's discriminatory treatment of School Plaintiffs. *See* Dkt. 31-1 at 35, 38 (listing the "'neutrality re: *religion*' principle," the "advance[ment of] *religious* views" in the K-12 context, the "purposes of *sectarian* organizations," and oversight of religious groups (emphasis added) (cleaned up)). State Defendants' own arguments thus prove that private nonsectarian schools are similarly situated to private religious schools in all relevant respects such that any distinctions are drawn based on religious status and exercise.

As for State Defendants' discrimination-against-religion argument, to state it is to refute it. Though discriminating against specific religious denominations certainly triggers strict scrutiny, *see Larson v. Valente*, 456 U.S. 228, 244 (1982), it simply does not follow that discriminating against religion generally is constitutional. If that were the case, a statute would be unconstitutional if it favored Christians over Buddhists, but it would pass constitutional muster if it favored believers over nonbelievers, or vice-versa.

That is not the law. *See, e.g., Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1266 (10th Cir. 2008) ("[S]tatutes involving discrimination on the basis of religion, including interdenominational discrimination, are subject to heightened scrutiny [under] the Equal Protection Clause[.]").

None of the cases cited by State Defendants suggest otherwise. Dkt. 31-1 at 40. *Corp. of Presiding Bishop v. Amos* was an Establishment Clause case, not an Equal Protection Clause case. 483 U.S. 327, 338 (1987). *Droz v. C.I.R.* doesn't apply because the statute there didn't draw religious distinctions on its face, unlike California's facial disqualification of "nonsectarian" institutions. 48 F.3d 1120, 1124 (9th Cir. 1995) (statute at issue was "not facially discriminatory"). And *St. John's United Church of Christ v. City of Chicago* likewise involved "a facially neutral statute" and noted that the law "neither classifies *on the basis of religion* nor discriminates among religions," confirming that both forms of discrimination trigger strict scrutiny. 502 F.3d 616, 638, 639 (7th Cir. 2007) (emphasis added). In any event, State Defendants' quibbling over "the level of scrutiny to apply or whether the [State's] policy can withstand such scrutiny" is "premature" as "[b]oth are fact-dependent inquiries that are unsuitable for resolution at the pleading stage." *Duronslet*, 266 F. Supp. 3d at 1223. In sum, Count IV of the complaint states an Equal Protection Clause claim.[3]

## IV.  Defendants violate the unconstitutional conditions doctrine (Count V).

The Supreme Court "has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, . . . [i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). This applies equally to First Amendment cases. *Id.*; *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (unconstitutional conditions doctrine

---

[3]  To the extent State Defendants argue no Equal Protection violation exists because no fundamental right is burdened, Dkt. 31-1 at 39, their arguments fail for the reasons described *supra* at 20-33.

prevents the government from denying a person their First Amendment rights as "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental [efforts] that fall short of a direct prohibition against the exercise of First Amendment rights"); *see also S.F. Cnty. Democratic Cent. Comm. v. Eu*, 826 F.2d 814, 823 (9th Cir. 1987) ("The First Amendment bars the government from attaching unconstitutional conditions even to benefits the government has no obligation to bestow."); *Blaisdell v. Frappiea*, 729 F.3d 1237, 1242 (9th Cir. 2013) (same). Here, by forcing private religious schools to abandon their religious identity as a prerequisite to applying for NPS certification, California has violated the unconstitutional conditions doctrine (Count V) by coercing schools into forgoing their free exercise rights.

District Defendants do not even address this count, and so concede it. State Defendants claim that no unconstitutional condition exists here because the "nonsectarian" restriction is rationally related or has a "nexus" to the State's NPS objectives. Dkt. 31-1 at 28-30. In support, they cite the test for assessing unconditional conditions under the *Fourth and Fifth Amendments*, *id*., while ignoring cases arising under *the First Amendment*.[4] But the Supreme Court and the Ninth Circuit have emphasized that, when dealing with Fourth and Fifth Amendment rights, the unconstitutional conditions doctrine is limited by other jurisprudential doctrines and concerns. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) (Fifth Amendment's Takings Clause "involve a special application" of the unconstitutional conditions doctrine); *United States v. Scott*, 450 F.3d 863, 867 (9th Cir. 2006) (explaining the government has limited power to "sometimes condition benefits on waiver of *Fourth Amendment rights*" (emphasis added)).

When the government conditions access to benefits on persons forgoing their First Amendment rights, the doctrine is "not so limited." *Agency for Int'l Dev. v. All. for Open*

---

[4]   *Bingham v. Holder*, 637 F.3d 1040, 1046 (9th Cir. 2011) provides no aid to defendants, since there the court did not even decide whether the party, a citizen of the United Kingdom, enjoyed constitutional protections.

*Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013). And in the free-exercise context, the Supreme Court has squarely rejected State Defendants' argument by name, calling it "basic that no showing merely of a rational relationship to some colorable state interest would suffice," even where the burden is imposed by the state's "placing of conditions upon a benefit or privilege." *Sherbert*, 374 U.S. at 404, 406 (1963). Rather, "in this highly sensitive constitutional area, only the gravest abuses, endangering paramount interest, give occasion for permissible limitation," *id.* at 406-07 (cleaned up)—and State Defendants have identified no such compelling interest here. *Supra* at 30-32. *See also, e.g.*, *Thomas v. Rev. Bd.*, 450 U.S. 707, 718-19 (1981) (invalidating unconstitutional condition even though the "purposes urged" were "by no means unimportant").

State Defendants' only other argument is to reprise their theme that no coercion exists, so the unconstitutional conditions doctrine has no application. Dkt. 31-1 at 29-30. But this argument fails for the exact same reasons described above—the condition means that School Plaintiffs can either exercise their religion or pursue the desire to serve students with disabilities; they cannot do both. That is enough to state a viable unconstitutional conditions claim.

## CONCLUSION

The motions should be denied.

Dated: June 30, 2023

Respectfully submitted,

/s/ *Eric C. Rassbach*
Eric C. Rassbach (CA SBN 288041)
erassbach@becketlaw.org
Nicholas R. Reaves (DC Bar No. 1044454)
Daniel L. Chen (CA SBN 312576)
Laura Wolk Slavis (DC Bar No. 1643193)
Brandon L. Winchel* (CA SBN 344719)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave., Suite 400
Washington, DC 20006
202-955-0095 tel. / 202-955-0090 fax

* Not a member of the DC Bar; admitted in California. Practice limited to cases in federal court.

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

On June 30, 2023, I filed the foregoing document with the Court via ECF. I hereby certify that I have served the document on all counsel by a manner authorized by the Federal Rules of Civil Procedure.

/s/ *Eric C. Rassbach*
Eric C. Rassbach

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for the Plaintiffs, certifies that this brief contains less than 40 pages, which complies with this Court's May 16, 2023, order, Dkt. 27, concerning the length of this filing.


Dated: June 30, 2023


/s/ *Eric C. Rassbach*
Eric C. Rassbach