LEN GARFINKEL State Bar No. 114815
General Counsel
BRUCE YONEHIRO, State Bar No. 142405
Assistant General Counsel
THOMAS PROUTY. State Bar No. 238950
Deputy General Counsel
California Department of Education
1430 N Street, Room 5319
Sacramento, California 95814
Telephone: 916-319-0860
Facsimile: 916-322-2549
Email: TProuty@cde.ca.gov
Attorneys for Defendants California Department of Education and Tony Thurmond, in his Official Capacity as Superintendent of Public Instruction

*(Defendants CDE and Tony Thurmond in his Official Capacity as SPI are Governmental Parties Exempt from the Provisions of FRCP 7.1 and L.R. 7-1.1)*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CHAYA LOFFMAN and JONATHAN LOFFMAN, on their own behalf and on behalf of their minor child M.L.; FEDORA NICK and MORRIS TAXON, on their own behalf and on behalf of their minor child K.T.; SARAH PERETS and ARIEL PERETS, on their own behalf and on behalf of their minor child N.P.; JEAN & JERRY FRIEDMAN SHALHEVET HIGH SCHOOL; and SAMUEL A. FRYER YAVNEH HEBREW ACADEMY,

Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF EDUCATION; TONY THURMOND, in his official capacity as Superintendent of Public Instruction; LOS ANGELES UNIFIED SCHOOL DISTRICT; and ANTHONY AGUILAR, in his official capacity as Chief of Special Education, Equity, and Access,

Defendants.

Case No. 2:23-cv-01832-JLS-MRW

**THE STATE DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Hearing:        July 21, 2023
Time:           10:30 a.m.
Courtroom:   8A
Judge:          Hon. Josephine L. Staton

Action Filed: March 13, 2023
Trial Date:     Not set

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................................... i

TABLE OF AUTHORITIES ................................................................................... ii

I.  INTRODUCTION ............................................................................................ 1

II. BASIC LEGAL STANDARD ......................................................................... 2

III. PROPER ASSESSMENT OF THIS CASE REQUIRES A COMPLETE
    UNDERSTANDING OF THE LEGAL FRAMEWORK ................................ 2

IV. PLAINTIFFS CANNOT MAKE THE "CLEAR SHOWING" OF
    STANDING REQUIRED FOR A PRELIMINARY INJUNCTION .................. 4

V.  PLAINTIFFS DO NOT SHOW THAT THEIR CLAIMS ARE VIABLE
    OR LIKELY TO SUCCEED ........................................................................ 10

    A. Plaintiffs Cannot Establish an Essential Element for a Claim Under the
       Free Exercise Clause – a Substantial Burden Imposed by the
       Government on Their Exercise of Religion. ............................................. 10

    B. The Three-Decades-Old Nonsectarian NPS Requirement is Narrowly
       Tailored to Serve Compelling Legitimate Interests. ............................... 14

    C. Reliance on the Unconstitutional Conditions Doctrine is Misplaced. ........... 18

VI. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST
    CONSIDERATIONS STRONGLY FAVOR DENYING THE
    REQUESTED EXTRAORDINARY RELIEF ................................................ 19

    A. Because Plaintiffs' Alleged Injury is Speculative and Not Imminent,
       Injunctive Relief is Inappropriate. ........................................................ 20

    B. Plaintiffs' Delay in Both Bringing Suit and Seeking Relief is an
       Important Consideration Militating in Favor of Denying the Motion. ........... 22

    C. Because it Seeks to Overturn Long-Standing State Law and the Status
       Quo and to Force Government Action with Respect to Non-Parties,
       Plaintiffs' Request Does Not Serve the Purpose of a Preliminary
       Injunction nor Satisfy a Heightened Burden. ......................................... 23

    D. The Compelling Interests Supporting the Nonsectarian NPS
       Requirement Cannot Be Ignored. ........................................................ 25

VII. CONCLUSION .............................................................................................. 25

# TABLE OF AUTHORITIES

**Federal Cases**

*American Freedom Defense Initiative v. King County*,
   796 F.3d 1165 (9th Cir. 2015) ..............................................................20, 24

*Bd. of Ed. of Kiryas Joel Village Sch. Dist. v. Grumet*,
   512 U.S. 687 (1994)............................................................................14, 16

*Benisek v. Lamone*,
   138 S.Ct. 1942 (2018)........................................................................22, 24

*Bingham v. Holder*,
   637 F.3d 1040 (9th Cir. 2011) ...................................................................19

*Bowen v. Roy*,
   476 U.S. 693 (1986)...........................................................................11, 14

*California Parents for the Equalization of Educational Materials v.
   Torlakson*,
   973 F.3d 1010 (9th Cir. 2020), *cert. denied*, 141 S.Ct. 2583 (2021) ................11

*Capistrano U.S.D. v. S.W.*,
   21 F.4th 1125 (9th Cir. 2021) ......................................................................9

*Caribbean Marine Servs. Co. v. Baldridge*,
   844 F.2d 668 (9th Cir. 1988) .....................................................................21

*Carney v. Adams*,
   141 S. Ct. 493 (2020)...........................................................................5, 8

*Carson v. Makin*
   142 S. Ct. 1987 (2002)...................................................................passim

*Community House, Inc. v. City of Boise*,
   490 F.3d 1041 (9th Cir. 2007) ...................................................................25

*Crofts v. Issaquah Sch. Dist. No. 411*,
   22 F.4th 1048 (9th Cir. 2022) ....................................................................10

*CTIA – The Wireless Association v. City of Berkeley, Calif.*,
   928 F.3d 832 (9th Cir. 2019) .....................................................................20

*Dish Network Corp. v. Federal Communications Commission,*
   653 F.3d 771 (9th Cir. 2011) ...................................................................19, 20

*Drakes Bay Oyster Co. v. Jewell,*
   747 F.3d 1073 (9th Cir. 2014) ..................................................................2, 25

*Edwards v. Aguillard,*
   482 U.S. 578 (1987).......................................................................................17

*Endrew F. v. Douglas County School District RE-1,*
   580 U.S. 386 (9th Cir. 2017) ......................................................................3, 9

*Epperson v. Arkansas,*
   393 U.S. 97 (1968)...................................................................................14, 15

*Espinoza v. Montana Dept. of Revenue,*
   140 S.Ct. 2246 (2020)..................................................................11, 12, 13, 22

*Everson v. Bd. of Ed. of Ewing,*
   330 U.S. 1 (1947).........................................................................................11

*Garcia v. Google, Inc.,*
   786 F.3d 733 (9th Cir. 2015) .............................................................19, 22, 24

*Gary S. v. Manchester Sch. Dist.,*
   374 F.3d 15 (1st Cir. 2004), *cert. denied*, 543 U.S. 988 (2004)....................3, 12

*Gregory K. v. Longview Sch. Dist.,*
   811 F.2d 1307 (9th Cir. 1987) .......................................................................9

*D.L. ex rel. K.L. v. Baltimore Bd. of School Com'rs,*
   706 F.3d 256 (4th Cir. 2013) .......................................................................12

*Koontz v. St. Johns River Mgmt. Dist.,*
   570 U.S. 595 (2013)......................................................................................18

*LA Alliance for Human Rights v. County of Los Angeles,*
   14 F.4th 947 (9th Cir. 2021) ..........................................................................4

*M.L. v. Smith,*
   867 F.3d 487 (4th Cir. 2017), *cert. denied*, 138 S.Ct. 752 (2018) ..............3, 6, 9

*Marshall Joint Sch. Dist. No. 2 v. C.D. ex rel. Brian D.,*
   616 F.3d 632 (7th Cir. 2010) ........................................................................10

*Miracle v. Hobbs*,
    427 F. Supp. 3d 1150 (D. Ariz. 2019) ........................................................21, 24

*Mitchell v. Helms*,
    530 U.S. 793 (2000)...................................................................................15

*Munaf v. Geren*,
    553 U.S. 674 (2008)....................................................................................2

*Regan v. Taxation With Representatives of Wash.*,
    461 U.S. 540 (1983)...................................................................................11

*Rubin v. Vista Del Sol Health Services, Inc.*,
    80 F. Supp. 3d 1058 (C.D. Cal. 2015) ........................................................20, 21

*Sabra v. Maricopa County Community College Dist.*,
    44 F.4th 867 (9th Cir. 2022) .......................................................................11

*Staumann USA, LLC v. TruAbutment Inc.*,
    2019 WL 6887172 (C.D. Cal. Oct. 1, 2019) ...................................................22

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ....................................................................24, 25

*Teen Ranch Inc. v. Udow*,
    389 F. Supp. 2d 827 (W.D. Mich. 2005), *aff'd* 479 F.3d 403 (6th Cir. 2007) .....................................................................................................12

*Teen Ranch, Inc. v. Udow*,
    479 F.3d 403 (6th Cir. 2007), *cert denied*, 128 S.Ct. 653 (2007) .....................12

*TransUnion LLC v. Ramirez*,
    141 S.Ct. 2190 (2021)..................................................................................4

*Trinity Lutheran Church of Columbia, Inc. v. Comer*
    137 S. Ct. 2012 (2017)................................................................................13, 22

*U.S. v. American Library Ass'n, Inc.*,
    539 U.S. 194 (2003)...................................................................................11, 14

*U.S. v. Scott*,
    450 F.3d 863 (9th Cir. 2006) ......................................................................18, 19

*Winkelman v. Parma City Sch. Dist.,*
  411 F. Supp. 2d 722, 733-34 (N.D. Ohio 2005) *aff'd,* 294 Fed. Appx.
  997 (6th Cir. 2008), *cert. denied,* 557 U.S. 946 (2009)......................................10

*Winter v. Natural Resources Defense Council, Inc.,*
  555 U.S. 7 (2008)...........................................................................2, 19, 20, 21

*Yazzie v. Hobbs,*
  977 F.3d 964 (9th Cir. 2020) ........................................................................4, 8

*Zelman v. Simmons-Harris,*
  536 U.S. 639 (2002)....................................................................................15, 16

**Federal Regulations**

34 C.F.R.
  § 76.532.........................................................................................................3, 6
  § 300.1(a).........................................................................................................2
  § 300.17...........................................................................................................2
  § 300.28...........................................................................................................3
  § 300.41...........................................................................................................3
  § 300.100.........................................................................................................2
  § 300.101(a).....................................................................................................2
  § 300.114.........................................................................................................3
  § 300.114-300.116...........................................................................................5
  § 300.115.........................................................................................................3
  § 300.116.........................................................................................................3
  § 300.118.........................................................................................................3
  § 300.121.........................................................................................................3
  §§ 300.130-300.138.........................................................................................2
  § 300.137(a)-(c)...............................................................................................3
  § 300.138(a)(2)................................................................................................3
  § 300.138(b).....................................................................................................3
  § 300.138(c)(2)................................................................................................3
  § 300.141(a).....................................................................................................3
  § 300.141(b).....................................................................................................3
  § 300.145.........................................................................................................3
  § 300.146.........................................................................................................3
  § 300.147......................................................................................................3, 4
  § 300.320(a)(1)(i)..........................................................................................3, 6
  § 300.325(c).....................................................................................................3
  § 300.600.........................................................................................................3

**California Regulations**

5 C.C.R.
   § 3001(a) ...................................................................................4
   § 3060 ........................................................................................4
   § 3060(c)(8) ..........................................................................4, 17
   § 3061(a) ..............................................................................4, 17
   § 3062 ........................................................................................4
   § 3063 ..................................................................................4, 17
   § 3063(a)-(c) ............................................................................23
   § 3064 ........................................................................................4
   § 3070 ........................................................................................4

**Federal Statutes**

20 U.S.C.
   § 1400(d)(1) ..............................................................................2
   §§ 1400 *et seq.* ..........................................................................1
   § 1401(9) ...............................................................................2, 3
   § 1412(a)(10)(A)(vi) ..................................................................3
   § 1412(a)(10)(C)(ii) ..................................................................8
   § 1415(i)(2)(A) ..........................................................................8
   § 1415(b)(6)(A) ........................................................................8
   § 1415(b)(6)(B) ........................................................................8
   § 1415(f)(1)(A) ........................................................................8
   § 1415(f)(3)(C) ........................................................................8
   § 1415(l) ....................................................................................8

**California Statutes**

Educ. Code

§ 56034................................................................................................22
§ 56365..................................................................................................4
§§ 56365-56366..................................................................................22
§ 56365(a).........................................................................................3, 5
§ 56366..................................................................................................4
§ 56366(a)(2)(B).................................................................................4
§ 56366.1(i)(3)......................................................................................4
§ 56366.1(a)..........................................................................................4
§ 56366.1(e)(1).....................................................................................4
§ 56366.1(e)(3).....................................................................................4
§ 56366.1(e)-(f)...................................................................................23
§ 56366.1(f)........................................................................................23
§ 56366.1(j)...........................................................................................4
§ 56366.1(n)..........................................................................................4
§ 56366.4...............................................................................................4
§ 56366.5...............................................................................................4
§ 56366.10(b)........................................................................................4
§ 56366.10(c)........................................................................................4

## I.   INTRODUCTION

Plaintiffs seek the extraordinary remedy of a preliminary injunction to overturn state law that has been unchallenged for three decades.  They do this while arguing that their position is supported by "decades-old precedent" (Dkt. 28-1 at 22:7)[1], but without explaining why they have waited years to sue, and months later to file their motion.

Plaintiffs' motion should be denied.  As discussed in the State Defendants' 40-page motion to dismiss (set for hearing along with Plaintiffs' motion),[2] Plaintiffs lack standing and their claims lack merit.  (Dkt. 31-1, State Defs' Mot. to Dismiss.)  As discussed in Section IV below, while Plaintiffs' burden to "clearly" demonstrate all elements for standing has now been heightened, their moving papers only serve to prove that they lack standing and that this case must be dismissed.  In addition, on the merits, Plaintiffs' moving papers continue to misapprehend the highly relevant legal framework of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq*. ("IDEA") and California's "nonpublic schools" ("NPS") regime implementing that law.  Plaintiffs characterize California's nonsectarian NPS requirement as a decision by the State of California to subsidize the provision/receipt of a private education by schools/families as an alternative to the state's public education while refusing to provide that "public benefit" to religious schools and families.  As summarized in Section III below and discussed at greater length in the State Defendants' motion to dismiss (Dkt. 31-1, § II), Plaintiffs' characterization is fundamentally wrong.  Plaintiffs are not prohibited from exercising their religion, and under existing law, it cannot be said that the nonsectarian NPS requirement constitutes an actual and substantial burden on their free exercise

---

[1] At "22:7" refers to page 22, line 7, using the ECF-stamped page number at the top. This convention is used throughout this brief for ECF-filed documents.

[2] The California Department of Education and the Superintendent of Public Instruction appreciate the Court's grant of extra pages for the briefing on their motion to dismiss.  In this opposition, they have tried to strike the appropriate balance between treating the motions as separate and not burdening the Court with repetitive argument.

---

rights.  Nor can it be said that the requirement is not narrowly tailored to serve compelling interests.  Moreover, the question of imminent irreparable harm, the balance of the equities and the public interest strongly favor denying the motion.

## II.    BASIC LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy."  *Munaf v. Geren*, 553 U.S. 674, 689 (2008).  Plaintiffs seeking a preliminary injunction "must establish" that: (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest."  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  When the government is a party, the last two factors merge and are considered together.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

While this is the basic legal standard for a preliminary injunction, as discussed in Section VI, a heightened standard and important considerations come into play where, as here, a plaintiff asks a federal court to disrupt the status quo by overturning long-standing state law, forcing government action with respect to third parties.

## III.    PROPER ASSESSMENT OF THIS CASE REQUIRES A COMPLETE UNDERSTANDING OF THE LEGAL FRAMEWORK

A proper assessment of the Court's jurisdiction and of Plaintiffs' claims requires a complete understanding of the frameworks of, and relationship between, the IDEA and California's NPS regime.  That subject is addressed at length in § II of the State Defendants' motion to dismiss, which explains the following points:

- Under the IDEA, families have a choice to enroll their child in a private school or to accept their state's free public education; in either case the IDEA provides services. (*See* Dkt. 31-1 [Mot. to Dismiss], § II.A., at 13; *see also* 20 U.S.C. §§ 1400(d)(1), 1401(9); 34 C.F.R. §§ 300.1(a), 300.17, 300.100, 300.101(a), 300.130–300.138.)

- The IDEA's provision of services differs based on the family's choice, but Plaintiffs do not challenge that difference, and its constitutionality has been upheld.

(Dkt. 31-1, § II.B., at 13-14; *see also* 34 C.F.R. §§ 300.137(a)-(c), 300.138(a)(2), 300.138(b), 300.320(a)(1)(i); *Gary S. v. Manchester Sch. Dist.*, 374 F.3d 15, 19-21 (1st Cir. 2004), *cert. denied*, 543 U.S. 988 (2004).)

- When a family accepts the state's free public education, the state directs and supervises the provision of *its* state-adopted *public* curriculum, even in the rare case where the law's "least restrictive environment" rules permit NPS placement by the state. (Dkt. 31-1, § II.C., at 14-16; 20 U.S.C. § 1401(9); 34 C.F.R. §§ 300.114, 300.115, 300.116, 300.118, 300.147, 300.325(c), 300.600; *see also* 34 C.F.R. §§ 300.28, 300.41.)

- The IDEA's "free appropriate public education" need not account for a family's desire for religious instruction; and ultimately, placement decisions are made by state officials, with courts giving due weight to their expertise. (Dkt. 31-1, § II.D., at 16-18; 34 C.F.R. § 300.121; *Endrew F. v. Douglas County School District RE-1*, 580 U.S. 386, 399-401 (9th Cir. 2017); *M.L. v. Smith*, 867 F.3d 487, 495-98 (4th Cir. 2017), *cert. denied*, 138 S.Ct. 752 (2018).)

- When one of the state's local educational agencies ("LEAs") places a child in an NPS, IDEA funds benefit the child whose family has accepted the state's free public education (not the private school itself) and may not be used for religious instruction. (Dkt. 31-1, § II.E., at 18; *see* 34 C.F.R. § 76.532; *M.L.*, 867 F.3d at 496; *see also* 20 U.S.C. § 1412(a)(10)(A)(vi); 34 C.F.R. §§ 300.138(c)(2), 300.141(a), 300.141(b).)

- California's nonsectarian NPS requirement only comes into play when a family accepts the state's free public education, and only when no appropriate public program is available (and the IDEA's least restrictive environment rules allow). (Dkt. 31-1, § II.F., at 18-19; *see also* Educ. Code § 56365(a); 34 C.F.R. §§ 300.115, 300.145, 300.146.)

- An NPS assists an LEA in providing California's public education under an IEP – including through the use of state-approved textbooks and curriculum and state-credentialed teachers – pursuant to a contract; however, the child is deemed enrolled in public school and graduates with a diploma from the LEA. (Dkt. 31-1, § II.G., at 19-21;

*see also* Educ. Code §§ 56365, 56366, 56366.1(a), 56366.1(n), 56366.5, 56366.10(b); Cal. Code Regs., tit. 5 ["5 C.C.R."] §§ 3001(a), 3060, 3062, 3064, 3070.)

- <u>NPS placement involves extensive and continuing state monitoring, evaluation and direction, with the required shared goal of transitioning a pupil back to less restrictive environments in the LEA.</u>  (Dkt. 31-1, § II.H., at 21-23; *see* Educ. Code §§ 56366(a)(2)(B), 56366.1(e)(1), 56366.1(e)(3), 56366.1(i)(3), 56366.1(j), 56366.4, 56366.10(c); 5 C.C.R. §§ 3060(c)(8), 3061(a), 3063; *see also* 34 C.F.R. § 300.147.)

## IV.   PLAINTIFFS CANNOT MAKE THE "CLEAR SHOWING" OF STANDING REQUIRED FOR A PRELIMINARY INJUNCTION

Federal courts must dismiss cases where the plaintiffs lack Article III standing. *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021).  Because standing is "a threshold matter of jurisdiction," it is considered first and must be established prior to issuance of a preliminary injunction.  *LA Alliance for Human Rights v. County of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021); *Yazzie v. Hobbs*, 977 F.3d 964, 966-68 (9th Cir. 2020).

At the "preliminary injunction stage," the plaintiffs have the burden of proving each element of standing with a "clear showing," relying on well-plead allegations "and whatever other evidence they submitted in support of their motion to meet their burden." *Alliance for Human Rights*, 14 F.4th at 956-57; *Yazzie*, 977 F.3d at 966 (same).

To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion LLC*, 141 S.Ct. at 2203.

The State Defendants' Motion to Dismiss argued that, based on the Complaint's allegations and the law, each of the Plaintiff-Schools and Plaintiff-Families did not, and could not, establish Article III standing.  (Dkt. 31-1 at 25:18 – 34:6.)  As a condensed summary, the State Defendants argued that the Schools lacked standing because: (1) the Complaint demonstrated that the Schools sought to provide their own private religious

education to Orthodox Jewish students, but even if the nonsectarian NPS requirement were removed and the Schools achieved certification, several unchallenged aspects of the IDEA and California law implementing it would not allow them to ignore the state's public secular curriculum and to provide their own private religious education instead; (2) the Schools did not allege that they would, or could, follow all of the many regulations and requirements applicable to NPSs aside from the nonsectarian requirement, and the Complaint's allegations suggested that they could and would not do so; and (3) the Schools did not show that they are "likely" and "able and ready" to be NPSs in the "reasonably imminent future" if not for the nonsectarian requirement, *Carney v. Adams*, 141 S. Ct. 493, 500-02 (2020).  (Dkt. 31-1 at 26:12 – 30:17.)

To summarize with respect to the Families, the State Defendants argued that the Families lacked standing because: (1) the Complaint demonstrated that the Families sought an Orthodox Jewish education for their children, but several unchallenged aspects of the IDEA and California law implementing it would not allow a certified NPS to ignore the state's public, secular curriculum and provide a religious education instead; (2) given the IDEA's "least restrictive environment" rules (34 C.F.R. §§ 300.114–300.116) and the additional requirement that NPSs only serve public school children "if no appropriate public education program is available" (Educ. Code § 56365(a)), the Complaint's allegations strongly suggested that none of the Families' disabled children could ever be legally be placed in *any* NPS; and (3) even if placement of their children in any NPS were legally possible, parents that have accepted the state's free public education do not dictate where their children will be placed, rendering it speculative that LAUSD would decide to place their children in a sectarian NPS (assuming there was one that applied and obtained certification, which itself is speculative).  (Dkt. 31-1 at 30:18 – 34:6).

While Plaintiffs' burden to clearly show standing increased from stating specific, well-pleaded allegations to providing actual evidence, Plaintiffs' motion and accompanying declarations only prove their lack of standing.  For example, the heads of

the respective Schools have now declared the centrality of the Orthodox Jewish religion to the school's respective educational programs (Dkt. 28-5, Block Dec., ¶4; Dkt. 28-6, Einhorn Dec., ¶4), and that the school "***seeks the opportunity*** to qualify to provide *a* ***distinctively Orthodox Jewish education*** *to children with disabilities*" (Dkt. 28-5, Block Dec., ¶14; Dkt. 28-6, Einhorn Dec., ¶13; *see also* Dkt. 28-1 at 18:11-13, representing that the Schools "are committed to helping Orthodox Jewish parents fulfill their duty to provide an Orthodox Jewish education to their children.").  Similarly, a parent in each of the Families has declared that they "believe firmly in the importance of sending our children to *an Orthodox Jewish school*, where they will *not only* receive an education in secular subjects, *but also in the faith*."  (Dkt. 28-3, ¶4; Dkt. 28-4, ¶4; Dkt. 28-2, ¶4.) And in arguing in favor of their proposed order, Plaintiffs assert that it will "***allow***[] parent Plaintiffs ***to obtain the religious education*** their Plaintiff children with disabilities deserve, and Plaintiff schools the right to serve them."  (Dkt. 28-1 at 9:10-13.)  However, as argued at greater length in the State Defendants' Motion to Dismiss (Dkt. 31-1 at 13:25 – 21:1):  **(1)** NPSs provide the state's public and secular curriculum, using state-adopted instructional materials, at the state's direction and under its supervision; **(2)** NPSs assist an LEA in carrying out an IEP, which is designed by LEA representatives and other members of the IEP Team to enable the child to participate and make progress in the LEA's "general education curriculum (*i.e.*, the same curriculum as for nondisabled children)" (34 C.F.R. § 300.320(a)(1)(i)); **(3)** while an IEP team considers the public-school child's needs for accessing the state's general education curriculum due to their disability, the families religious and cultural needs do not require the LEA to include any religious or cultural instruction as part of an IEP (*M.L. v. Smith*, 867 F.3d 487, 495-98 (4th Cir. 2017), *cert. denied*, 138 S.Ct. 752 (2018)); and **(4)** federal regulations prohibit use of IDEA funds for "[r]eligious worship, instruction, or proselytization" (34 C.F.R. § 76.532; *M.L.*, 867 F.3d at 496 [concluding that "federal regulations support the conclusion that states may not use IDEA funds to provide religious and cultural instruction."]).  Thus, even if the nonsectarian NPS requirement

were removed, it would not permit a certified NPS "to provide a distinctively Orthodox Jewish education" to the children with disabilities placed there by an LEA. (Dkt. 28-5, Block Dec., ¶14; Dkt. 28-6, Einhorn Dec., ¶13.) Consequently, Plaintiffs cannot show that the nonsectarian NPS requirement has caused them to suffer an individualized actual or imminent concrete injury that would be redressed by this action.

The Plaintiffs' motion proves their lack of standing in other ways too. Significantly, while the Complaint insufficiently included the general and conclusory allegation – made only "[o]n information and belief" – that the Schools "either otherwise meet[] or [are] capable of meeting California's other certification requirements to become an NPS" (Comp., ¶¶156, 166), the heads of the respective Schools have now declared that while the Schools would like "to explore" what it takes to become certified as an NPS in the future, they have not even begun "to explore" that topic. (*See* Dkt. 28-5, Block Dec., ¶ 9 ["One area in which Shalhavet wishes to explore becoming more inclusive is the education of students with disabilities"] and ¶ 16 [asserting, without explanation, that the existence of the nonsectarian requirement somehow makes it so that the school is "unable to even explore NPS certification"]; Dkt. 28-6, Einhorn Dec., ¶ 10 ["Yavneh would like to explore additional avenues of serving students with disabilities, especially those with more complex needs"] and ¶ 15; *see also* Dkt. 28-1 at 8:19-21 (stating that the Plaintiff-Schools "wish to explore becoming certified"].) It is unclear why the Schools have not even begun to explore what it takes to serve as an NPS. It is now equally unclear if they truly do believe on some unidentified "information" that they are capable of meeting California's other requirements to become an NPS. (*See* Comp., ¶¶ 156, 166). However, it *is* clear that Plaintiffs' moving papers included a declaration attaching a lengthy blank application to become a new NPS, which the declarant requested and received from the CDE, and which calls for very specific information and references applicable statutes and regulations. (Dkt. 28-7, Shuchatowitz Dec., ¶¶ 2-4, and Ex. A thereto.)

///

To demonstrate Article III standing, the Schools were required to clearly show that they are "likely" and "able and ready" to be NPSs in the "reasonably imminent future" were it not for the nonsectarian NPS requirement. *Carney*, 141 S.Ct. at 500-02; *see also Yazzie*, 977 F.3d at 966 ("The Complaint alleges a general 'desire to participate in the electoral and political processes of Arizona on an equal basis with non-Indian voters.'  But this kind of general intent to decide, 'at some point,' to cast a ballot in a particular way that may disenfranchise them 'epitomizes speculative injury.'")  Here, they have provided no evidence that they are able to, or would even want to, serve as an NPS under the law were it not for the nonsectarian requirement.

On the issue of whether it is likely (or even possible) for any of the Families' respective children to be placed in *any* NPS in the foreseeable future (or at all), the Plaintiffs' moving papers do nothing to change the analysis based on the Complaint's allegations, which suggest that such placement is, at best, highly unlikely.  (*See* Dkt. 31-1 at 31:5 – 33:15.)  Parents from two of the Families confirm the Complaint's allegations that their children have been receiving special education within LAUSD for many years.[3]  (Dkt. 28-4, ¶¶ 19-21; Dkt. 28-3, ¶¶ 19-21.)  And while they assert that they "do not believe [their child] is currently a receiving a FAPE in public school" (Dkt. 28-4, ¶ 21; Dkt. 28-3, ¶ 2), they do not testify that they have ever invoked the IDEA's due process procedures to challenge (successfully or not) any of LAUSD's offers of FAPE in the several years they have been enrolled in its public schools.[4]  Moreover, while it

---

[3] There is no allegation that the remaining family has ever invoked its right to have LAUSD assess their child for an IEP, a prerequisite for potential NPS placement.

[4] The IDEA provides due process procedures for parents to challenge IEPs (20 U.S.C. §§ 1415(b)(6)(A), (f)(1)(A)), which allow for reimbursed private school tuition as a remedy if the parents successfully prove that their district failed to offer a "FAPE" and that the parents' resulting unilateral private school placement was appropriate.  (20 U.S.C. § 1412(a)(10)(C)(ii).)  Those procedures must be exhausted before bringing a civil action under the IDEA (20 U.S.C. §§ 1415(i)(2)(A), (l)), and there is a two-year statute of limitations for such actions (20 U.S.C. §§ 1415(b)(6)(B), (f)(3)(C)).

appears that those declarants base their belief on LAUSD's lack of religious or cultural education, under the IDEA, the lack of such things is not a legal basis for challenging an LEA's provision of FAPE.  *M.L.*, 867 F.3d at 495-98.

Furthermore, under the IDEA, the question of whether an LEA is adequately providing its free appropriate *public* education to a child is not answered by a finding that a parent's preferred placement would be better.  Under the IDEA, "[a]n 'appropriate' public education does not mean the absolutely best or 'potential-maximizing' education for the individual child."  *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1314 (9th Cir. 1987).  Rather, an LEA must offer a program reasonably calculated to enable a child to make progress in the LEA's general education curriculum, in light of the child's disability.  *Endrew F*, 580 U.S. at 399-401.  If a parent challenges an LEA's decision, then the court "must focus primarily on the District's proposed placement, not on the alternative that the family preferred."  *Gregory K.*, 811 F.2d at 1314.  That is because even if the parent's preferred placement "was better for [the student] than the District's proposed placement, that would not necessarily mean that the placement was inappropriate."  *Id*.  Courts "must uphold the appropriateness of the [LEA's] placement if it was reasonably calculated to provide [the student] with educational benefits."  *Id*.  Moreover, in reviewing whether a district's proposed IEP was appropriate, courts "are not free to substitute [their] own notions of sound educational policy for those of the school authorities which [they] review.'"  *Capistrano U.S.D. v. S.W.*, 21 F.4th 1125, 1132 (9th Cir. 2021).  Rather, courts "must defer" to the school authorities' "'specialized knowledge and experience' by giving 'due weight' to the decisions of the states' administrative bodies."  *Id*.

Plaintiffs' reliance on the Declaration of Ronald Nagel is unavailing.  The declaration underscores that it is Plaintiffs' desire to provide/receive a distinctly *religious* free education, because the declaration's main thrust is the overarching belief that Orthodox Jewish students should "receive an education tailored to their religious beliefs."  (Dkt. 28-8, ¶ 5.)  In addition, the declaration does not suggest that the declarant

has ever: (a) examined or even met any of the Families' children; (b) observed any of them in their educational setting; or (c) conferred with any of their teachers or service providers.  However, courts have emphasized that decisions about special education under the IDEA should be driven by the opinions of trained educational professionals, not of physicians.  *See Marshall Joint Sch. Dist. No. 2 v. C.D. ex rel. Brian D.*, 616 F.3d 632, 638-41 (7th Cir. 2010) (administrative law judge erred in crediting a physician's opinion about the child's need for special education and in discounting the testimony of the school district's special education teacher) ("The cursory examination aside, Dr. Trapane is not a trained educational professional and had no knowledge of the subtle distinctions that affect classifications under the [IDEA]."); *Crofts v. Issaquah Sch. Dist. No. 411*, 22 F.4th 1048, 1053-54, 1056 (9th Cir. 2022) (holding both that: [a] administrative law judge properly discounted family's expert witness who "did not evaluate A.S. or speak to her teachers" "based on her lack of special-education credentials and inexperience writing IEPs"; and [b] "School districts are 'entitled to deference in deciding what programming is appropriate as a matter of education policy."); *Winkelman v. Parma City Sch. Dist.*, 411 F. Supp. 2d 722, 733-34 (N.D. Ohio 2005) (holding that administrative hearing officer could disregard pediatric neurologist's testimony that student required educational placement with more one-on-one interaction "based on his lack of expertise in education, his limited personal interaction with [the student], and the fact that he never observed [the student] in an educational setting."), *aff'd*, 294 Fed. Appx. 997 (6th Cir. 2008), *cert. denied*, 557 U.S. 946 (2009).

## V.   PLAINTIFFS DO NOT SHOW THAT THEIR CLAIMS ARE VIABLE OR LIKELY TO SUCCEED

### A. Plaintiffs Cannot Establish an Essential Element for a Claim Under the Free Exercise Clause – a Substantial Burden Imposed by the Government on Their Exercise of Religion.

The Free Exercise Clause "'is written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government'"

and it does not "require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family." (Italics in original.) *Bowen v. Roy*, 476 U.S. 693, 699-700 (1986).

To state a claim under the Free Exercise Clause, a plaintiff must show that the challenged state action substantially burdens the plaintiff's exercise of their religion. *Sabra v. Maricopa County Community College Dist.*, 44 F.4th 867, 809 (9th Cir. 2022); *California Parents for the Equalization of Educational Materials v. Torlakson*, 973 F.3d 1010, 1019-20 (9th Cir. 2020), *cert. denied*, 141 S.Ct. 2583 (2021). Being offended by government actions that address religion in some way does not suffice; the government's action must actually operate as a burden on the plaintiff's practice of their religion. *Id*.

It is easy to see how laws affirmatively proscribing the public's conduct can burden religious practice. In addition, the Supreme Court has recognized that a state disqualifying otherwise eligible recipients from certain "generally available" "public" benefits or rights based on their religious exercise can constitute such a burden. *Espinoza v. Montana Dept. of Revenue*, 140 S.Ct. 2246, 2254-55 (2020); *Everson v. Bd. of Ed. of Ewing*, 330 U.S. 1, 16 (1947) (recognizing infringement based on exclusion from benefits of "public welfare legislation"). At the same time, however, the Supreme Court has recognized that when the government appropriates public funds to establish a program it is entitled to define the limits of that program, and that a state's decision not to subsidize the exercise of a fundamental right does not equate to an infringement of that right. *U.S. v. American Library Ass'n, Inc.*, 539 U.S. 194, 211-212 (2003); *Regan v. Taxation With Representatives of Wash.*, 461 U.S. 540, 549-50 (1983).

Plaintiffs characterize the nonsectarian NPS requirement as limiting Plaintiffs' access to the "public benefit" of money for the public to provide/receive "alternatives to a public school education." (Dkt. 28-1 at 8:10-17.) However, California's provision for government contracts with NPSs is not a public benefit program to subsidize the provision/receipt of private alternatives to a public education. Rather, it is California securing *for itself* the help *it* needs in order for *it* to meet *its* obligations to provide *its*

**public** education to the children with disabilities that *decided to enroll in its public schools*, *instead of* enrolling in a private school.

This does not violate the Free Exercise Clause.  For example, in *Teen Ranch, Inc. v. Udow*, the Sixth Circuit rejected a religious organization's free exercise claim based on the notion that the ability to contract with the state of Michigan to provide youth residential services was a "public benefit."  479 F.3d 403, 409-410 (6th Cir. 2007), *cert denied*, 128 S.Ct. 653 (2007).  The court affirmed the district court's conclusion that "[u]nlike unemployment benefits or the ability to hold public office, a state contract for youth residential services is not a public benefit" and that "[t]he *Sherbert v. Verner* line of cases does not stand for the proposition that the State can be required under the Free Exercise Clause to contract with a religious organization."  *Teen Ranch Inc. v. Udow*, 389 F. Supp. 2d 827, 838 (W.D. Mich. 2005), *aff'd* 479 F.3d at 409-10.

Similarly, the First Circuit held that a religious family choosing to enroll its child with disabilities in a private religious school for religious purposes was not denied a "generally available public benefit" by the IDEA's provisions that granted greater rights to eligible children that enrolled in public school.  *Gary S. v. Manchester Sch. Dist.*, 374 F.3d 15, 19-21 (1st Cir. 2004), *cert. denied*, 543 U.S. 988 (2004) ("Unlike unemployment benefits that are equally available to all, private school parents can have no legitimate expectancy that they or their children's schools will receive the same federal or state financial benefits provided to public schools.")

And the Fourth Circuit rejected an argument that a government educational agency placed an unconstitutional burden on families wishing to attend private religious schools by conditioning receipt of educational services under Section 504 of the Rehabilitation Act of 1973 to students enrolled in public schools.  *D.L. ex rel. K.L. v. Baltimore Bd. of School Com'rs*, 706 F.3d 256, 257-58, 262-64 (4th Cir. 2013).

The cases that Plaintiffs attempt to analogize to are inapposite.  *Espinoza* involved a Montana state "scholarship program," intended "to provide parental and student choice in education," which "provide[d] tuition assistance to parents who send

their children to private school." 140 S.Ct. at 2251-52. Under the program, a family whose child was awarded a scholarship could direct funds to virtually any private school in the state, of their own private choice. *Id*. A free exercise challenge was brought against a subsequent administrative rule (based on an application of the state constitution's "no aid" provision) that prohibited recipient families from selecting a *religious* private school. *Id*. at 2252. The Court concluded: "A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious." *Id*. at 2261.

Similarly, *Carson v. Makin* involved "a program of tuition assistance for parents" whose local school district did not operate a public secondary school or contract with a private entity for such schooling. 142 S.Ct. 1987, 1993 (2022). The program directed funds to pay tuition at the private or public school of the parents' choice; however, the state later imposed a requirement disqualifying sectarian schools. *Id*. at 1993-94. After noting that "the curriculum taught at participating private schools need not even resemble that taught in the Main public schools" and that those private schools "need not administer state assessments" and "need not hire state-certified teachers[,]" the Court characterized the state's program as a public benefit program where "[t]he benefit is tuition at a public or private school, selected by the parent, with no suggestion that the 'private school' must somehow provide a 'public' education." *Id*. at 1998-99.

And *Trinity Lutheran Church of Columbia, Inc. v. Comer* involved a "grant" program to help public and private schools, nonprofit daycare centers, and other nonprofit entities purchase rubber playground surfaces, but excluded otherwise eligible religious entities. 137 S.Ct. 2012, 2017 (2017).

Plaintiffs' view of the law would suggest that because states use public money to provide the benefit of a free public and secular education, and it is burdensome for religious families to pay to send their children to religious school instead, states must provide money for those religious families to attend religious school. However, the Supreme Court has rejected that revolutionary concept. *Espinoza*, 140 S.Ct. at 2261 ("A

State need not subsidize private education."); *Carson,* 142 S. Ct. at 1993-94 (emphasizing that Maine's program was *not* intended to provide beneficiaries with the state's "public" education); *see also American Library Ass'n, Inc.*, 539 U.S. at 211-212; *Bowen*, 476 U.S. at 699-700.

**B. The Three-Decades-Old Nonsectarian NPS Requirement is Narrowly Tailored to Serve Compelling Legitimate Interests.**

Even if Plaintiffs could show an actual, substantial infringement on the free exercise their religion, their Free Exercise claim fails because California's law is narrowly tailored to serve compelling state interests. If the nonsectarian requirement were eliminated, then certain religious groups (those with sufficient resources and whose beliefs do not preclude them from performing the "master contracts") could be certified, and government officials at the state's more than 1,000 LEAs would be able to steer public school children with the most severe disabilities toward particular (favored) religious institutions for daily instruction. In addition, if the requirement were eliminated, then government officials would have the power to, and would be required to, audit, monitor and assess whether and how those religious institutions are, *inter alia*, meeting California's public education standards, performing the LEA-developed IEPs, and complying with law prohibiting federal funding of religious instruction.

That scenario presents several problems, which California has a compelling interest in avoiding. The principle that the government must be neutral toward and among religions, and "may not aid, foster, or promote" religion, is "rooted in the foundation soil of our Nation" and "fundamental to freedom." *Epperson v. Arkansas*, 393 U.S. 97, 103 (1968). "A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of 'neutrality' toward religion, favoring neither one religion over others nor religious adherents collectively over nonadherents." *Bd. of Ed. of Kiryas Joel Village Sch. Dist. v. Grumet* ("*Grumet*"), 512 U.S. 687, 696 (1994) (citations omitted). Thus, a state "may not adopt programs or

practices in its public schools or colleges which 'aid or oppose' any religion."
*Epperson*, 393 U.S. at 106.

There have been cases where the Supreme Court has upheld government programs that resulted in government aid flowing to private religious schools; however, the Court has repeatedly stressed that what saved those programs was the neutrality ensured by the fact that they were programs "of true private choice, in which government aid reaches religious schools only as a result of the genuine and independent choices of private individuals," as distinct from programs where government officials could direct aid to religious schools. *Zelman v. Simmons-Harris*, 536 U.S. 639, 648-52 (2002) (discussing cases); *Mitchell v. Helms*, 530 U.S. 793, 810 (2000) (recognizing that when aid goes to a religious institution "only as a result of the genuinely independent and private choices of individuals" it "assur[es] neutrality" by removing government officials' ability to direct aid and to "grant special favors," as well as by "mitigating the preference for pre-existing recipients that is arguably inherent in any government aid program," which "could lead to a program inadvertently favoring one religion[.]")

In this case, government funds do not reach NPSs "only as a result of the genuine and independent choices of private individuals." *Zelman*, 536 U.S. at 649. Indeed, an NPS only receives government funds if LEA officials decide that one of the LEA's pupils with disabilities should be placed in the NPS, and in reaching that decision, the LEA officials need not agree with the parents' preferences or account for the family's religious views. (Dkt. 31-1 [Mot. to Dismiss] at 16:16 – 20:5.) While the pupil's parent/guardian must consent to the LEA's proposed placement, that consent is not independent. It comes only after the LEA tells the parent/guardian what it believes is the appropriate way to provide public education to the child. And it comes in a context where administrative law judges and courts give "due weight" to the LEA officials' placement decision. (*Id*. at 16:16 – 18:3.) This gives LEA officials significant power to direct pupils (and IDEA funds) to particular favored religious institutions.
///

There is, of course, another important way in which this case is clearly distinguishable from those neutral independent private choice programs that have been upheld in the past.  Here, unlike in any of those cases, the private school is tasked with providing the *State's public* education, not its own private education.  *Zelman*, 536 U.S. at 648-52 (discussing cases); *Carson*, 142 S. Ct. at 1998-99 (concluding that Maine's program offered the "benefit" of "tuition at a public or private school, selected by the parent, with no suggestion that the 'private school' must somehow provide a 'public' education[,]" noting that the private school's curriculum "need not even resemble that taught in the Maine public schools," and that the private schools did not have to hire state-certified teachers or administer state assessments).  Here, an NPS assists California in meeting its IDEA obligation of providing its "free appropriate <u>public</u> education" to children that have enrolled in public schools; and NPSs ***are*** required to teach state standards-aligned curriculum, use state-adopted textbooks, hire state-certified teachers, and administer state assessments.  (Dkt. 31-1 [Mot. to Dismiss] at 18:26 – 21:24.)

Because of that feature of the IDEA/NPS program – (that the NPS is specifically contracted to provide the state's public education) – the nonsectarian NPS requirement is also necessary to avoid the problematic delegation of authority over public schooling to an institution "defined by" its religious beliefs, selected in individual cases by government officials.  *Grumet*, 512 U.S. at 696 (striking down New York's creation of a school district because it departed from the "constitutional command" of neutrality toward religion "by delegating the State's discretionary authority over public schools to a group defined by its character as a religious community," in a context that gave "no assurance that governmental power has been or will be exercised neutrally.")

In addition to the neutrality problem discussed above, such a delegation is problematic because it exposes vulnerable and impressionable children, whose parents enrolled them in public school districts expecting a secular education, to substantial risks of the inculcation of particular religious beliefs, and pressure or coercion to conform to particular religious beliefs or practices, that may be either unwanted by the

child and their family, or counter to the child's or family's own religious beliefs. *Edwards v. Aguillard*, 482 U.S. 578, 583-84 (1987). "Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family." *Id*. at 584. These well-accepted and long-recognized understandings make K-12 education a "special context" requiring heightened protection against indoctrination and coercion that infringe on the rights of the students and their families. *Edwards*, 482 U.S. at 583-84.

California's nonsectarian requirement does not preclude religious *individuals* from owning and controlling an NPS; rather, the definition excludes organizations that are owned or operated by *a religious group or sect*. 5 C.C.R. § 3001(p). This is a material distinction, because when a group operating a school specifically organizes and defines itself by and for its religious beliefs and commitments, there is a particular concern that such beliefs and commitments will manifest themselves in the school's operation in ways that both violate the deeply rooted neutrality principle and infringe the rights of students and families. Courts recognize that "[e]ducating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that *lie at the very core* of the mission of a private religious school[.]" *Carson*, 142 S. Ct. at 2001.

Finally, the nonsectarian requirement is necessary to avoid the serious problems caused when government is put in the position of supervising, evaluating and auditing religious institutions, particularly in the context of the providing of state standards-aligned education. Both the IDEA and California's laws implementing it authorize and require state officials to supervise, evaluate and audit, and continued certification as an NPS depends upon compliance with rules and audit findings. (Dkt. 31-1 [Mot. to Dismiss] at 14:21 – 16:15 and 21:25 – 23:17.) Applying anything like that oversight regime with respect to sectarian NPSs would result in the sort of government entanglement with religion that has long been recognized as a chief concern of the

Establishment Clause, as well as open the door for non-neutral enforcement.  Indeed, in last year's *Carson* decision, the Supreme Court reaffirmed the principle that "scrutinizing whether and how a religious school pursues its educational mission" would "raise serious concerns about state entanglement with religion and denominational favoritism."  *Carson*, 142 S. Ct. at 2001.

### C. Reliance on the Unconstitutional Conditions Doctrine is Misplaced.

Plaintiffs argue that even if the nonsectarian NPS requirement did not violate the Free Exercise Clause it would be still "an independent violation" of the "unconstitutional conditions doctrine[.]"  (Dkt. 28-1 at 27:21-23.)  Plaintiffs cite two cases in support of their argument, but neither case involved free exercise rights, religion or education: *Koontz v. St. Johns River Mgmt. Dist.*, 570 U.S. 595 (2013) (Fifth Amendment "takings clause" context) and *U.S. v. Scott*, 450 F.3d 863 (9th Cir. 2006) (Fourth Amendment prohibition on unreasonable searches context).  However, an important lesson from those two cases is that the unconstitutional conditions doctrine is not a simple and separate mechanical rule, but rather a general principle that derives from, and must account for, the precise constitutional right and circumstances raised in each case.  In *Koontz*, for example, the Court did not hold that conditioning approval of a land use permit on the dedication of property to the public is always unconstitutional; rather, it held that doing so was unconstitutional only if there was no "nexus" and "rough proportionality" between the property that the government demands and the social costs of the applicant's proposal.  570 U.S. at 605-606.  Those factors accounted for the specific constitutional right at issue, as well as the practical "realities" that framed the parties' interests and reasonable expectations in the land use permit context.  *Id*.  And in *Scott*, the Ninth Court noted that the "government *may* sometimes condition benefits on waiver of Fourth Amendment rights – for instance, *when dealing with contractors*[.]"  (Emphasis added.)  *Scott*, 450 F.3d at 867.

The unconstitutional conditions doctrine is intended to protect against "the risk that the government will abuse its power by attaching strings strategically, striking

lopsided deals and gradually eroding constitutional protections." *Scott*, 450 F.3d at 866. Thus, a condition on even "a valuable government benefit" does not run afoul of the doctrine unless it produces a denial "on a basis that infringes [one's] constitutionally protected interests." *Bingham v. Holder*, 637 F.3d 1040, 1046 (9th Cir. 2011). "Also, the government may condition the grant of a discretionary benefit on a waiver of rights 'if the condition is rationally related to the benefit conferred." *Id.*

Here, as previously discussed, the NPS system and its nonsectarian requirement cannot be viewed as an attempt by California to pressure religious entities into forsaking their identity. Plaintiffs' repackaging of their Free Exercise argument as a separate "unconstitutional conditions doctrine" argument does not materially change the analysis, because that doctrine does not turn a constitutional condition into an unconstitutional one. *Bingham*, 637 F.3d at 1046 (condition must actually operate to "infringe" plaintiff's "constitutionally protected interests," and if placed on a "discretionary benefit," is proper "if rationally related to the benefit conferred.").

## VI.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST CONSIDERATIONS STRONGLY FAVOR DENYING THE REQUESTED EXTRAORDINARY RELIEF

As discussed above and previously, Plaintiffs' claims lack merit. Even in a constitutional case, the Court may end the analysis there, and deny the motion for that reason alone. *Dish Network Corp. v. Federal Communications Commission*, 653 F.3d 771, 776-77 (9th Cir. 2011) (in a First Amendment case, agreeing with district court that there is no need to consider remaining three *Winter* factors when plaintiff "has failed to satisfy its burden on demonstrating it has met the first element."); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) ("Because it is a threshold inquiry, when 'a plaintiff has failed to show the likelihood of success on the merits, we 'need not consider the remaining three [*Winter* elements].'").

Plaintiffs' argument on the remaining three *Winter* factors is based entirely on the supposed strength of its case on the merits and the mistaken belief that the remaining

factors must be taken for granted.  (*See* Dkt. 28-1 at 30:18-20, arguing that the balance of the equities and public interest factors are met solely "because California law violates Plaintiffs' rights under the Free Exercise[.]")  However, the Ninth Circuit has expressly rejected the proposition that a plaintiff demonstrating a likelihood of success on the merits in a First Amendment case satisfies the test for a preliminary injunction.  *Dish Network Corp.*, 653 F.3d at 776 ("DISH argues that in the case of a First Amendment claim, all four of the Winter factors collapse into the merits. We have held otherwise.")

"While a First Amendment claim 'certainly raises the specter' of irreparable harm and public interest considerations, proving the likelihood of such a claim is not enough to satisfy *Winter*." *Id*.  Rather, the movant "must demonstrate that it meets all four of the elements of the preliminary injunction test established in [*Winter*.]" *Id*.; *see also American Freedom Defense Initiative v. King County*, 796 F.3d 1165, 1172 (9th Cir. 2015) (same, and holding that plaintiff would not have been entitled to relief *even if they had* established a likelihood of success of the merits in First Amendment case).

As shown below, the remaining factors strongly favor denial of the motion.

### A. Because Plaintiffs' Alleged Injury is Speculative and Not Imminent, Injunctive Relief is Inappropriate.

The second *Winter* factor is whether Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief[.]" *Winter*, 555 U.S. at 20.  Plaintiffs argue that they easily meet this "low bar" because this is a First Amendment case.  (Dkt. 28-1 at 29.)  Plaintiffs misapprehend the standard.

While it can be said that the actual "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury[,]" the Ninth Circuit has reminded us that "the mere assertion of First Amendment rights does not automatically require a finding of irreparable injury." *CTIA – The Wireless Association v. City of Berkeley, Calif.*, 928 F.3d 832, 851 (9th Cir. 2019).  "To warrant injunctive relief, it is not enough that the claimed harm will be irreparable; it must be imminent as well." *Rubin v. Vista Del Sol Health Services, Inc.*, 80 F. Supp. 3d 1058, 1100 (C.D.

Cal. 2015) (citing multiple Ninth Circuit decisions).  "Nor does speculative injury constitute irreparable harm sufficient to warrant granting a preliminary injunction." *Id.; see also Winter*, 555 U.S. at 22 (plaintiff must demonstrate that irreparable harm is "*likely*" in the absence of an injunction, not merely possible); *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable harm sufficient to warrant granting a preliminary injunction."); *Miracle v. Hobbs*, 427 F. Supp. 3d 1150, 1162-64 (D. Ariz. 2019) (in a First Amendment case, rejecting plaintiffs' argument that the irreparable harm element for a preliminary injunction was met because "each day the [challenged] law remains in effect is another day that the constitutional right of Plaintiffs are irreparably harm[,]" because likelihood that the law would actually harm the plaintiffs [even assuming its unconstitutionality] was speculative).  And a plaintiff must do more than allege imminent harm; it must demonstrate such harm with probative evidence, and "[c]onclusory affidavits are insufficient[.]" *Rubin*, 80 F. Supp. 3d 1100-01.  Moreover, "[i]f the harm to the plaintiff is merely monetary, it 'will not usually support injunctive relief.'" *Id.* at 1100.

In the cases Plaintiffs cite, First Amendment rights would have actually been infringed in the absence of preliminary relief (*e.g.*, ability to attend Church service in person, ability to keep hair long, *etc*.).  That is simply not the case here.  The Schools can continue operating as Jewish Orthodox schools as they have for decades, and the Families can practice their faith.  Moreover, even if Plaintiffs' claims had merit and the nonsectarian NPS were immediately rescinded, there is no evidence that it would relieve alleged harm.  The Schools have not even begun to explore whether they could or would agree to perform under an NPS contract, and there is no evidence that they could or would do so.  Given the prohibition on using IDEA funds for religious instruction, and the requirement that NPSs use California's public (and secular) curriculum and instructional materials, and the record reflecting the Schools' desire to provide a distinctly Orthodox Jewish education, removing the nonsectarian requirement would not allow for the Schools' religiously-motivated desired outcome.  Similarly,

removing the requirement would not allow for the Families' desired outcome: to wit, a government-funded private religious education with all of the IDEA rights of a public school student.  Indeed, as previously discussed, the Families do not show that their children with disabilities would legally be able to be placed in *any* NPS (religious or otherwise) if the nonsectarian requirement were removed.

**B. Plaintiffs' Delay in Both Bringing Suit and Seeking Relief is an Important Consideration Militating in Favor of Denying the Motion.**

The Supreme Court has emphasized that, even if a plaintiff is likely to succeed on the merits, the plaintiff's lack of reasonable diligence in suing and moving for relief is an important factor in balancing the equities and may justify denying preliminary relief. *Benisek v. Lamone*, 138 S.Ct. 1942, 1944 (2018) (upholding denial of preliminary injunction to plaintiffs whose challenge of redistricting decision was brought "six years, and three general elections" after the new district map was adopted).

In addition, a plaintiff's delay in seeking relief undercuts any claim of irreparable harm and militates against the issuance of a preliminary injunction.  G*arcia*, 786 F.3d at 746 ("Garcia waited months to seek an injunction after Innocence of Muslims was uploaded to YouTube in July 2012; she did not seek emergency relief when the film first surfaced on the Internet.  The district court did not abuse its discretion by finding this delay undercut Garcia's claim of irreparable harm."); s*ee also Staumann USA, LLC v. TruAbutment Inc.*, 2019 WL 6887172, *1 n.1 (C.D. Cal. Oct. 1, 2019) ("If 'movants unduly delayed in bringing suit,' it is far more difficult to make out a showing of likelihood of irreparable harm.' Absent a good explanation, a substantial period of delay 'militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.'" Citations omitted.)

Here, California's nonsectarian NPS requirement has been in place for decades. Educ. Code § 56034 (defining "nonpublic, nonsectarian school," enacted in 1993) and Educ. Code §§ 56365-56366 (enacted in 1994).  Plaintiffs assert that a "trilogy of Supreme Court precedents – *Carson*, *Espinoza*, and *Trinity Lutheran* – places beyond

dispute that the Free Exercise Clause prohibits" the nonsectarian NPS requirement (Dkt. 28-1 at 21:10-12); however, those decisions were published in June 2017, June 2020 and June 2022.  Moreover, Plaintiffs argue that those decisions were "unremarkable" considering "decades-old precedent" supposedly supporting their case.  (*Id*. at 22:4-7.)

Both Plaintiff Schools have operated for decades (since 1958 and 1992).  (Dkt. 28-6, Einhorn Dec., ¶3; and Dkt. 28-5, Block Dec., ¶3.)  Plaintiffs K.T. (now in eighth grade) and N.P. (now in seventh grade) have been enrolled in LAUSD public schools with IEPs for several years.  (Dkt. 28-4, Nick Dec., ¶19; Dkt. 28-3, Perets Dec., ¶19.)  Yet, despite asserting that "[e]very day" that the nonsectarian NPS requirement is allowed to stand, is another day that causes them harm (Dkt. 28-1 at 29:21 – 30:3), Plaintiffs do not provide any explanation for why they did not file this suit before March 13, 2023.  Nor do they explain why they waited until May 22, 2023 to file their motion.

**C. Because it Seeks to Overturn Long-Standing State Law and the Status Quo and to Force Government Action with Respect to Non-Parties, Plaintiffs' Request Does Not Serve the Purpose of a Preliminary Injunction nor Satisfy a Heightened Burden.**

While Plaintiffs phrase their requested relief in terms of enjoining defendants from "excluding religious schools from eligibility" as NPSs and from "the ability to receive public funding," in effect, their proposed order would not only overturn decades-old state law and policy, but also require defendants to act.  At a minimum, it would require the State Defendants to review and analyze the extensive NPS application materials received from any sectarian applicants, conduct an on-site review of each applicant's facility and program, and make a certification decision.  Educ. Code § 56366.1(e)-(f); 5 C.C.R. § 3063(a)-(c).  In addition, any LEA that enters a master contract with a certified sectarian NPS would be required to conduct an onsite visit prior to placing one of its pupils with that NPS.  Educ. Code § 56366.1(f).  And to the extent that any of the state's 1,000+ LEAs decide to place a pupil in a sectarian NPS, public money would be paid for performance of the contract, opening the door to all the

problems that the nonsectarian NPS requirement was intended to avoid. Such an order constitutes a disfavored mandatory injunction that may not be issued unless a plaintiff establishes "that the law and facts *clearly favor* [its] position, not simply that [it] is likely to succeed." (Italics in original.) *Garcia*, 786 F.3d at 740; *American Freedom Defense Initiative*, 796 F.3d at 1173 ("'In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases[.]'")

Indeed, by seeking to disrupt the status quo, Plaintiffs' proposed injunction contravenes the very purpose of preliminary injunctive relief, which "is merely to preserve the relative positions of the parties" until the merits are resolved. *Benisek v. Lamone*, 138 S.Ct. 1942, 1945 (2018); *Garcia*, 786 F.3d at 740 (recognizing that mandatory injunctive relief "goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored.") Here, the relevant *status quo* is that, for three decades, the nonsectarian NPS requirement has been unquestioned state law. *Miracle*, 427 F. Supp. 3d at 1164 (in First Amendment case, recognizing that relevant *status quo* is the law remaining in place, and that disrupting that status requires both facts and law that "clearly favors" the plaintiff: "The current status quo, Defendant submits, is the Strikeout Law remaining in place. [Citation] Defendant is right.").

In addition, public interest considerations are amplified when the plaintiff requests injunctive relief enjoining enforcement of a law against not just the plaintiffs, but third parties. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009). Here, the requested relief is not limited to Plaintiffs. Moreover, the Ninth Circuit has emphasized that district courts must proceed with caution when asked to overturn state law and policy. *Id*. at 1140 (recognizing that "the public interest may be declared in the form of a statute" and that it "is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy.").

"The plaintiffs bear the initial burden on showing that the injunction is in the public interest." *Id*. at 1139. "However, the district court need not consider public

consequences that are 'highly speculative.'" *Id.* Here, Plaintiffs have presented no evidence that there is any sectarian entity with a current and real desire (let alone the capability) to apply to become an NPS and comply with a master contract and all relevant federal and state regulations. Plaintiffs also fail to grapple with the fact that if preliminary relief is granted but the defendants ultimately prevail on the merits, then among other things, the educational plans of students with disabilities could be disrupted, and government contracts may have to rescinded and unwound.

### D. The Compelling Interests Supporting the Nonsectarian NPS Requirement Cannot Be Ignored.

Plaintiffs' motion fails to recognize the compelling interests supporting the challenged requirement. Even if there was some likelihood that Plaintiffs would suffer some constitutional harm, courts recognize that where there are difficult-to-weigh public interests on both sides of the scale, relief is appropriately denied. *Drakes Bay Oyster Co.*, 747 F.3d at 1092. Notably, in one of the cases that Plaintiffs cite in their motion, the Ninth Circuit *overturned* a district court's decision *not* to preliminarily enjoin voluntary religious services conducted at a government-owned homeless shelter, by the government's lessee, a religiously affiliated organization, because the plaintiffs in that case "raised serious questions regarding an Establishment Clause violation." *Community House, Inc. v. City of Boise*, 490 F.3d 1041, 1059-1060 (9th Cir. 2007). Contrary to Plaintiffs' insinuation, the Establishment Clause is not a dead letter, and the compelling and legitimate reasons that have supported the heretofore unchallenged nonsectarian NPS requirement for decades are not to be disregarded.

### VII. CONCLUSION

The motion should be denied in its entirety.

Dated: June 30, 2023                      Respectfully submitted,

                                   By:    /s/ Thomas Prouty
                                          THOMAS PROUTY
                                          Attorney for the State Defendants

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the State Defendants, certifies that this memorandum contains 25 pages (excluding the caption and tables of contents and authorities), which complies with the applicable 25-page limit for memoranda of points and authorities.

Dated: June 30, 2023                    Respectfully submitted,

                                        By:    /s/ Thomas Prouty
                                               THOMAS PROUTY