1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                    CENTRAL DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11   CHAYA LOFFMAN and JONATHAN | CASE NO.  2:23-cv-01832-JLS-MRW |

11   CHAYA LOFFMAN and JONATHAN
     LOFFMAN, on their own behalf and on behalf      CASE NO.  2:23-cv-01832-JLS-MRW
12   of their minor child M.L.; FEDORA NICK and
13   MORRIS TAXON, on their own behalf and on        **ORDER: (1) GRANTING**
     behalf of their minor child K.T.; SARAH         **DEFENDANTS' MOTIONS TO**
14   PERETS and ARIEL PERETS, on their own           **DISMISS CASE (Docs. 29, 31); AND**
15   behalf and on behalf of their minor child N.P.; **(2) DENYING PLAINTIFFS'**
     JEAN & JERRY FRIEDMAN SHALHEVET           **MOTION FOR PRELIMINARY**
16   HIGH SCHOOL; and SAMUEL A. FRYER             **INJUNCTION (Doc. 28)**
17   YAVNEH HEBREW ACADEMY,
18
19                          Plaintiffs,
20           v.
21
22   CALIFORNIA DEPARTMENT OF
     EDUCATION; TONY THURMOND, in his
23   official capacity as Superintendent of Public
     Instruction; LOS ANGELES UNIFIED
24   SCHOOL DISTRICT; and ANTHONY
25   AGUILAR, in his official capacity as Chief of
     Special Education, Equity, and Access,
26
27                          Defendants.
28

Before the Court are: (1) a Motion to Dismiss Case filed by Defendants Anthony Aguilar and Los Angeles Unified School District (the "LAUSD Defendants") (LAUSD Mot., Doc. 29); and (2) a Motion to Dismiss Case filed by Defendants California Department of Education and Tony Thurmond (the "CDE Defendants") (CDE Mot., Doc. 31; CDE Mem., Doc. 31-1).  Plaintiffs Jean & Jerry Friedman Shalhevet High School, Samuel A. Fryer Yavneh Hebrew Academy (collectively, the "School Plaintiffs"), M. L., Chaya Loffman, Jonathan Loffman, K.T., Fedora Nick, Morris Taxon, N. P., Ariel Perets, and Sarah Perets, (collectively, "Plaintiffs") opposed, and the LAUSD Defendants and CDE Defendants (collectively, "Defendants") replied.  (MTD Opp., Doc. 37; LAUSD Reply, Doc. 42; CDE Reply, Doc. 43.)  Also before the Court is a Motion for Preliminary Injunction filed by Plaintiffs.  (MPI, Doc. 28; MPI Mem., Doc. 28-1.)  Defendants opposed Plaintiffs' Motion for Preliminary Injunction, and Plaintiffs replied.  (LAUSD MPI Opp., Doc. 36; CDE MPI Opp., Doc. 37; MPI Reply, Doc. 44.)  Having considered the parties' briefs and pleadings and having held oral argument, for the reasons set forth below, the Court GRANTS Defendants' Motions and DENIES Plaintiffs' Motion.

## I.      BACKGROUND

### A.  The Legal Framework

#### 1.  Children's and Parents' Rights Under the IDEA

"The Individuals with Disabilities Education Act [("IDEA")] offers States federal funds to assist in educating children with disabilities."  *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017) (citations omitted).  The IDEA lists as one of its primary purposes "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further

education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).  According to the Supreme Court, Congress's intent in enacting the IDEA was "to bring previously excluded handicapped children into the public education systems of the States and to require the States to adopt procedures which would result in individualized consideration of and instruction for each child." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 189 (1982) (emphasis deleted).  The IDEA's aim, that is, "was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Id.* at 192.

To receive IDEA funds, States "must provide a free appropriate public education— a FAPE, for short—to all eligible children." *Endrew F.*, 580 U.S. at 390 (citing 20 U.S.C. § 1412(a)(1)).  "A FAPE . . . includes both 'special education' and 'related services.'" *Id.* (quoting 20 U.S.C. § 1401(9)).  "Special education" means "specially designed instruction . . . to meet the unique needs of a child with a disability" and "related services" are support services "required to assist a child . . . to benefit from that instruction." *Id.* (quoting 20 U.S.C. §§ 1401(26), (29)).  "A State covered by the IDEA must provide a disabled child with such special education and related services 'in conformity with the [child's] individualized education program,' or IEP." *Id.* at 390–91 (quoting 20 U.S.C. § 1401(9)(D)).

"The IEP is 'the centerpiece of the statute's education delivery system for disabled children.'" *Id.* at 391 (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).  "A comprehensive plan prepared by a child's 'IEP Team' (which includes teachers, school officials, and the child's parents), an IEP must be drafted in compliance with a detailed set of procedures." *Id.* (quoting 20 U.S.C. § 1414(d)(1)(B)).  "These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances." *Id.* (citing 20 U.S.C. § 1414).  "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Id.* (quoting *Rowley*, 458 U.S. at 181).

Each child's IEP "is prepared at a meeting between a qualified representative of the local educational agency [("LEA")], the child's teacher, the child's parents or guardian, and, where appropriate, the child[.]" *Rowley*, 458 U.S. at 182.  The IEP is a written document that contains the following:

> (A) a statement of the present levels of educational performance of such child, (B) a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

*Id.* (quoting 20 U.S.C. § 1401(19)).  An IEP should also include a statement of "academic and functional goals designed to . . . [m]eet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum[.]" 34 C.F.R. § 300.320(a)(2)(i)(A).  LEAs "must review, and where appropriate revise, each child's IEP at least annually." *Rowley*, 458 U.S. at 182 (citing 20 U.S.C. § 1414(a)(5)).

When an LEA develops an IEP for an eligible child to receive a FAPE, it "must consider 'the strengths of the child'; 'the concerns of the parents for enhancing the education of their child'; 'the results of the initial evaluation or most recent evaluation of the child'; and 'the academic, developmental, and functional needs of the child.'" *Capistrano Unified Sch. Dist. v. S.W.*, 21 F.4th 1125, 1130 (9th Cir. 2021), *cert. denied sub nom. S.W. on Behalf of B. W. v. Capistrano Unified Sch. Dist.*, 143 S. Ct. 98 (2022).  The IDEA provides parents with the right to participate in the development of their children's IEP, but "[p]arents' participation does not require school authorities automatically to defer to their concerns." *Id.* at 1134.  Furthermore, the IDEA requires State agencies to develop an IEP that provides an education "reasonably calculated to enable the child to receive

4

educational benefits"—not "a potential-maximizing education."  *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1095 (9th Cir. 2013) (first quoting *Rowley*, 458 U.S. at 206–7; and then quoting *id.* at 197 n.21).

The IDEA contemplates some families will choose to place their children in private schools, including religious schools.  Indeed, the IDEA requires LEAs to locate "parentally placed private school children" and spend a proportionate share of their IDEA funds on providing those children with a special education and related services "after timely and meaningful consultation with representatives of private schools[.]"  *See* 20 U.S.C. § 1412(a)(10)(A)(i); 34 C.F.R. §§ 300.133–34.

LEAs' obligations and families' rights under the IDEA will differ depending on whether the family has chosen to send the child to a public school or a private school.  "No parentally-placed private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school." 34 C.F.R. § 300.137(a).  Parentally placed private school children, that is, do not have an individually enforceable right to receive a FAPE.  *See* 20 U.S.C. § 1412(a)(10)(C)(i)  (stating that the IDEA "does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility").  Instead, children with a disability who attend private schools are entitled to "equitable services" that must be "secular, neutral, and nonideological"— even when provided in religious schools.   20 U.S.C. § 1412(a)(10)(vi).  LEAs do not create IEPs for children who attend private schools, but instead create a "services plan" describing the special education services that the LEA will provide "in light of the services that the LEA has determined" that it will make available to parentally placed private school students, based on its mandatory consultation with private school officials and parents. 34 C.F.R. §§ 300.137(b)–(c), 300.138(b).

1    When parents reject the LEA's offer of a FAPE for their eligible child on the

2  ground that the LEA has failed to make a FAPE available to the child—regardless of

3  whether the LEA previously provided the student with special education and related

4  services through an IEP or the LEA simply failed to offer the student a FAPE—they may

5  unilaterally place the child in a private school and seek reimbursement from the LEA

6  through an administrative due process hearing.  *See, e.g.*, *Forest Grove Sch. Dist. v. T.A.*,

7  557 U.S. 230, 241–45 (2009); *see also* 20 U.S.C. § 1412(a)(10)(C)(ii); 34 C.F.R.

8  § 300.148(c).  "[A] court or a hearing officer may require the [LEA] to reimburse the

9  parents for the cost of that enrollment" upon finding "that the agency had not made FAPE

10  available to the child in a timely manner prior to that enrollment and that the private

11  placement is appropriate."  34 C.F.R. § 300.148(c).

12    When an LEA provides a FAPE to a child with a disability, it does so in accordance

13  with the State's public curriculum and under the direction and supervision of the State's

14  public educational agencies.  *See* 20 U.S.C. § 1401(9) (a FAPE must be "provided at

15  public expense, under public supervision and direction, and without charge; meet the

16  standards of the State educational agency;" and be "provided in accordance with the

17  [child's IEP]"); *see also* 34 C.F.R. § 300.600 (providing that the State must monitor

18  implementation of the IDEA by LEAs.  Furthermore, LEAs must ensure that each child

19  with a disability receives a FAPE "in the least restrictive environment"—*i.e.*, that children

20  who receive a special education spend as much time as possible in the same classroom as

21  children who do not receive such an education.  34 C.F.R. § 300.600(d)(1).  LEAs must

22  ensure, that is, that "to the maximum extent appropriate" children with disabilities are

23  "educated with children who are nondisabled" and that learning outside the LEA's regular

24  classes "occurs only if the nature or severity of the disability is such that education in

25  regular classes with the use of supplementary aids and services cannot be achieved

26  satisfactorily."  34 C.F.R. § 300.114(a).

27    Given the broad range of disabilities and special needs children can have, LEAs

28  must "ensure that a continuum of alternative placements is available" to meet those varied

needs, and alternative placements may include "private institutions."  34 C.F.R.

§§ 300.115, 300.118, 300.325.  In such a scenario, the LEA may offer the child placement

at a private school as a FAPE through the IEP process.  34 C.F.R. §§ 300.115–16.  LEAs

have an obligation to ensure that all placement decisions comply with the requirement that

children with disabilities be educated with nondisabled children to the maximum extent

possible and in the least restrictive environment.  34 C.F.R. § 300.116.  Moreover,

alternative placements must be based on the child's IEP; keep children as close as possible

to their home; and, if possible, provide that "the child is educated in the school that he or

she would attend if nondisabled."  *Id.*

In the context of alternative placements in private institutions, the decision is made

by the LEA, not the child's parents.  *Compare* 20 U.S.C. § 1412(a)(10)(B) ("Children

placed in, or referred to, private schools by public agencies"), *with id.* § 1412(a)(10)(A)

("Children enrolled in private schools by their parents").  When an LEA chooses to place a

child in a private institution, it remains responsible for adequately implementing the

IDEA's requirements: "Even if a private school or facility implements a child's IEP,

responsibility for compliance . . .  remains with the [State and local agencies]."  34 C.F.R.

§ 300.325(c).  Further, the State must ensure that private institutions chosen for an

alternative placement "meet standards that apply to State educational agencies and local

educational agencies and that children so served have all the rights the children would have

if served by such agencies."  20 U.S.C. § 1412(a)(10)(B)(ii).  The State "must . . .

[m]onitor compliance" with those standards "through procedures such as written reports,

on-site visits, and parent questionnaires[.]"  34 C.F.R. § 300.147.

When parents challenge the LEA's alternative placement, courts must focus their

review "primarily on the [LEA's] proposed placement, not on the alternative that the

family preferred" and "must uphold the appropriateness of the [LEA's] placement if it was

reasonably calculated to provide [the child] with educational benefits."  *Gregory K. v.*

*Longview Sch. Dist.*, 811 F.2d 1307, 1314 (9th Cir. 1987).  Additionally, courts reviewing

the appropriateness of an LEA's IEP "are not free "to substitute [their] own notions of

sound educational policy for those of the school authorities which [they] review." *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 887 (9th Cir. 2001) (quoting *Rowley*, 458 U.S. at 206).   "Because Congress intended states to have the primary responsibility of formulating each individual child's education, [courts] must defer to their 'specialized knowledge and experience' by giving 'due weight' to the decisions of the states' administrative bodies." *Id.* (quoting *Rowley*, 458 U.S. at 206–8.)  At least one United States Court of Appeals has held that a family's religious and cultural needs do not require an LEA to include any religious or cultural instruction as part of an IEP. *See M.L. v. Smith*, 867 F.3d 487, 497–98 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 752 (2018).

When an LEA determines that it is appropriate to involve a private contractor in a child's public education, the LEA and the private contractor are bound by federal regulations prohibiting the use of IDEA funds for "[r]eligious worship, instruction, or proselytization."  34 C.F.R. § 76.532; *see also M.L.*, 867 F.3d at 496 ("[F]ederal regulations support the conclusion that states may not use IDEA funds to provide religious and cultural instruction.").  Even when LEAs provide services to "parentally-placed private school children" whose families have chosen to enroll in a private school, including a religious school, the IDEA requires that funds be used only for education that is "secular" and "neutral," and to benefit the eligible children, as opposed to the private school itself or its general student population. *See*, *e.g.*, 20 U.S.C. § 1412(a)(10)(A)(vi) ("Special education and related services provided to parentally placed private school children with disabilities, including materials and equipment, shall be secular, neutral, and nonideological."); 34 C.F.R. § 300.141(a) ("An LEA may not use [IDEA] funds . . . to finance the existing level of instruction in a private school or to otherwise benefit the private school.").

### 2.  California's "Nonsectarian" Requirement

California participates in the IDEA and has devised a statutory and regulatory framework for implementing and complying with the IDEA.  Responsibility for implementing and ensuring compliance with the IDEA lies with the California Department of Education, which also administers IDEA funds to local agencies.  *See, e.g.*, *Los Angeles Cnty. Off. of Educ. v. C.M.*,  2011 WL 1584314, at *3 (C.D. Cal. Apr. 22, 2011), *aff'd*, 550 F. App'x 387 (9th Cir. 2013).

The California Education Code provides that, "services provided by nonpublic, nonsectarian schools . . . and nonpublic, nonsectarian agencies . . shall be made available . . . under contract with the [LEA] to provide the appropriate special educational facilities, special education, or designated instruction and services required by the individual with exceptional needs if no appropriate public education program is available." Cal. Educ. Code § 56365(a).  California Department of Education regulations define "nonsectarian" as "a private, nonpublic school . . . that is not owned, operated, controlled by, or formally affiliated with a religious group or sect, whatever might be the actual character of the education program or the primary purpose of the facility and whose articles of incorporation and/or by-laws stipulate that the assets of such agency or corporation will not inure to the benefit of a religious group."  Cal. Code Regs. tit. 5, § 3001(p).

These provisions of the California Education Code and implementing regulations apply only when a child has been referred to or placed in a private school or facility to receive a FAPE—when the LEA, not the child's parents, decides that alternative placement in a private institution is appropriate.  *See* Cal. Educ. Code. § 56365(a) (providing that services rendered by nonsectarian, nonpublic institutions must be in accordance with 34 C.F.R. § 300.146, which sets forth State agencies' obligations when they place a child in a private institution).  California's provision for "nonsectarian, nonpublic schools" applies,

1    that is, only in situations where a family has chosen to accept a FAPE from their LEA—

2    not when parents have invoked their right to obtain a private education for their children.

3         An LEA's placement of one of its students in a nonpublic school ("NPS") allows

4    the LEA to receive state funding for that student because such students are "deemed to be

5    enrolled in public schools" for funding purposes.  *Id.* § 56365(b).  The LEA pays the NPS

6    pursuant to a contract between the LEA and the NPS.  *Id.* § 56365(d).  The "master

7    contract" for NPSs to provide special education and related services must incorporate

8    provisions concerning instruction, program development, staffing, documentation, IEP

9    implementation, and LEA supervision.  *Id.* § 56366.  Specifically, the master contract must

10   include an "individual services agreement" for each pupil "placed by" an LEA with the

11   NPS to cover the special education "specified in" the pupil's IEP.  *Id.* § 56366(a)(2).  A

12   master contract must recognize that the NPS cannot make changes in the instruction or

13   services that it provides to any student under the contract unless those changes are based

14   on revisions made to the student's IEP.  *Id.* § 56366(a)(3)(A).  Further, a master contract

15   must recognize that the NPS is subject to the state's accountability system "in the same

16   manner as public schools" and that each pupil placed in the NPS by an LEA shall be tested

17   by qualified staff at the NPS in accordance with that system.  *Id.* § 56366(a)(8).  Last,

18   when a child placed by the LEA in a nonpublic school completes the IEP's prescribed

19   course of study, "the public education agency which developed the IEP shall award the

20   diploma."  Cal. Code Regs. tit. 5, § 3070.

21        LEAs may enter into master contracts only with state-certified NPSs.  Cal. Educ.

22   Code § 56366(d).  To be certified, NPSs must apply with the Superintendent of Public

23   Instruction and meet several requirements.  An applying NPS must certify that it will use

24   the State Board of Education ("SBE")-adopted, standards-based core curriculum and

25   instructional materials for kindergarten and grades 1 through 8, and will use the state

26   standards-aligned core curriculum and instructional materials used by an LEA that

27   contracts with the NPS for grades 9 through 12.  *Id.* § 56366.10(b); Cal. Code Regs. tit. 5,

28   § 3001(a).  An application for certification must therefore describe, among other things,

the "SBE-adopted core curriculum (K-8) and standards-aligned core curriculum (9-12) and instructional materials used by general education students."  Cal. Code Regs. tit. 5, § 3060(c)(9).

Administrators and staff of the NPS must "hold a certificate, permit, or other document equivalent to that which staff in a public school are required to hold[.]"  Cal. Educ. Code § 56366.1(n); Cal. Code Regs. tit. 5, § 3064(a).  Accordingly, the NPS's application for certification must include the names of its teachers with a credential authorizing service in special education, and copies of the credentials.  Cal. Educ. Code § 56366.1(a)(3); Cal. Code Regs. tit. 5, § 3060(c)(4).  An institution applying for NPS certification must also agree that it will "maintain compliance" with not only the IDEA, but other federal laws including the Civil Rights Act, Fair Employment Act, and Section 504 of the Rehabilitation Act.  Cal. Code Regs. tit. 5, § 3060(d).  Applications for certification also need to include "a description of the special education and designated instruction and services provided to individuals with exceptional needs[.]"  Cal. Educ. Code § 56366.1(a)(1).

The Superintendent is authorized to "certify, conditionally certify, or deny certification."  *Id.* § 56366.1(f).  The Superintendent must conduct an initial "validation review" before granting "an initial conditional certification," and then must conduct an "on-site review" within 90 days of that.  Cal. Code Regs. tit. 5, § 3063(a).

When a nonpublic school applies for certification, it cannot petition for a waiver of the nonsectarian requirement.  *See* Cal. Educ. Code § 56366.2 (permitting waiver of certain requirements, but not the certification requirements contained in § 56366.1).  LEAs can petition for such waivers, however, certification requirements may be waived only if "approved by the [State Board of Education] pursuant to Section 56101."  *Id.* § 56366.2(b). Section 56101 permits a "public agency" to "request the [B]oard to grant a waiver of any provision of this code or regulations adopted pursuant to that provision if the waiver is necessary or beneficial to the content and implementation of the pupil's individualized education program and does not abrogate any right provided individuals with exceptional

11

needs and their parents or guardians under [IDEA]."  *Id.* § 56101(a).  A "public agency"

includes "special education local plan area[s]" like LAUSD.  *Id.* § 56028.5.  The decision

whether to grant such a waiver lies with the Superintendent, however, not the public

agency.  *Id.* § 56366.2(a).

Certified NPSs agree to continued oversight by the State, and to provide services

aimed at transitioning pupils to less restrictive environments in the pupils' respective

LEAs.  For example, a master contract must "include a description of the process being

utilized by the [LEA] to oversee and evaluate placements in [NPSs], as required by federal

law[,]" which must "include a method for evaluating whether each pupil is making

appropriate educational progress."  Cal. Educ. Code § 56366(a)(2)(B).  Evaluations must

take place at least annually and must consider whether or not the needs of the pupil placed

in the NPS "continue to be best met" at the NPS, as well as whether changes to the IEP are

necessary, "including whether the pupils may be transitioned to a public school setting."

*Id.*  Moreover, the NPS must certify that its teachers and staff will provide instruction and

support "with the goal of integrating pupils into the least restrictive environment pursuant

to federal law."  *Id.* § 56366.10(c).  In view of this goal, an applying NPS must describe its

"exit criteria for transition back to the public school setting."  Cal. Code Regs. tit. 5, §

3060(c)(8).

The Superintendent must conduct on-site reviews of certified NPSs at least every

three years.  Cal. Code Regs. tit. 5, § 3063(a).  On-site reviews must include "a review and

examination of files and documents, classroom observations and interviews with the site

administrator, teachers, students, volunteers and parents to determine compliance with all

applicable state and federal laws and regulations."  *Id.* § 3063(e)(2).  On-site reviews are

followed by a written report detailing any noncompliance findings.  *Id.* §§ 3063(e)–(h).

Further, when the Superintendent receives evidence of certain matters, such as "a

significant deficiency in the quality of educational services provided," the Superintendent

is required to "conduct an investigation" and may conduct an unannounced on-site visit.

Cal. Educ. Code § 56366.1(i)(3).  The Superintendent "may revoke or suspend the

certification" of a nonpublic school for any one of ten enumerated reasons, including: (a) violation of an applicable state or federal rule or regulation; (b) failure to comply with a master contract; (c) "[f]ailure to implement recommendations and compliance requirements following an onsite review"; and (d) failure to implement a student's IEP. *Id.* § 56366.4.

Putting aside the Superintendent's supervisory functions with respect to NPSs, LEAs that have placed one or more of pupils at a given NPS must conduct "at least" one on-site monitoring visit during each school year, which must include "a review of progress the pupil is making toward the goals set forth in the pupil's [IEP]," "an observation of the pupil during instruction, and a walkthrough of the facility." Cal. Educ. Code § 56366.1(e)(3).

### B.  Factual Background

Plaintiffs are two Orthodox Jewish private schools—Jean & Jerry Friedman Shalhevet High School and Samuel A. Fryer Yavneh Hebrew Academy (the "Schools")— and three pairs of Orthodox Jewish parents— Chaya and Jonathan Loffman, Fedora Nick and Morris Taxon, and Sarah and Ariel Perets—suing on their own behalf and on behalf of their respective children with disabilities.  (Compl. ¶¶ 2–3, 19–34, Doc. 1.)  According to Plaintiffs, "California discriminates against Jewish children with disabilities and Jewish schools that seek to provide an education for children with disabilities."  (*Id.* ¶¶ 1, 6.) Plaintiffs aver that California violates their rights guaranteed by the First Amendment's Free Exercise Clause and the Fourteenth Amendment's Equal Protection Clause because, by extending IDEA funds only to "nonsectarian" schools, it "will not allow a private school to access otherwise generally available funds for special education if the private school is religious."  (*Id.* ¶¶ 1, 7.)  According to Plaintiffs, the "nonsectarian" requirement makes it "impossible for a child with a disability to be placed at a religious school and receive the same funding that he would otherwise be entitled to had his parents sent him to

1   a nonreligious school" and likewise "impossible for a private religious school to receive
2   the public funding necessary to provide critical services to children with disabilities." (*Id.*
3   ¶¶ 8–9.) Plaintiffs claim that California "forces [parents] to choose between accessing
4   those services and giving their children a Jewish education." (*Id.* ¶ 10.)

5          Plaintiffs Chaya and Jonathan Loffman (the "Loffmans") have a four-year-old son
6   who has been diagnosed with high-functioning autism, M.L. (*Id.* ¶¶ 19–20, 79.) M.L.
7   currently receives educational services at Maor Academy, an Orthodox Jewish learning
8   center that supports students with special needs. (*Id.* ¶¶ 20, 78.) The Loffmans "believe
9   that they are obligated to send their children to Orthodox Jewish schools to maintain and
10  strengthen their family's Jewish religious beliefs, culture, and heritage" and wish to enroll
11  M.L. in an Orthodox Jewish school. (*Id.* ¶¶ 82–83.) M.L. received behavioral,
12  occupational, and speech therapy at a Jewish preschool. (*Id.* ¶¶ 85–86.) The Loffmans
13  "opted to pay out of pocket for M.L.'s costly therapies" because they "wanted him to have
14  an Orthodox Jewish education." (*Id.* ¶ 87.) The Loffmans "continue to pay weekly for
15  [M.L.'s] 25 hours of behavior therapy and 1 hour of occupational therapy out of pocket, as
16  well as his tuition" at Maor Academy. (*Id.* ¶ 88.) The Loffmans "recognize that M.L.
17  might be eligible for more services in public school as part of an IEP" but allege that they
18  have been "forced to forgo those services" because the nonsectarian requirement they
19  challenge would make it impossible for M.L. to receive a FAPE at an Orthodox Jewish
20  school. (*Id.* ¶ 90.) The Complaint does not allege that the Loffmans have ever sought a
21  FAPE from LAUSD or that M.L. has been evaluated by LAUSD personnel.

22         Plaintiffs Fedora Nick and Morris Taxon (the "Taxons") have three children,
23  including their fourteen-year-old son Plaintiff K.T., who was diagnosed with autism at age
24  2. (*Id.* ¶¶ 91, 94.) The Taxons sent their two non-disabled children exclusively to
25  Orthodox Jewish schools. (*Id.* ¶ 92.) Like the Loffmans, the Taxons "believe that they are
26  obligated to send their children to Orthodox Jewish schools to maintain and strengthen
27  their family's Jewish religious beliefs, culture, and heritage." (*Id.* ¶ 98.) This is why they
28  have sent their two other children to Orthodox Jewish schools and desire to enroll K.T. in

an Orthodox Jewish school "where he can receive both a religious and secular education, as well as the services necessary to support his disability." (*Id.* ¶¶ 99–100.)

The Complaint alleges that the Taxons have sought out opportunities for K.T. since he was in preschool but "have been unable to place K.T. in an Orthodox Jewish school due to California's prohibition on using generally available special-education funding at private religious schools." (*Id.* ¶ 101.) The Taxons are allegedly "unable to utilize funds for K.T. that would otherwise be available to them—unless they decide to forgo a religious education for K.T." (*Id.* ¶ 103.) "From kindergarten through eighth grade, K.T. has received a mainstreamed classroom education in public school" but "performs below grade level academically." (*Id.* ¶ 105.) As a public-school student, "K.T. has an IEP that includes 9 service providers, including a full-time aide, a supervisor for the aide, speech and occupational therapists, adaptive physical education, resource specialists for English and math, and a private reading tutor." (*Id.* ¶ 106.) Those services are currently provided through LAUSD. (*Id.* ¶ 107.) The Taxons do not believe that K.T. is receiving a FAPE in public school because he misses out on needed special education and related services both for secular and religious holidays and is repeatedly served nonkosher food. (*Id.* ¶¶ 108–12.)

Sarah and Ariel Perets have six children, including their fourteen-year-old son Plaintiff N.P., who was diagnosed with autism at age 3 and a WAC gene mutation at age 6. (*Id.* ¶¶ 116, 119.) The Peretses sent their five nondisabled children exclusively to Orthodox Jewish schools. (*Id.* ¶ 117.) Like the Loffmans and the Taxons, the Peretses "believe that they are obligated to send their children to Orthodox Jewish schools to maintain and strengthen their family's Jewish religious beliefs, culture, and heritage." (*Id.* ¶ 122.) This is why they have sent their other five children to Orthodox Jewish schools and desire to enroll N.P. in an Orthodox Jewish school "where he can receive both a religious and secular education, as well as the services necessary to support his disability." (*Id.* ¶¶ 123–24.)

The Complaint alleges that the Peretses "have been unable to seek placement for N.P. in an Orthodox Jewish school due to California's prohibition on using generally available special-education funding at private religious schools." (*Id.* ¶ 125.)  The Peretses "attempted to enroll [N.P.] in Orthodox Jewish schools such as Emek Hebrew Academy and Adat Ari El, but because the public school district would not pay for his services, the costs of paying for his services out of pocket were prohibitive." (*Id.* ¶ 128.)  N.P. "currently attends Sutter Middle School, a public middle school, where he has an IEP in place." (*Id.* ¶ 129.)  N.P. receives "limited speech therapy" at Sutter Middle School. (*Id.* ¶ 131.)  According to Plaintiffs, "LAUSD's speech therapists are prohibited from administering therapy involving physical touch, which has slowed N.P.'s speech progression." (*Id.* ¶ 132.)  Plaintiffs also allege that N.P. has been "placed in classes with peers that the Peretses believe operate at a lower level of functioning than N.P." and that "[s]ince N.P. was removed from a mainstream setting, his academic progress and his speech development has [sic] regressed." (*Id.* ¶¶ 135–36.)

The Peretses do not believe that N.P. is receiving a FAPE in public school and desire to enroll N.P. in an Orthodox Jewish school. (*Id.* ¶¶ 124, 130, 149.)  The Complaint alleges that "N.P. could receive prompted speech therapy in private schools." (Compl. ¶ 133.)  It also alleges that "[t]he Peretses believe that the smaller class sizes available in private schools would better meet N.P.'s needs and would enable him to be placed in a classroom with peers who function at a similar level to N.P." (*Id.* ¶ 137.)  Plaintiffs also allege that the public school is inadequately staffed and that the Peretses believe staffing problems would not occur in private schools. (*Id.* ¶¶ 138–40.)  Last, the Complaint alleges that N.P.'s faith "imposes unique difficulties in public school" because N.P. "fails to receive services not only when the public school is not in session, but also when he misses school for religious observance." (*Id.* ¶¶ 141–42.)  And the Peretses often remind the public school that N.P. cannot eat non-kosher food. (*Id.* ¶ 147.)

The Jean & Jerry Friedman Shalhevet High School ("Shalhevet") and the Samuel A. Fryer Yavneh Hebrew Academy ("Yavneh") are co-educational, dual-curriculum

1   Orthodox Jewish schools in Los Angeles, California.  (*Id.* ¶¶ 150, 161.)  "[T]he inculcation
2   and transmission of Jewish religious beliefs and practices to children is the very reason that
3   Shalhevet and Yavneh exist."  (*Id.* ¶ 76.)  Plaintiffs allege that "Shalhevet's mission is to
4   promote the values of Jewish heritage, to live Torah values, to stimulate Torah learning,
5   and to develop a love of, and commitment to, the State of Israel."  (*Id.* ¶ 151.)  It "seeks the
6   opportunity to qualify to provide a distinctively Orthodox Jewish education to children
7   with disabilities."  (*Id.* ¶ 152.) Yavneh "seeks to foster in its students a passion for Torah,
8   learning, hard work, joy, a respect for tradition, and a desire to be positive members of the
9   community."  (*Id.* ¶ 162.)  It also "seeks the ability to qualify as a certified NPS."  (*Id.*
10  ¶ 165.)

11          The Complaint alleges "[o]n information and belief" that the School Plaintiffs
12  "either otherwise meet[] or [are] capable of meeting California's other certification
13  requirements to become an NPS."  (Compl. ¶¶ 156, 166.)  It also alleges that neither school
14  can "be considered for placement as part of a student's FAPE for the sole reason that it is
15  religious, nor can it receive the reimbursement that would result from such a placement."
16  (*Id.* ¶¶ 159, 169.)  According to Plaintiffs, neither school can "provide its services and
17  religious education to all children with disabilities" because "California law prohibits the
18  use of generally available public funds at private religious schools."  (*Id.* ¶¶ 160, 170.)

19          Plaintiffs filed the instant lawsuit on March 13, 2023.  (*See* Compl.)  Plaintiffs are
20  suing the California Department of Education and the Superintendent of Public Instruction,
21  Tony Thurmond, as well as the Los Angeles Unified School District and its Chief of
22  Special Education, Equity, and Access, Anthony Aguilar.  (*Id.* ¶ 11.)  Plaintiffs bring suit
23  under 42 U.S.C. § 1983 ("Section 1983") for alleged violations of their civil rights (*id.* ¶ 1)
24  as follows:

25          Count I: Defendants have categorically excluded Plaintiffs from otherwise
26          available government benefits in violation of the Free Exercise Clause of the
27          First Amendment (*id.* ¶¶ 171–83);

28

<u>Count II</u>: Defendants have allowed nonsectarian schools, but not religious schools, to petition for waiver of certain statutory requirements for NPS certification, also in violation of the Free Exercise Clause of the First Amendment (*id.* ¶¶ 184–95);

<u>Count III</u>: Defendants have conditioned access to government funding on nonsectarian status and refuse to waive the nonsectarian requirement for Shalhevet's and Yavneh's NPS certification applications, also in violation of the Free Exercise Clause of the First Amendment (*id.* ¶¶ 196–204);

<u>Count IV</u>: Defendants have discriminated against Plaintiffs on the basis of religion, in violation of the Equal Protection Clause (*id.* ¶¶ 205–9);

<u>Count V</u>: Defendants have imposed unconstitutional conditions on the School Plaintiffs by requiring them to give up their religious identity by certifying themselves as nonsectarian in their applications for NPS status, in violation of the Free Exercise Clause of the First Amendment (*id.* ¶¶ 210–15);

<u>Count VI</u>: Defendants have interfered with Plaintiffs' right to direct the religious upbringing of their children by preventing them from sending their children with disabilities to religious schools (*id.* ¶¶ 216–22).

Plaintiffs seek: (a) a declaration that the California Education Code's requirement that NPSs providing services pursuant to the IDEA be nonsectarian is unconstitutional; (b) preliminary and permanent injunctive relief prohibiting Defendants from excluding religious schools from eligibility as NPSs; (c) preliminary and permanent injunctive relief preventing Defendants from requiring schools seeking NPS certification to indicate whether they are religious or not; (d) actual and nominal damages in an amount to be determined; and (e) attorneys' fees. (*Id.* at 36–37, "Prayer for Relief.")

On May 22, 2023, Plaintiffs moved for a preliminary injunction barring Defendants from enforcing the nonsectarian requirement in Sections 56365 and 56366 of the California Education Code. (*See* MPI at 2, 24.)

18

On May 23 and 24, the LAUSD Defendants and the CDE Defendants filed separate motions to dismiss Plaintiffs' Complaint.  (*See* LAUSD Mot.; CDE Mot.; CDE Mem.) Defendants argue that: (a) Plaintiffs' causes of action against LAUSD and CDE are barred by Eleventh Amendment immunity (LAUSD Mot. at 17–19; CDE Mem. at 13–14); (b) Plaintiffs' claims for monetary relief are also barred by the Eleventh Amendment (LAUSD Mot. at 19; CDE Mem. at 14); (c) Plaintiffs all lack Article III standing to bring their claims (LAUSD Mot. at 19–27; CDE Mem. at 14–23); (d) Plaintiffs all fail to state claims for violations of the Free Exercise Clause and the Equal Protection Clause (LAUSD Mot. at 27–35; CDE Mem. at 23–40).

The Court held a hearing on the parties' Motions on July 21, 2023.

## II.   <u>LEGAL STANDARD</u>

### A. Rule 12(b)(1)

A defendant may move to dismiss an action for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  Fed. R. Civ. P. 12(b)(1).  "Dismissal for lack of subject matter jurisdiction is appropriate if the complaint, considered in its entirety, on its face fails to allege facts sufficient to establish subject matter jurisdiction." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984–85 (9th Cir. 2008).  When considering a Rule 12(b)(1) motion, the Court "is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction."  *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).  "The party asserting [] subject matter jurisdiction bears the burden of proving its existence."  *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

1        **B. Rule 12(b)(6)**

2

3       "Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint for

4 'failure to state a claim upon which relief can be granted.'  Dismissal of a complaint can be

5 based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged

6 under a cognizable legal theory." *Alfred v. Walt Disney Co.*, 388 F. Supp. 3d 1174, 1180

7 (C.D. Cal. 2019) (citation omitted).  In deciding a motion to dismiss under Rule 12(b)(6),

8 courts must accept as true all "well-pleaded factual allegations" in a complaint.  *Ashcroft v.*

9 *Iqbal*, 556 U.S. 662, 679 (2009).  Courts must also draw all reasonable inferences in the

10 light most favorable to the non-moving party.  *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629

11 F.3d 992, 998 (9th Cir. 2010).  Yet, "courts 'are not bound to accept as true a legal

12 conclusion couched as a factual allegation.'"  *Bell Atlantic Corp. v. Twombly*, 550 U.S.

13 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

14       "Dismissal without leave to amend is improper unless it is clear . . . that the

15 complaint could not be saved by any amendment."  *Intri-Plex Techs., Inc. v. Crest Grp.*,

16 Inc., 499 F.3d 1048, 1056 (9th Cir. 2007) (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006,

17 1013 (9th Cir. 2005)); *see also Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149,

18 1160 (9th Cir. 1989) ("Leave need not be granted where the amendment of the complaint

19 . . . constitutes an exercise in futility.").

20

21    **III.**    <u>**DISCUSSION**</u>

22

23       **A. Sovereign Immunity Requires Dismissal of CDE and LAUSD**

24

25       The Eleventh Amendment bars federal jurisdiction over suits by individuals against

26 a State and its instrumentalities, unless either the State consents to waive its sovereign

27 immunity or Congress abrogates that immunity.  *See Pennhurst State Sch. & Hosp. v.*

28 *Halderman*, 465 U.S. 89, 100 (1984) ("[A]n unconsenting State is immune from suits

1   brought in federal courts by her own citizens as well as by citizens of another state.")

2   (quoting *Emps. v. Mo. Public Health & Welfare Dep't*, 411 U.S. 279, 280 (1973)

3   (Marshall, J., concurring)).

4        Eleventh Amendment immunity extends to a State's agencies and to officials of

5   those agencies acting in their official capacity.  *Krainski v. Nevada ex rel. Bd. of Regents*

6   *of Nevada Sys. of Higher Educ.*, 616 F.3d 963, 967 (9th Cir. 2010).  The Ninth Circuit has

7   held that California school districts are arms of the state entitled to sovereign immunity

8   under the Eleventh Amendment.  *Sato v. Orange Cty. Dep't of Educ.*, 861 F.3d 923, 934

9   (9th Cir. 2017) (concluding that "California school districts . . .  remain arms of the state

10  and continue to enjoy Eleventh Amendment immunity" following passage of state

11  legislation that "reformed the financing and governance of California public schools"); *see*

12  *also Belanger v. Madera Unified Sch. Dist.*, 963 F.2d 248, 251 (9th Cir. 1992) ("[U]nder

13  California law, the school district is a state agency that performs central governmental

14  functions.  Thus, the school district is protected by the Eleventh Amendment.").

15       To overcome the Eleventh Amendment bar to federal jurisdiction, the State's

16  consent or Congress's intent must be "unequivocally expressed."  *Pennhurst*, 465 U.S. at

17  99.  Section 1983 "does not explicitly and by clear language indicate on its face an intent

18  to sweep away the immunity of the States; nor does it have a history which focuses directly

19  on the question of state liability and which shows that Congress considered and firmly

20  decided to abrogate the Eleventh Amendment immunity of the States."  *Quern v. Jordan*,

21  440 U.S. 332, 345 (1979).  Accordingly, Section 1983 does not abrogate the States'

22  Eleventh Amendment immunity.  *Id.*  Nor has California "waived its Eleventh Amendment

23  immunity with respect to claims brought under § 1983 in federal court[.]"  *Dittman v.*

24  *California*, 191 F.3d 1020, 1025–26 (9th Cir. 1999) (citation omitted); *accord Brown v.*

25  *California Dep't of Corr.*, 554 F.3d 747, 752 (9th Cir. 2009).

26       Plaintiffs concede that Ninth Circuit precedent bars their claims against the

27  California Department of Education and the Los Angeles Unified School District.  (MTD

28  Opp. at 12 n.1.)  Accordingly, the Court DISMISSES WITH PREJUDICE Plaintiffs'

claims against the California Department of Education and the Los Angeles Unified
School District.

### B. Sovereign Immunity Bars Damages Claims Against Thurmond and Aguilar

Although the Eleventh Amendment shields state officials from official-capacity suits, "[a] narrow exception exists 'where the relief sought is prospective in nature and is based on an ongoing violation of the plaintiff's federal constitutional or statutory rights.'" Krainski, 616 F.3d at 967–68 (quoting *Central Reserve Life of N. Am. Ins. Co. v. Struve*, 852 F.2d 1158, 1160–61 (9th Cir. 1988)); *see also Quern*, 440 U.S. at 337 ("[A] federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury.") (citation omitted). Thus, while courts may not award retrospective—*i.e.*, monetary—relief in official capacity suits, they may nevertheless issue injunctions or declaratory judgments to prevent a state official from violating a plaintiff's federal rights. *Quern*, 440 U.S. at 337 ("The distinction between that relief permissible under the doctrine of *Ex parte Young* and that found barred in *Edelman* was the difference between prospective relief on one hand and retrospective relief on the other.").

Plaintiffs concede that they are barred from seeking damages from Defendants Tony Thurmond and Anthony Aguilar, whom they have sued in their official capacities. (MTD Opp. at 12 n.1). Accordingly, the Court DISMISSES WITH PREJUDICE Plaintiffs' claims for damages against Thurmond and Aguilar.

1          **C.  Article III Standing**

2

3          "The Constitution grants Article III courts the power to decide 'Cases' or

4   'Controversies.'"  *Carney v. Adams*, 141 S. Ct. 493, 498 (2020) (quoting U.S. Const. art.

5   III, § 2).  The Supreme Court has "long understood that constitutional phrase to require

6   that a case embody a genuine, live dispute between adverse parties, thereby preventing the

7   federal courts from issuing advisory opinions."  *Id.* (citations omitted).  "The doctrine of

8   standing implements this requirement by insisting that a litigant 'prove that he has suffered

9   a concrete and particularized injury that is fairly traceable to the challenged conduct, and is

10  likely to be redressed by a favorable judicial decision.'"  *Id.* (quoting *Hollingsworth v.

11  Perry*, 570 U.S. 693, 704 (2013); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61

12  (1992)).

13          Standing has three elements: "[t]he plaintiff must have (1) suffered an injury in fact,

14  (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely

15  to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330,

16  338 (2016).  A plaintiff "bears the burden of establishing standing as of the time he [brings

17  his] lawsuit and maintaining it thereafter."  *Carney*, 141 S. Ct. at 499 (citations omitted);

18  *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 191 (2000)

19  (standing is evaluated "at the time the action commences"); *id.* at 189 ("The requisite

20  personal interest that must exist at the commencement of the litigation (standing) must

21  continue throughout its existence[.]") (citations omitted).

22          "When the government erects a barrier that makes it more difficult for members of

23  one group to obtain a benefit than it is for members of another group, a member of the

24  former group seeking to challenge the barrier need not allege that he would have obtained

25  the benefit but for the barrier in order to establish standing."  *Ne. Fla. Chapter of

26  Associated Gen. Contractors of Am. v. City of Jacksonville* ("*AGC*"), 508 U.S. 656, 666

27  (1993).  When a plaintiff alleges discrimination, the "injury in fact . . . is the denial of

28

                                                23

1  equal treatment resulting from the imposition of the barrier, not the ultimate inability to

2  obtain the benefit." *Id.* (citation omitted).

3          Nevertheless, to establish standing plaintiffs challenging an allegedly

4  discriminatory policy must show that they are "able and ready" to apply for the benefit that

5  they seek. *Id.* The "able and ready" standard pertains to the first requirement of Article III

6  standing, that a plaintiff has suffered a concrete and particular injury-in-fact. *Planned*

7  *Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946

8  F.3d 1100, 1108 (9th Cir. 2020) ("It is a plaintiff's ability and readiness to bid that ensures

9  an injury-in-fact is concrete and particular; the requirement precludes the airing of

10 generalized grievances.") (citation omitted).

11         A court's inquiry as to whether a plaintiff has shown the requisite ability and

12 readiness to apply is a "highly-fact specific" undertaking and requires more than the non-

13 applicant's belief that they meet the "minimum qualifications" and are "able and ready."

14 *Carney*, 141 S. Ct. at 500–1 (concluding that the plaintiff lacked standing where the record

15 did not show that he was "able and ready" to apply); *see also Faculty v. New York Univ.*,

16 11 F.4th 68, 77 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2813 (2022) (holding that plaintiffs

17 lacked standing because their complaint failed to include "any 'description of concrete

18 plans' to apply" and indefinite "'some day intentions' . . . cannot 'support a finding of []

19 actual or imminent injury'") (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 496

20 (2009)). A plaintiff sufficiently alleges injury when a discriminatory policy *has interfered*

21 with the plaintiff's *otherwise equal ability* to compete for the program benefit." *Dragovich*

22 *v. U.S. Dep't of the Treasury*, 764 F. Supp. 2d 1178, 1187 (N.D. Cal. 2011) (emphasis

23 added). A mere affirmation that one is "able and ready to apply" is insufficient—concrete

24 facts showing that readiness and ability are necessary. *Carney*, 141 S. Ct. at 501–2.

25 "[T]he intent of the applicant may be relevant to standing in an equal protection

26 challenge"—but facts must be adduced to support a finding of intent. *Carroll v. Nakatani*,

27 342 F.3d 934, 942 (9th Cir. 2003) (citing *Gratz v. Bollinger*, 539 U.S. 244, 261 (2003)).

28

The Ninth Circuit has illuminated the contours of "discriminatory barrier" standing and the "able and ready" standard in a few key cases.  In *Bras v. California Public Utilities Commission*, 59 F.3d 869, 873 (9th Cir. 1995), the Ninth Circuit concluded that the plaintiff had met his burden by stating in a declaration: "I *earnestly desire* to reinstate my long term business relationship with Pacific Bell . . . in the future *and stand ready, willing and able* to provide such services should I be given an opportunity to do so."  *Id.* at 874 (emphasis in original).  The plaintiff there challenged a pre-qualification preference for women- and minority-owned businesses, alleging that, due to the discriminatory preference, he had lost out on the ability to continue providing architectural services to Pacific Bell after he had done so for 20 years.  *Id.* at 871.  In addition to the plaintiff's declaration, Pacific Bell had also provided a declaration to the court stating that it was pleased with the plaintiff's past work and would consider him for future work.  *Id.* at 874.

In *City of Los Angeles v. Barr* ("*Barr*"), 929 F.3d 1163 (9th Cir. 2019), the Ninth Circuit concluded that a "thin" or "slight" injury was sufficient to establish so-called "competitor standing."  *Id.* at 1073–74.  There, Los Angeles argued that it was injured when it submitted a grant application to the Department of Justice for law enforcement funds without selecting an "illegal immigration focus" in the application or submitting a certification related to illegal immigration.  *Id.* at 1073.  Los Angeles argued that by declining to select an illegal immigration focus or submit the certification it was placed at a competitive disadvantage to other applicants; its "inability to compete on an even playing field" was the Article III injury.  *Id.*  The Ninth Circuit reasoned that "Los Angeles need not prove that it would have received funding absent the challenged considerations" and decided that Los Angeles's "slight competitive disadvantage" was sufficient to confer Article III standing "[d]espite the weakness of Los Angeles's argument."  *Id.* at 1073–74.  There was no question whether Los Angeles was "able and ready" to apply in that case, however, because Los Angeles *had* applied for the federal grants in question for two consecutive years and submitted a declaration of its intent to apply in the next year.  *Id.* at 1072–73.

By contrast, in *Carroll v. Nakatani*, 342 F.3d 934 (9th Cir. 2003), the Ninth Circuit concluded that the plaintiff had not met his burden under the "able and ready" standard because he had done "essentially nothing to demonstrate that he is in a position to compete equally" with other applicants. *Id.* at 942. There, the plaintiff alleged discrimination in a loan program run by the Office of Hawaiian Affairs ("OHA") accessible only to "native Hawaiians" or "Hawaiians" as defined by Hawaii law. *Id.* at 938. Although the plaintiff, Barrett, had submitted an application for a loan, the application was so "materially deficient" that it failed to satisfy the "able and ready" standard:

> Unlike the contractor cases[—*i.e.*, *AGC* and *Bras*], he has no work history with small business copy shops or any other entrepreneurial endeavors that might bolster his bona fides. Barrett did not respond to OHA's request for additional information to complete the application. His failure to respond to the OHA's request for additional information further illustrates that he is not prepared to compete for the loan.

*Id.* at 942–43 (footnote omitted). Given these facts, the Ninth Circuit concluded that "Barrett's declaration of 'interest' in starting a copy shop, and submission of a meritless application falls short of being 'able and ready' to compete" and standing had not been established. *Id.* at 943.

While each of the above cases was decided at summary judgment, the Third Circuit has explained more recently that, even at the pleading stage, "there are a wide variety of factors that may bear on a plaintiff's intent to pursue a benefit in the near future" and "whether a plaintiff is 'able and ready' to apply for a benefit is not reducible to a strict rule." *Ellison v. Am. Bd. Of Orthopaedic Surgery*, 11 F.4th 200, 207 (3d Cir. 2021). Still, "in most cases, a plaintiff will need to plead that he or she took some actual steps that demonstrate a real interest in seeking the alleged benefit." *Id.* (citing *Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1337 (11th Cir. 2019) (holding that the plaintiff had not established injury in fact where it failed to allege that it took any concrete steps to found a methadone clinic, "such as selecting a clinic location, securing a lease option,

consulting with relevant government officials, applying for the necessary permits or certifications, or associating with potential clients"); *Finkelman v. Nat'l Football League*, 810 F.3d 187, 195 (3d Cir. 2016) (holding that the plaintiff failed to allege injury in fact where he "took no meaningful action" to pursue the alleged opportunity); *Pucket v. Hot Springs Sch. Dist. No. 23-2*, 526 F.3d 1151, 1161 (8th Cir. 2008) ("[I]f a plaintiff is required to meet a precondition or follow a certain procedure to engage in an activity or enjoy a benefit and fails to attempt to do so, that plaintiff lacks standing to sue because he or she should have at least taken steps to attempt to satisfy the precondition.")).

The case before the Third Circuit concerned a surgeon, Ellison, who wished to move from California to New Jersey. *Ellison*, 11 F.4th at 202. Ellison challenged a New Jersey medical board's certification process on the ground that the board illegally restricted applicants from becoming certified without first obtaining staff privileges at a local hospital. *Id.* at 202–3. The surgeon, Ellison, had "not attempted to apply for medical staff privileges or taken any concrete steps to practice in New Jersey," however. *Id.* at 203. Ellison allegedly believed that "the New Jersey hospitals where he desires to practice will reject his application, as their bylaws provide that they generally grant privileges only to physicians who are already board certified," so that applying would be inadvisable and futile. *Id.* at 203, 208. Although Ellison argued that "he did not need to plead that he took any steps to practice in New Jersey, as it was a foregone conclusion that the hospitals he identified would not hire him," the Third Circuit rejected that argument. *Id.* at 208. Rather than merely allege futility, Ellison needed to "plead something more to indicate that he was positioned to practice at the hospitals he specified in the near future." *Id.* What was fatal to Ellison's case is that his complaint "d[id] not allege that Ellison took any steps" to position himself to practice and "allege[d] virtually no acts by Ellison apart from taking the first part of [the board's] certification exam." *Id.* The scant allegations in Ellison's complaint were insufficient to establish Article III standing because they failed to show that Ellison had more than "a hypothetical 'some day' interest in possibly" seeking board

27

certification.  *Id.* at 208–9 (citations omitted).  "Ellison's alleged injury," the Third Circuit held, was "neither concrete nor imminent under the circumstances."  *Id.* at 209.

The cases cited above go to the first element of Article III standing: whether the plaintiff has suffered an injury-in-fact.  To establish Article III standing, however, a plaintiff must also allege facts showing that the injury-in-fact is "is caused by the challenged conduct and . . . is likely redressable by a favorable judicial decision."  *Juliana v. United States*, 947 F.3d 1159, 1168 (9th Cir. 2020) (citing *Friends of the Earth*, 528 U.S. at 180–81.)  "Causation can be established even if there are multiple links in the chain, as long as the chain is not hypothetical or tenuous[.]"  *Id.* (internal quotation marks and citations omitted).

"To establish redressability, a plaintiff must show that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'"  *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) (quoting *Lujan*, 504 U.S. at 561).  A plaintiff does not need to show that it is certain that his or her injuries will be redressed by a favorable decision, but only that there is "a substantial likelihood that the relief sought would redress the injury[.]"  *Id.*  (internal quotation marks and citations omitted).  "If, however, a favorable judicial decision would not require the defendant to redress the plaintiff's claimed injury, the plaintiff cannot demonstrate redressability . . . unless she adduces facts to show that the defendant or a third party are nonetheless likely to provide redress as a result of the decision."  *Id.*  (internal quotation marks and citations omitted).  "Finally, even where a plaintiff requests relief that would redress her claimed injury, there is no redressability if a federal court lacks the power to issue such relief."  *Id.*  (citing *Republic of Marshall Islands v. United States*, 865 F.3d 1187, 1199 (9th Cir. 2017)).

The parties dispute whether the facts alleged here make this case more analogous to cases like *AGC*, *Bras* and *Barr*, where the plaintiffs were "able and ready" to apply for and receive the benefits at issue, or more analogous to the other cases—*Carney*, *Carroll*, and *Ellison*—where the plaintiffs failed to meet their burden to establish Article III standing.  (*See* LAUSD Mot. at 19–27; CDE Mem. at 14–23; MTD Opp. at 12–20; LAUSD Reply at

10–16; CDE Reply at 5–11.)  The parties also dispute whether California's nonsectarian requirement is causing any of the Plaintiffs here to suffer a concrete harm that could be redressed by this action.  (*See* LAUSD Mot. at 20–24; CDE Mem. at 19–23; MTD Opp. at 19–20; LAUSD Reply at 14–16; CDE Reply at 6–8.)  For the reasons stated below, the Court concludes that neither the School Plaintiffs nor the Loffmans have pleaded sufficient facts to show Article III standing.

### 1.  The School Plaintiffs Lack Standing

Defendants argue that the School Plaintiffs fail to establish standing under the "able and ready" standard because: (1) they have not alleged sufficient facts to show that they would be able and ready to apply for NPS certification were it not for the nonsectarian requirement; and (2) they have alleged facts showing that they likely would not be able to satisfy NPS certification requirements that are independent from the nonsectarian requirement.  (LAUSD Mot. at 24–27; CDE Mem. at 15–19; LAUSD Reply at 14; CDE Reply at 5–6.)

Plaintiffs counter that that the School Plaintiffs satisfy the "able and ready" test because: (1) "they desire and intend to explore the NPS process as a means of meeting religious obligations to serve children with disabilities"; (2) they believe that they can satisfy NPS certification requirements; and (3) pursuing certification would be futile right now because they cannot certify that they are nonsectarian institutions.  (MTD Opp. at 17; *see also* Compl. ¶¶ 152–60, 163–70.)  According to Plaintiffs, at the pleading stage the School Plaintiffs can satisfy the "able and ready" standard by alleging that they intend to apply and that a discriminatory barrier—here, the nonsectarian requirement—prevents them from competing for benefits on an equal footing.  (MTD Opp. at 16–18.)

The Court agrees with Defendants and concludes that the School Plaintiffs lack Article III standing.  First, the Court considers the Complaint's affirmative allegations regarding the School Plaintiffs' ability and readiness to apply for NPS certification.

1   Instead of alleging specific facts showing either School Plaintiff's ability and willingness

2   to satisfy NPS certification requirements, the Complaint simply alleges:

3         On information and belief, Shalhevet either otherwise meets or is capable of

4         meeting California's other certification requirements to become an NPS.

5         . . . .

6         On information and belief, Yavneh either otherwise meets or is capable of

7         meeting California's other certification requirements to become an NPS.

8   (Compl. ¶¶ 156, 166.)  The Complaint does not include any allegations about concrete

9   steps the School Plaintiffs have taken to become certified as NPSs, and it does not explain

10   on what grounds the schools believe that they would be able to meet the other certification

11   requirements for becoming an NPS.  As to Shalhevet, the Complaint alleges merely that it

12   "seeks the opportunity to qualify to provide a distinctively Orthodox Jewish education to

13   children with disabilities."  (*Id.* ¶ 152.)  Yavneh similarly "seeks the ability to qualify as a

14   certified NPS."  (*Id.* ¶ 165.)  The Complaint includes no allegations related to the School

15   Plaintiffs' experience or efforts in educating children with disabilities.

16         Plaintiffs' allegations fail to show that the School Plaintiffs are able and ready to

17   apply for NPS certification.  The statutory requirements for a school to achieve NPS

18   certification in California are extensive.  To obtain NPS certification, schools must provide

19   "special education and designated instruction and services" from "appropriately qualified

20   staff," including an administrator with appropriate credentials.  Cal. Educ. Code

21   § 56366.1(a)(1)–(5).  Moreover, NPSs must offer a "standards-based curriculum" with

22   "standards-focused instructional materials" to implement students' IEPs.  *Id.*

23   §§ 56366(a)(5), 56366.1(j), 56366.10(b).  Schools applying to receive NPS certification

24   must certify that they will use the State Board of Education ("SBE")-adopted, standards-

25   aligned core curriculum and instructional materials for kindergarten and grades 1 through

26   8, and will use the state standards-aligned core curriculum and instructional materials used

27   by the LEA that contracts with the NPS for grades 9 through 12.  Cal. Educ. Code

28   § 56366.10(b); Cal. Code Regs. tit. 5, § 3001(a).  Schools applying for NPS certification

1  must also certify that their teachers and staff will provide instruction and support "with the

2  goal of integrating pupils into the least restrictive environment pursuant to federal law."

3  Cal. Educ. Code § 56366.10(c).

4          Furthermore, implementing regulations require a school seeking NPS certification

5  to describe the school's "exit criteria for transition back to the public school setting."  Cal.

6  Code Regs. tit. 5, § 3060(c)(8).  Indeed, NPS placement entails extensive and ongoing

7  state monitoring, evaluation, and direction of the NPS by the LEA, with the aim of

8  transitioning a pupil back to less restrictive environments in public school.  Cal. Educ.

9  Code § 56366(a)(2)(B).  Last, institutions applying for NPS certification must agree that

10 they  will "maintain compliance" with the IDEA and other federal laws, including the Civil

11 Rights Act, Fair Employment Act, and Section 504 of the Rehabilitation Act.  Cal. Code

12 Regs. tit. 5, § 3060(d).  And the California Education Code prohibits discrimination based

13 on, among other things, religion in any program or activity conducted by an educational

14 institution receiving or benefitting from state financial assistance.  Cal. Educ. Code § 220.

15         Given the extensive requirements for achieving NPS certification outlined above,

16 the Complaint's vague, conclusory allegations that the schools "otherwise meet" or are

17 "capable of meeting" other requirements for NPS certification lack sufficient factual

18 content to be deemed plausible.  *See Iqbal*, 556 U.S. at 678 (a complaint is insufficient "if

19 it tenders 'naked assertions' devoid of 'further factual enhancement'") (quoting *Twombly*,

20 550 U.S. at 557).  Moreover, Plaintiffs do not allege that either School Plaintiff would

21 follow the state curriculum and use state-adopted educational materials as required by

22 California law, or that they would consent to continuous state monitoring and work with

23 LAUSD to transition pupils with disabilities back to public school.  Nor do Plaintiffs

24 allege that the School Plaintiffs would comply with state and federal nondiscrimination

25 requirements, as every NPS must.  Instead, Plaintiffs allege that the School Plaintiffs offer

26 "a distinctively Orthodox Jewish education" that combines religious and secular studies

27 and that "the inculcation and transmission of Jewish religious beliefs and practices to

28 children is the very reason that Shalhevet and Yavneh exist."  (Compl. ¶ 31–34, 76.)

1   Plaintiffs further allege that the School Plaintiffs specifically seek to serve *Jewish* families

2   and children with disabilities.  (*Id.* ¶¶ 3, 32, 34, 154.)  These allegations do not raise a

3   plausible inference that the School Plaintiffs are able and ready to apply for and obtain

4   NPS certification.

5        Compare this case with *Carroll*, where the plaintiff had taken more steps to apply

6   than the School Plaintiffs allege to have taken here—there, at least, the plaintiff had

7   submitted a "materially deficient" and "meritless" application.  342 F.3d at 942–43.  But

8   the Ninth Circuit concluded that submitting a deficient application was not enough to

9   establish standing.  *Id.* at 943.  Here, there is no allegation that the School Plaintiffs have

10   even begun to prepare to apply or have any experience serving students with disabilities.

11        The lack of any allegations about steps that the schools have taken to apply for and

12   receive NPS certification makes this case closely analogous to other cases where courts

13   have found a lack of standing based on lack of concrete steps showing ability and

14   readiness to apply.  *See*, *e.g.*, *Faculty v. New York Univ.*, 11 F.4th at 77 (concluding that

15   plaintiffs lacked standing because their complaint failed to include "any 'description of

16   concrete plans' to apply" and indefinite "'some day intentions' . . . cannot 'support a

17   finding of [] actual or imminent injury'") (quoting *Summers*, 555 U.S. at 496); *Ellison*, 11

18   F.4th at 208–9 (allegations failed to establish standing because they did not show that

19   plaintiff had more than "a hypothetical 'some day' interest in possibly" seeking board

20   certification).  It also sets this case apart from the facts of the cases on which Plaintiffs

21   rely: unlike in *AGC*, *Bras*, and *Barr*, where the plaintiffs either had actually applied for the

22   benefits at issue or had a history of receiving those benefits, no facts are alleged here to

23   show that either School Plaintiff is able and ready to apply for and receive NPS

24   certification.

25        Plaintiffs do not need to prove that the School Plaintiffs would receive NPS

26   certification but for the nonsectarian requirement.  At this stage, they need only allege

27   sufficient facts that, if proven, would show that the School Plaintiffs are able and ready to

28   apply for NPS certification but are unable to do so because of the nonsectarian

requirement.  Without that, they cannot show that they have suffered a concrete injury because of the nonsectarian requirement—*i.e.*, they cannot establish Article III standing.

For the above reasons, the Court concludes that Plaintiffs have not alleged sufficient facts to show that the School Plaintiffs have suffered or are suffering a concrete injury on account of the nonsectarian requirement challenged here.  Accordingly, the Court DISMISSES the School Plaintiffs' claims against Defendants for lack of Article III standing.

"[W]here a plaintiff fails to allege facts to support Article III standing, the complaint ordinarily is subject to dismissal, albeit with leave to amend."  *Greenpeace, Inc. v. Walmart Inc.*, 2022 WL 591451, at *2 (N.D. Cal. Feb. 3, 2022); *see also Warth v. Seldin*, 422 U.S. 490, 501–2 (1975) (observing that with respect to "a motion to dismiss for want of standing," "it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing").  Because Plaintiffs represented to the Court during oral argument that they could allege additional facts to establish that the School Plaintiffs have Article III standing, dismissal is WITH LEAVE TO AMEND.

## 2.  The Loffmans Lack Standing

The LAUSD Defendants argue that Plaintiff M.L. and his parents, Plaintiffs Chaya and Jonathan Loffman, lack Article III standing because the Complaint fails to plead facts showing that M.L. is eligible to receive a special education and related services under the IDEA.  (LAUSD Mot. at 20–21; CDE Mem. at 21–22; LAUSD Reply at 13.)  The CDE Defendants further argue that the Loffmans have not asked LAUSD for an IEP for M.L. and that Plaintiffs allege that LAUSD is able to provide services such as "a full-time aide, a supervisor for the aide, speech and occupational therapists, adaptive physical education, resource specialists for English and math, and a private reading tutor."  (CDE Mem. at 21–22; Compl. ¶ 106.)  In light of this, the Complaint fails to allege plausibly that M.L.'s

1   disability is so severe that LAUSD could legally place him in any NPS, which would first

2   require an IEP to be developed for M.L.  (CDE Mem. at 22.)

3         Plaintiffs counter that they have shown a sufficient injury at this stage by alleging

4   that California's nonsectarian requirement acts as a discriminatory barrier that prevents

5   them from advocating for and seeking placement in a religious NPS.  (MTD Opp. at 15–

6   16.)  According to Plaintiffs, they do not need to show that any of their children would be

7   placed in an NPS but for the nonsectarian requirement, because the nonsectarian

8   requirement already forces them to participate in California's IDEA program on an

9   unequal basis.  (*Id.*)  Plaintiffs further argued during the hearing that the students and

10  families here have suffered an Article III injury analogous to the one recognized by the

11  First Circuit in *Carson v. Makin* ("*Carson I*"), 979 F.3d 21 (1st Cir. 2020): the lost

12  opportunity to find a religious secondary education that would qualify for public funding

13  for their children.  *Id.* at 30–31.  For Plaintiffs, the nonsectarian requirement at issue here

14  similarly injures the families and their children by preventing them from even advocating

15  for placement in an otherwise qualifying religious NPS.

16        The Court agrees with Defendants that Plaintiffs have not alleged sufficient facts to

17  show that M.L. and the Loffmans have suffered or continue to suffer a concrete injury that

18  is traceable to the challenged nonsectarian requirement.  Plaintiffs allege that M.L. was

19  diagnosed with high functioning autism at age 3.  (Compl. ¶¶ 20, 79.)  They do not allege

20  that the Loffmans have ever sought to enroll M.L. in public school or requested a FAPE

21  from LAUSD.  Rather, the Loffmans have only enrolled M.L. in private religious schools

22  and "recognize that M.L. might be able for more services in public school as part of an

23  IEP[.]"  (*Id.* ¶¶ 84–90.)  Because the Loffmans wish to send M.L. to an Orthodox Jewish

24  school, however, they have opted to pay for M.L.'s special education needs and therapy

25  out of pocket rather than seek a FAPE from LAUSD.  (*Id.* ¶¶ 82, 84, 87–90.)  According to

26  Plaintiffs, the Loffmans are forced to pay out of pocket for special education services for

27  M.L. "due to California law and Defendants' practices."  (*Id.* ¶ 90.)

28

The Complaint suggests that the Loffmans' claimed injury is that the challenged nonsectarian requirement forces them to pay for M.L.'s special education and related services: absent the nonsectarian requirement, M.L. could receive an education that is both publicly funded and meets the family's religious needs.  In their opposition brief and during oral argument, however, Plaintiffs have argued that all three families have suffered and continue to suffer an Article III injury because the nonsectarian requirement prevents them from advocating for their children to be placed at a religious NPS.  Regardless of how they characterize their injury, however, Plaintiffs do not allege sufficient facts to show that the challenged requirement is the cause of the Loffmans' alleged injuries.

First, the facts alleged do not show that M.L. could receive a publicly funded Orthodox Jewish education if not for California's nonsectarian requirement.  Again, it is important to focus on the legal framework as described in Section I.A., *supra*.  The Complaint assumes that M.L. is eligible to receive a FAPE from LAUSD because of his autism diagnosis, but an autism diagnosis does not equate to IDEA eligibility.  Autism makes a pupil eligible under the IDEA if it both "significantly affect[s] verbal and nonverbal communication and social interaction" and "adversely affects a child's educational performance."  34 C.F.R. § 300.8(c)(1)(1)(i).  The Complaint alleges that M.L. requires speech and behavior therapy, but it does not allege that M.L.'s autism adversely affects his educational performance.  More importantly, there is no allegation that the Loffmans have ever sought a FAPE from LAUSD or that LAUSD has ever evaluated M.L., who may or may not be entitled to receive a special education and related services under the IDEA.  *See* 20 U.S.C.A. § 1414(a)(1)(A) ("A State educational agency, other State agency, or local educational agency shall conduct a full and individual initial evaluation . . . before the initial provision of special education and related services to a child with a disability under this subchapter.").

Plaintiffs do not allege sufficient facts to show that the Loffmans have been forced to choose between a publicly funded special education and related services and an Orthodox Jewish education for M.L. because they have not alleged enough facts to show

1  that M.L. is eligible to receive a FAPE under the IDEA.  Because the Loffmans have not

2  sought a FAPE from LAUSD and M.L. has not been evaluated, they cannot be said to have

3  forgone services available to children with disabilities under the IDEA because of their

4  desire to provide M.L. with a religious education.

5       Reframing the injury as being prevented from advocating for placement in a

6  religious school does not assist the Loffmans.  Again, the allegations pertaining to the

7  Loffmans and M.L. specifically do not suffice to show that the nonsectarian requirement

8  has prevented or is preventing them from seeking an IEP that places M.L. in a religious

9  school: there is no allegation that the Loffmans have ever sought publicly funded special

10  education services from LAUSD, which means that they are not in a position to advocate

11  for such placement even if the nonsectarian requirement were eliminated.  Moreover, the

12  purported loss of an opportunity to advocate for placement in a religious school in these

13  circumstances is too amorphous and hypothetical to qualify as a concrete Article III injury:

14  if any child or family could claim a legally cognizable interest in an advocacy opportunity

15  without otherwise alleging eligibility under the IDEA and the denial of a FAPE, standing

16  to challenge different aspects of the IDEA and States' implementation thereof would be

17  essentially limitless.  To challenge how California implements the IDEA, the Loffmans

18  have to allege sufficient facts to show that the IDEA applies to their child; that they have a

19  concrete interest in how the statute is implemented.  The allegations in the Complaint, even

20  if assumed to be true, fall short of showing that.

21       Based on the foregoing, the Court concludes that Plaintiffs have not put forth

22  sufficient facts to show that the nonsectarian requirement has caused the Loffmans any

23  injury.  Accordingly, the Court DISMISSES the Loffmans' claims against Defendants for

24  lack of Article III standing.  Unlike the School Plaintiffs, the Loffmans cannot allege

25  additional facts that would show that they had Article III standing at the time the

26  Complaint was filed—the Loffmans have not sought a FAPE from LAUSD, and M.L. has

27  not been evaluated to determine whether he is eligible to receive a special education under

28

1    the IDEA.  The dismissal is therefore WITHOUT PREJUDICE, but WITHOUT LEAVE

2    TO AMEND.

3

4                    **3.  The Taxons' Allegations Establish Standing**

5

6           Defendants argue that Plaintiff K.T. and his parents, Plaintiffs Fedora Nick and

7    Morris Taxon, lack Article III standing because K.T. does not require placement in an NPS

8    and the nonsectarian requirement has no bearing on his placement.  (LAUSD Mot. at 22–

9    23; CDE Mem. at 21; LAUSD Reply at 13, 23; CDE Reply at 6.)  Defendants argue that

10   the Complaint fails to allege that K.T. is "able and ready" to receive NPS placement

11   because it admits that "from kindergarten through eighth grade, K.T. has received a

12   mainstreamed classroom education in public school" and that LAUSD has provided,

13   through an IEP, "a full-time aide, a supervisor for the aide, speech and occupational

14   therapists, adaptive physical education, resource specialists for English and math, and a

15   private reading tutor." (CDE Mem. at 21; LAUSD Reply at 23; Compl. ¶¶ 105–7.)

16          According to the LAUSD Defendants, NPS placement is simply not on the table for

17   K.T.'s IEP team and removing the nonsectarian requirement would not affect his

18   placement.  (LAUSD Mot. at 23.)  They also observe that the Complaint does not allege

19   that the Taxons have sought placement in an NPS and been denied.  (LAUSD Reply at 23.)

20   The CDE Defendants argue more generally that "the Complaint's affirmative allegations

21   about the children's disabilities and the special education services that they have been

22   receiving in LAUSD public schools for years, strongly suggest[] that no NPS placement is

23   possible or likely at *any* time, let alone imminently[.]" (CDE Reply at 6.)

24          Plaintiffs' counterargument is the same here: that they have shown a sufficient

25   injury at this stage by alleging that California's nonsectarian requirement acts as a

26   discriminatory barrier that prevents them from advocating for and seeking placement in a

27   religious NPS.  (MTD Opp. at 15–16.)

28

                                              37

The Complaint alleges that K.T. was diagnosed with autism at age 2 and is now fourteen years old.  (Compl ¶¶ 91, 94.)  The Taxons sent their two other, non-disabled children to Orthodox Jewish schools and wish to provide K.T. with the same education as his siblings.  (*Id.* ¶¶ 92, 99–100.)  Plaintiffs further allege that the Taxons have sought opportunities for K.T. since he was in preschool but "have been unable to place K.T. in an Orthodox Jewish school due to California's prohibition on using generally available special-education funding at private religious schools."  (*Id.* ¶ 101.)  The Taxons are allegedly "unable to utilize funds for K.T. that would otherwise be available to them— unless they decide to forgo a religious education for K.T."  (*Id.* ¶ 103.)  "From kindergarten through eighth grade, K.T. has received a mainstreamed classroom education in public school" but "performs below grade level academically."  (*Id.* ¶ 105.)  As a public-school student, "K.T. has an IEP that includes 9 service providers, including a full-time aide, a supervisor for the aide, speech and occupational therapists, adaptive physical education, resource specialists for English and math, and a private reading tutor."  (*Id.* ¶ 106.)  Those services are currently provided through LAUSD.  (*Id.* ¶ 107.)  The Taxons do not believe that K.T. is receiving a FAPE in public school because he misses out on needed special education and related services both for secular and religious holidays and is repeatedly served non-kosher food.  (*Id.* ¶¶ 108–12.)  The Taxons believe that K.T.'s absences during religious holidays have affected his progress in school and that absences would not similarly affect K.T.'s progress if he were placed in an Orthodox Jewish school. (*Id.* ¶ 111.)

Construing the allegations in the light most favorable to Plaintiffs, the Court is not persuaded that the Taxons and K.T. lack Article III standing.  Defendants assert that the allegations in the Complaint establish that placement in an NPS would be clearly inappropriate for K.T., who already receives ample services from LAUSD and receives most of his instruction in a regular classroom.  Defendants may be correct that it is unlikely that K.T. would be placed in an NPS in light of his current situation as described in the Complaint.  But Plaintiffs also allege deficiencies in the FAPE that K.T. receives in

public school due to conflicts between how the school operates and the Taxons' religious beliefs and observance: K.T.'s absences during religious holidays have slowed his progress and the school regularly gives him non-kosher food.  Even if it is unlikely that K.T.'s IEP team would agree with the Taxons that placing K.T. in an Orthodox Jewish school is necessary for him to receive a FAPE, Plaintiffs plausibly allege that the nonsectarian requirement harms the Taxons by making it impossible for them to even suggest that possibility.  Due to the nonsectarian requirement, the Taxons are prevented from even advocating for possible placement in an Orthodox Jewish school, regardless of whether the ultimate decision resides with the IEP team and the LEA.

Contrary to Defendants' position, that the ultimate decisionmaker is the LEA does not affect the injury analysis for the Taxons.  Parents are undeniably involved in the development of their children's IEP, even if they do not get a veto over the LEA's decision about what is best for the child.  Parents who have concerns about the special education that their child is receiving at a public school and who believe that placement in a private school would better suit their child can present that as a possibility to other members in the child's IEP team.  But the nonsectarian requirement prevents parents who think that placement in a *religious* private school would better suit their child's needs from making that argument, while allowing parents who prefer placement in a *secular* private school to at least make the argument.  Thus, the nonsectarian requirement disadvantages parents who believe that a private religious school may be better equipped to provide their child with a special education and related services because of their religion.  *Cf. Carson I*, 979 F.3d at 30–31 (concluding that the plaintiff parents who challenged Maine's nonsectarian requirement for tuition assistance had established an Article III injury because they had "lost the 'opportunity' to find religious secondary education for their children that would qualify for public funding" regardless of whether they could show that they would be able to send their children to otherwise eligible religious schools absent the nonsectarian requirement) (citation omitted).  The loss of that opportunity to advocate for alternative placement is enough to establish an Article III injury, notwithstanding genuine doubts as to

whether the Taxons would be able to secure placement in an Orthodox Jewish NPS if the nonsectarian requirement were eliminated.

The Complaint alleges sufficient facts for the Taxons and K.T. to establish Article III standing: the nonsectarian requirement makes it impossible for them to advocate for K.T.'s placement in an Orthodox Jewish NPS and eliminating the requirement would remove a significant barrier to their doing so.  Accordingly, the Court declines to dismiss the Taxons' claims for lack of Article III standing.

### 4.  The Peretses' Allegations Establish Standing

Defendants' arguments that Plaintiff N.P. and his parents, Plaintiffs Ariel Perets and Sarah Perets, lack Article III standing are the same as their arguments regarding K.T. and the Taxons.  (LAUSD Mot. at 22–23; CDE Mem. at 21; LAUSD Reply at 13, 23; CDE Reply at 6.)  Plaintiffs' counterarguments are the same as well.  (MTD Opp. at 15–16.)

The Peretses are in materially the same situation as the Taxons with regard to Article III standing: they allege enough facts to show an injury that is caused by the nonsectarian requirement and can be redressed by its elimination—*i.e.*, the inability to advocate for N.P. to be placed in a religious NPS.  Accordingly, the Court declines to dismiss the Peretses' claims for lack of Article III standing.

### D. The Taxons and the Peretses Do Not State Viable Free Exercise Claims

Defendants argue that none of the Plaintiffs in this action state viable claims for violations of their rights under the Free Exercise Clause of the First Amendment because they "cannot show an actual and substantial burden on their exercise of religion."  (CDE Mem. at 23; *accord* LAUSD Mot. at 27; CDE Reply at 11–12.)  As the Court has

1  dismissed the School Plaintiffs and the Loffmans for lack of standing, the Court analyzes

2  Defendants' argument only as it applies to the remaining Plaintiffs.

3       Plaintiffs argue that the nonsectarian requirement violates their rights to freely

4  exercise their religion by making religious affiliation or identity a bar to receiving

5  otherwise available public benefits.  (MTD Opp. at 21–23.)  According to Plaintiffs, the

6  nonsectarian requirement is facially discriminatory against religion, which means that it is

7  not a neutral and generally applicable law that incidentally burdens free religious exercise.

8  (*Id.* at 23–28.)  And because the nonsectarian requirement is not facially neutral and

9  generally applicable, it is subject to strict scrutiny—which, according to Plaintiffs, the

10  nonsectarian requirement cannot survive.  (*Id.* at 28–33.)

11       The Free Exercise Clause of the First Amendment protects against "indirect

12  coercion or penalties on the free exercise of religion, not just outright prohibitions."

13  *Carson v. Makin* ("*Carson II*"), 142 S. Ct. 1987, 1996 (2022) (quoting *Lyng v. Northwest*

14  *Indian Cemetery Protective Assn.*, 485 U.S. 439, 450 (1988)).  The Supreme Court has

15  "repeatedly held that a State violates the Free Exercise Clause when it excludes religious

16  observers from otherwise available public benefits." *Id.* (citations omitted).  In three

17  recent cases, the Supreme Court has held unconstitutional state efforts that withheld

18  "otherwise available public benefits from religious organizations." *Id.*; *see also Trinity*

19  *Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017); *Espinoza v. Montana*

20  *Dep't of Revenue*, 140 S. Ct. 2246 (2020).  Barring otherwise eligible recipients from a

21  public benefit—say, funding benefits such as grants or tuition assistance payments—

22  "solely because of their religious character" imposes "a penalty on the free exercise of

23  religion that triggers the most exacting scrutiny,"  which is rarely satisfied.  *See Espinoza*,

24  140 S. Ct. at 2255 (quoting *Trinity Lutheran*, 582 U.S. at 462).

25       According to Defendants, there is no unconstitutional state effort to withhold

26  otherwise available funding from religious organizations here because the nonsectarian

27  requirement at issue does not withhold otherwise available public benefits from Plaintiffs.

28  Because Plaintiffs are not being denied otherwise available public benefits, argue

Defendants, they cannot show that the nonsectarian requirement burdens their free exercise rights.  And because there is no burden on the free exercise of religion, the nonsectarian requirement is constitutional.  (*See* LAUSD Mot. at 27–31; CDE Mem. at 24–28; LAUSD Reply at 17–25; CDE Reply at 15–19.)  As to students and their families, Defendants argue that the public benefit at issue is their right to a FAPE under the IDEA and that none of the Plaintiffs have been excluded from receiving that benefit because of their religion. (LAUSD Mot. at 28–29; CDE Mem. at 26–28; LAUSD Reply at 19–20, 22–23.) According to Defendants, Plaintiffs simply mischaracterize the benefits that the IDEA extends to pupils with disabilities and their families and distort the purpose of California's NPS system.  As the CDE Defendants put it,

> The NPS system is not a mechanism to subsidize private schools (religious or otherwise), or to create and bestow a public right to a free *private* education. Rather, it is a mechanism to allow the state to meet its obligation to give access to its free public (and secular) education to certain children with disabilities whose families had the option of enrolling in private religious school, but who enrolled in LEAs instead.  The system accomplishes that through government contracts, which obligate the contractor to perform many specific tasks and that grant many specific rights to the state's public educational agencies.

(CDE Mem. at 20.)  The NPS system does not fund private schools to provide children with a private education, but it establishes a framework for certain private schools to contract with the State to provide the State's public education.  (*Id.* at 26.)

According to Plaintiffs, it is immaterial that NPSs contract with the State to provide a public education because they remain private institutions and are recognized as such under the California Education Code.  (MTD Opp. at 26.)  Plaintiffs argue that Defendants' "public education" argument here is just as unavailing as the one rejected by the Supreme Court in *Carson II*, where Maine could not salvage a nonsectarian requirement for tuition assistance approval with the "magic words" of "public education."

42

(*Id.*)  As Plaintiffs see it, "California has not chosen to use the public school system to provide a FAPE to all students with disabilities; instead, it contracts with private schools to provide this service." (*Id.* at 27.)  For Plaintiffs, that means that California has made a choice to subsidize the *private* education of children with disabilities in certain instances. (*Id.*)  Having made that choice, California cannot choose to condition said subsidizing on nonsectarian status.  (*Id.*)

How we define the benefit at issue here is critical for determining whether the challenged nonsectarian requirement burdens the Taxons' and the Peretses' free exercise rights.  If Plaintiffs are correct that the NPS system subsidizes a private education for children eligible for a FAPE under the IDEA, then this case is on all fours with *Carson II* and the nonsectarian requirement here is unconstitutional.  If, however, the NPS system is not a program for subsidizing private education, then the scheme is not unconstitutional under *Carson II*, *Espinoza*, and *Trinity Lutheran*.

Because California's NPS system is a means of delivering benefits that are available to students with disabilities under the IDEA, we begin with the federal statute.  As stated in Section I.A, *supra*, the IDEA aims "to bring previously excluded handicapped children into the public education systems of the States" and "open the door of public education to handicapped children on appropriate terms." *Rowley*, 458 U.S. at 189, 192.  To receive IDEA funds, States "must provide a free appropriate public education—a FAPE, for short—to all eligible children." *Endrew F.*, 580 U.S. at 390 (citing 20 U.S.C. § 1412(a)(1)).  But the IDEA also contemplates that some families will opt for private education for their children and imposes on the States different obligations toward eligible children depending on the type of school eligible children attend.

When parents choose to send their eligible children to private school—including a religious school—rather than public school, those children—dubbed "parentally placed children"—are entitled to "equitable services," rather than the full range of benefits available to eligible children at public schools.  *See* 20 U.S.C. § 1412(a)(10)(vi) (children with a disability who attend private schools are entitled to "equitable services" that must be

1   "secular, neutral, and nonideological" even if provided in religious schools); *id.*

2   § 1412(a)(10)(C)(i) (the IDEA "does not require a local educational agency to pay for the

3   cost of education, including special education and related services, of a child with a

4   disability at a private school or facility if that agency made a [FAPE] available to the child

5   and the parents elected to place the child in such private school or facility"); 34 C.F.R. §

6   300.137(a) ("No parentally-placed private school child with a disability has an individual

7   right to receive some or all of the special education and related services that the child

8   would receive if enrolled in a public school.").

9         Parents may also choose to place an eligible child in a private school after the LEA

10   has failed to make a FAPE available to the child—so-called "unilateral placement." *See*

11   20 U.S.C. § 1412(a)(10)(C)(ii); 34 C.F.R. § 300.148(c).  When parents opt for unilateral

12   placement because they believe that their child's current placement is denying them a

13   FAPE and that their child can receive a FAPE at a private school, they can obtain

14   reimbursement from the LEA if they "can show both that the IEP offered by the [LEA]

15   violated the IDEA and that the alternative private placement they chose was proper under

16   the Act." *D.R. by & through R.R. v. Redondo Beach Unified Sch. Dist.*, 56 F.4th 636, 647

17   (9th Cir. 2022) (citation omitted).  Reimbursement for the child's education in that

18   scenario "is a form of equitable relief," which requires courts to "assess the reasonableness

19   of both parties' conduct to determine whether reimbursement is warranted." *Id.*  The

20   reimbursement is to the parents to make up for the LEA's failure to provide a FAPE, and it

21   will be denied if the parents' choice was not "proper and reasonable under the

22   circumstances." *Id.*  In unilateral placement situations, that is, the parents may be entitled

23   to reimbursement of the cost of seeking an appropriate education at a private school, but

24   private schools do not receive any IDEA funds.

25         For their children to receive the full benefits of the IDEA—a FAPE with the support

26   of an IEP—parents must work with the LEA in charge of the public schools their children

27   would attend.  As the Supreme Court has recognized, "[i]t is through the IEP that the free

28   appropriate public education required by the Act is tailored to the unique needs of a

particular child." *Endrew F.*, 580 U.S. at 401 (internal quotation marks and citation omitted).  The IEP is a "comprehensive plan" prepared by the pupil's "IEP Team," which must include: (i) the child's parents; (ii) at least one of the child's regular education teachers; (iii) at least one special education teacher; and (iv) a representative of the LEA with knowledge of available resources and the general education curriculum.  *See id.* at 391; 10 U.S.C. § 1414(d)(1)(B).

A child may be placed in a private elementary or secondary school by an LEA as part of an IEP if the child's IEP Team determines that a private school placement is needed to provide the child with a FAPE.  *See* 20 U.S.C. § 1412(a)(10)(B).  The decision to place a child in a private institution to implement the child's IEP rests with the LEA—not the child's parents—and the LEA is responsible for ensuring that the private institutions it chooses "meet standards that apply to State educational agencies and local educational agencies and that children so served have all the rights the children would have if served by such agencies."  *Id.*  For their child to receive the maximum support that the IDEA requires the State to provide to eligible pupils, parents have to give up their ability to choose a private school and accept the LEA's placement decision.  In sum: accept the State's offer of a FAPE, give up your choice of private school.

California's nonsectarian requirement does not prevent the provision of equitable services at religious schools or bar reimbursement to parents when they unilaterally place their child in a religious school.  The nonsectarian requirement only affects with what private institutions LEAs in California may contract to provide eligible children with a FAPE when placement in a private institution is necessary to implement the child's IEP.  *See* Cal. Educ. Code §§ 56365, 56366, 56505.2.

The Taxons and the Peretses do not—indeed, cannot—posit that the nonsectarian requirement stands in the way of either: (a) their children receiving equitable services if they were to attend an Orthodox Jewish school; or (b) being reimbursed the cost of their children's education at an Orthodox Jewish school of their choice if they could show that K.T. and N.P. were not receiving a FAPE in public school and their choice of school was

1  proper under the IDEA.  Rather, the benefit from which the Taxons and Peretses have

2  allegedly been excluded on account of their Orthodox Jewish faith is their children's

3  receipt of a FAPE from LAUSD.

4       But the Complaint does not allege that either the Taxons or the Peretses have been

5  denied a FAPE because of their religion.  Rather, the Complaint alleges that both families

6  wish to provide their children with disabilities an Orthodox Jewish education (Compl.

7  ¶¶ 99–100, 122–24); both families believe that neither K.T. or N.P. are receiving a FAPE

8  in public school at least in part because they miss school during religious holidays and are

9  repeatedly served non-kosher food (*id.* ¶¶ 108–12, 130–48); and they have been unable to

10  place the children "in an Orthodox Jewish school due to California's prohibition on using

11  generally available special-education funding at private religious schools"  and cannot

12  "utilize funds for [their children] that would otherwise be available to them—unless they

13  decide to forgo a religious education" for the K.T. and N.P. (*id.* ¶¶ 101, 103, 125–26).  The

14  benefit that the Taxons and the Peretses allege that they have been excluded from on

15  account of their religion is generally available special-education funding for private

16  schools.

17       When considering a motion to dismiss, the Court must assume that the factual

18  allegations in a complaint are true, but it will not assume the correctness of the complaint's

19  legal conclusions or statements of law.  California's nonsectarian requirement for NPS

20  certification is simply a limitation on the types of entities with which the State may

21  contract to provide a FAPE to children with exceptional needs when a public school cannot

22  meet those children's needs.  California's NPS system is not a mechanism for subsidizing

23  the education of IDEA-eligible children at private schools.  Rather, it is a regime whereby

24  the State contractually delegates its responsibility to educate eligible children to private

25  institutions in accordance with IDEA requirements and the same State educational

26  standards that apply to the LEA itself.  Characterizing the NPS system as a mechanism for

27  subsidizing private instruction of IDEA-eligible children is erroneous as a matter of law.

28

Under federal regulations, LEAs that place children in private institutions—in California, in a certified NPS—remain responsible for adequately implementing the IDEA's requirements: "Even if a private school or facility implements a child's IEP, responsibility for compliance . . . remains with the [State and local agencies]." 34 C.F.R. § 300.325(c). Furthermore, the State "must . . . [m]onitor compliance" with its educational standards "through procedures such as written reports, on-site visits, and parent questionnaires[.]" 34 C.F.R. § 300.147(a). In California, NPSs are obligated to provide the special education and related serviced "specified in each pupil's [IEP]." Cal. Educ. Code § 56366(a)(1). Accordingly, NPSs must provide each child placed with them by an LEA with a special education that follows the State's curriculum and standards. *Id.* § 56366.10; Cal. Code Regs, tit. 5, § 3060(c)(9). A child's enrollment in an NPS is equivalent to enrollment in the State's public education system, so that when a child completes the education prescribed in his or her IEP "the public education agency which developed the IEP shall award the diploma." Cal. Code Regs. tit. 5, § 3070. California provides funding to private schools acting as NPSs to meet its obligations under the IDEA, and that funding is available under a regulatory and contracting scheme that obligates NPSs to act as adjuncts of public education agencies. It is therefore a gross mischaracterization to characterize NPS funding as subsidies for private education or generally available special-education funding for private schools. In this respect, the Complaint misstates the nature of the benefits at issue.

*Carson II* does not assist Plaintiffs. There, the Supreme Court rejected Maine's argument that schools eligible for its tuition assistance program had to be nonsectarian to provide a "public education" in part because participating private schools did not actually provide a public education. The Supreme Court explained that: "the curriculum taught at participating private schools need not even resemble that taught in the Maine public schools"; participating private schools were generally "exempt from many of the State's curricular requirements"; and had no obligation to hire state-certified teachers. *Carson II*,

142 S. Ct. at 1999.  The benefit at issue there was nothing more than tuition assistance, not the provision of a public education or its equivalent.  *Id.* at 1998–99.

Here, by contrast, the purpose of the NPS system *is* to deliver a public education—more specifically, a FAPE—to certain students, rather than to disburse tuition assistance payments.  Unlike Maine's tuition assistance scheme, California's NPS system *does* obligate participating institutions to provide a public education that conforms to the State's curriculum and standards.  NPSs do not simply receive tuition assistance payments; they contract with the State to provide students with exceptional needs with a FAPE as detailed in their IEPs.  And the NPS system certainly does not direct funding to parents of eligible children that the parents can utilize to fund a private education, as Plaintiffs allege.  Thus, the nonsectarian requirement for NPS certification does not exclude the Taxons and the Peretses from access to funds that would otherwise be available to them if they wished to enroll their children in secular private schools.

Nor does the nonsectarian requirement preclude K.T. and N.P. from receiving a FAPE because of their religion.  The Taxons and the Peretses have accepted LAUSD's FAPE offers for their children, who receive a special education and related services in LAUSD public schools.  (Compl. ¶¶ 104–7, 129, 131–36.)  The Taxons and the Peretses, that is, have elected that their children receive a FAPE with the support of an IEP at public schools rather than the alternative available to them under the IDEA: enrolling the children in a private school of their choice where they can receive publicly funded equitable services.

Moreover, neither the Taxons nor the Peretses have removed K.T. or N.P. from their public schools for failing to provide a FAPE and enrolled them in Orthodox Jewish schools that they can show have provided an appropriate education.  By electing to have their children receive a FAPE with the support of an IEP from LAUSD, the Taxons and the Peretses accepted the tradeoff between full benefits and school choice inherent in the IDEA itself.  *Cf. Gary S. v. Manchester Sch. Dist.*, 374 F.3d 15, 19 (1st Cir.), *cert. denied* 543 U.S. 988 (2004) (explaining that the plaintiffs were not being deprived of a generally

available public benefit because the IDEA benefits that they claimed that they were denied under the First Amendment when seeking an education at a Catholic school "are benefits the federal government has earmarked solely for students enrolled in the nation's public schools—benefits still available for [the child] were he sent to a public school, though not otherwise").  Accepting an LEA's FAPE offer limits all parents' ability to enroll their children in private school, regardless of whether their private school of choice is religious or not.  Under the IDEA, parents of eligible children do not get to accept the LEA's FAPE offer *and* choose that their child receive that FAPE at a private school.

California's nonsectarian requirement for NPS certification is not what prevents the Taxons and the Peretses from receiving a FAPE for their children.  By their own allegations, LAUSD has provided the special education and services to which their children are entitled under the IDEA.  What LAUSD has not provided are special accommodations that take into account the families' religious wants.  But said accommodations are not available under the IDEA, which contemplates that parents who prefer private—including religious—school for their children will seek equitable services or reimbursement rather than the full range of benefits available under the IDEA.

For the foregoing reasons, the Court concludes that Plaintiffs have failed to allege that California's nonsectarian requirement burdens the Taxons' and the Peretses' right to freely exercise their religion.  Accordingly, the Taxons' and the Peretses' claims under the Free Exercise Clause—Counts I, II, III, and VI—are DISMISSED.[1]  Because the Taxons' and the Peretses' claims fail as a matter of law, dismissal is WITH PREJUDICE.

---

[1] The Court interprets Count V, which is styled "Free Exercise Clause Unconstitutional Conditions," to apply to the School Plaintiffs only and not the Taxons or the Peretses because the alleged unconstitutional condition is requiring schools to "give up their religious identity" to certify their nonsectarian status and apply to become NPS.  (Compl. ¶ 213).  That condition does not apply to the families.

1

**E.  The Taxons and the Peretses Fail to State Equal Protection Claims**

2

3          Plaintiffs' Equal Protection claims are predicated on the same theory of

4    discrimination against religion as their Free Exercise Claims.  The Complaint states that

5    Plaintiffs have been denied the equal protection of the laws because "California's

6    Education Code prohibits Plaintiffs from utilizing generally available, public funds to send

7    their children to private religious schools merely because those schools are religious."

8    (Compl. ¶ 206.)  But, as the Court has explained in the preceding Section, such a claim

9    mischaracterizes the nature of the available benefits.  Moreover, California's nonsectarian

10   requirement applies to schools, not IDEA-eligible children and their parents.

11          The Court therefore concludes that the Taxons and the Peretses have failed to state a

12   claim under the Equal Protection Clause.   Accordingly, their claims under the Equal

13   Protection Clause—Count IV—are DISMISSED WITH PREJUDICE.

14

15

**F.  Plaintiffs Are Not Entitled to a Preliminary Injunction**

16

17          "A preliminary injunction is an extraordinary and drastic remedy."  *Munaf v. Geren*,

18   553 U.S. 674, 676 (2008) (internal quotations marks omitted).  A district court should issue

19   a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such

20   relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

21          Because the Court concludes that the School Plaintiffs and the Loffmans have failed

22   to allege sufficient facts to establish that they have Article III standing to bring their

23   claims, Sections III.C.1–2, *supra*, and that the Taxons and the Peretses fail to state a claim

24   upon which relief can be granted as a matter of law, Sections III.E–F, *supra,* a fortiori,

25   Plaintiffs have failed to make a clear showing of entitlement to relief.  Accordingly,

26   Plaintiffs' Motion for a Preliminary Injunction is DENIED.

27

28

IV.   **CONCLUSION**

For the foregoing reasons, the Court DENIES Plaintiffs' Motion for a Preliminary Injunction and GRANTS Defendants' Motions to Dismiss Case as follows:

- Plaintiffs' claims against the California Department of Education and the Los Angeles Unified School District are DISMISSED WITH PREJUDICE.
- Plaintiffs' claims for monetary relief against Tony Thurmond and Anthony Aguilar are DISMISSED WITH PREJUDICE.
- The School Plaintiffs' claims asserting violations of the Free Exercise Clause and the Equal Protection Clause—Counts I through V—are DISMISSED WITH LEAVE TO AMEND.
- The Loffmans' claims are DISMISSED WITHOUT PREJUDICE, but WITHOUT LEAVE TO AMEND.
- The Taxons' and the Peretses' claims asserting violations of the Free Exercise Clause—Counts I, II, III, and VI—are DISMISSED WITH PREJUDICE.
- The Taxons' and the Peretses' claims asserting violations of the Equal Protection Clause—Count IV—are DISMISSED WITH PREJUDICE.

Any amended complaint must be filed within twenty-one (21) days of the date of this Order.  Failure to timely file an amended complaint will result in the dismissal of this action and closing of the case without further notice.

DATED:  August 9, 2023

_____
HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE