**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CHAYA LOFFMAN; JONATHAN LOFFMAN, on their own behalf and on behalf of their minor child M.L.; FEDORA NICK; MORRIS TAXON, on their own behalf and on behalf of their minor child K.T.; SARAH PERETS; ARIEL PERETS, on their own behalf and on behalf of their minor child N.P.; JEAN & JERRY FRIEDMAN SHALHEVET HIGH SCHOOL; SAMUEL A. FRYER YAVNEH HEBREW ACADEMY, | No.23-55714 <br><br> D.C. No. 2:23-cv-01832- JLS-MRW <br><br><br> OPINION |

*Plaintiffs-Appellants*,

v.

CALIFORNIA DEPARTMENT OF EDUCATION; TONY THURMOND, in his official capacity as Superintendent of Public Instruction; LOS ANGELES UNIFIED SCHOOL DISTRICT; ANTHONY AGUILAR, in his official capacity as Chief of Special Education, Equity, and Access,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Central District of California
Josephine L. Staton, District Judge, Presiding

Argued and Submitted May 7, 2024
Pasadena, California

Filed October 28, 2024

Before:  Kim McLane Wardlaw, Morgan Christen, and
Mark J. Bennett, Circuit Judges.

Opinion by Judge Wardlaw

---

## SUMMARY[*]

---

### Free Exercise/Individuals with Disabilities Education Act

In an action brought by two Orthodox Jewish schools
("School Plaintiffs") and Orthodox Jewish families who
alleged Free Exercise and Equal Protection Clause violations
arising from California's nonsectarian requirement for
private schools seeking certification to provide students with
disabilities a free appropriate public education under the
Individuals with Disabilities Education Act ("IDEA"), the
panel affirmed in part and reversed in part the district court's

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

dismissal, vacated the district court's denial of plaintiffs' motion for a preliminary injunction, and remanded.

As a mechanism for implementing the IDEA's provisions regarding children placed in private schools, California certifies "nonpublic, nonsectarian schools" or "NPSs" that meet certain statutory instructional criteria. Plaintiffs sought a preliminary injunction prohibiting the California Department of Education and its Superintendent of Public Instruction ("State Appellee"), and the Los Angeles Unified School District and its Chief of Special Education, Equity, and Access ("LAUSD Appellee"), from enforcing California's nonsectarian requirement. The district court granted appellees' motion to dismiss for failure to state a claim and denied plaintiffs' request for preliminary injunctive relief.

The panel first affirmed the dismissal of the School Plaintiffs' and the Loffman family's claims for lack of standing. The complaint failed to plausibly allege that the School Plaintiffs were "able and ready" to apply to serve as NPSs and further failed to plausibly demonstrate that the nonsectarian requirement had any effect on the educational placement of the Loffmans' son. The panel agreed with the district court that, at a minimum, the Peret family had standing to challenge California's nonsectarian requirement because the family plausibly alleged an injury to their ability to advocate for placement in a religious NPS that was fairly traceable to California's nonsectarian requirement and redressable by the sought-after injunction. Because the district court did not address the related issue of whether the LAUSD Appellee has a sufficient connection to enforcement of the nonsectarian requirement to satisfy Article III's redressability requirement for purposes of injunctive relief,

the panel directed the district court to consider the issue in the first instance on remand.

Turning to the merits, the panel reversed the district court's dismissal of the parent plaintiffs' free exercise claims seeking preliminary injunctive relief against the State Appellee. The parent plaintiffs plausibly alleged that the nonsectarian requirement violates their rights under the Free Exercise Clause. The California statute on its face burdens the free exercise rights of parents because it prohibits parents from advocating for a sectarian placement. Because the nonsectarian requirement is not neutral to religion, strict scrutiny applied. The panel concluded that the State Appellee failed to demonstrate that California's nonsectarian requirement satisfies the applicable strict scrutiny standard of review. Even if a compelling interest in neutrality could be demonstrated, the nonsectarian requirement was not narrowly tailored to serve that interest.

The panel reversed the dismissal of equal protection claims because the district court's dismissal was predicated on the same theory of discrimination against religion as the Free Exercise Claims. The panel remanded to the district court to consider the viability of these claims anew. The panel vacated the district court's denial of plaintiffs' motion for a preliminary injunction and remanded for consideration of the preliminary injunction factors in the first instance.

---

**COUNSEL**

Eric C. Rassbach (argued), Nicholas R. Reaves, Daniel L. Chen, and Laura E.W. Slavis, The Becket Fund for Religious Liberty, Washington, D.C., for Plaintiffs-Appellants.

Thomas H. Prouty (argued), Deputy General Counsel; Bruce Yonehiro, Assistant General Counsel; Len Garfinkel, General Counsel; California Department of Education, Sacramento, California; Sue Ann S. Evans (argued) and William G. Ash, Dannis Woliver Kelley, Long Beach, California; for Defendants-Appellees.

Dino L. LaVerghetta and Aaron P. Haviland, Sidley Austin LLP, Washington, D.C., for Amicus Curiae Professor Richard W. Garnett.

Kannon K. Shanmugam, Brian M. Lipshutz, and Yishai Schwartz, Paul Weiss Rifkind Wharton & Garrison LLP, Washington, D.C., for Amicus Curiae Jewish Coalition for Religious Liberty.

Katie R. Talley, Gibson Dunn & Crutcher LLP, Dallas, Texas; Joshua R. Zuckerman and Jonathan C. Bond, Gibson Dunn & Crutcher LLP, Washington, D.C.; for Amici Curiae The National Council of Young Israel, The Rabbinical Council of North America, and Torah Umesorah.

Mariel A. Brookins and Zachary J. Lustbader, Clement & Murphy PLLC, Alexandria, Virginia; Ilya Shapiro, Manhattan Institute, New York, New York; for Amicus Curiae Manhattan Institute.

Joshua N. Turner, Acting Solicitor General; Sean M. Corkery, Assistant Solicitor General; Lili Pirc, Extern in the Office of the Attorney General; Raul R. Labrador, Idaho Attorney General; Idaho Office of the Attorney General, Boise, Idaho; Steve Marshall, Alabama Attorney General Alabama Office of the Attorney General, Montgomery, Alabama; Tim Griffin, Arkansas Attorney General, Arkansas Office of the Attorney General, Little Rock, Arkansas; Ashley Moody, Florida Attorney General, Florida

Office of the Attorney General, Tallahassee, Florida; Christopher M. Carr, Georgia Attorney General, Georgia Attorney General's Office, Atlanta, Georgia; Theodore E. Rokita, Indiana Attorney General, Indiana Attorney General's Office, Indianapolis, Indiana; Brenna Bird, Iowa Attorney General, Iowa Attorney General's Office, De Moines, Iowa Kris W. Kobach, Kansas Attorney General, Kansas Attorney General's Office, Topeka, Kansas; Daniel Cameron, Commonwealth of Kentucky Attorney General, Kentucky Attorney General's Office, Frankfort, Kentucky; Jeff Landry, Louisiana Attorney General, Louisiana Attorney General's Office, Baton Rouge, Louisiana; Andrew Bailey, Missouri Attorney General, Missouri Attorney General's Office, Jefferson City, Missouri; Austin Knudsen, Montana Attorney General, Montana Attorney General's Office, Helena, Montana; Michael T. Hilgers, Nebraska Attorney General, Nebraska Attorney General's Office, Lincoln, Nebraska; John M. Formella, New Hampshire Attorney General, New Hampshire Attorney General's Office, Concord, New Hampshire; Drew H. Wrigley, North Dakota Attorney General, North Dakota Attorney General's Office, Bismarck, North Dakota; Dave Yost, Ohio Attorney General, Ohio Attorney General's Office, Columbus, Ohio; Alan Wilson, South Carolina Attorney General, South Carolina Attorney General's Office, Columbia, South Carolina; Marty Jackley, South Dakota Attorney General, South Dakota Attorney General's Office, Pierre, South Dakota; Ken Paxton, Texas Attorney General, Texas Attorney General's Office, Austin, Texas; Sean Reyes, Utah Attorney General, Utah Attorney General's Office, Salt Lake City, Utah; Jason S. Miyares, Commonwealth of Virginia Attorney General, Commonwealth of Virginia Attorney General's Office,

Richmond, Virginia; Patrick Morrisey, West Virginia
Attorney General, West Virginia Attorney General's Office,
Charleston, West Virginia; for Amici Curiae Idaho,
Alabama, Arkansas, Florida, Georgia, Indiana, Iowa,
Kansas, Kentucky, Louisiana, Missouri, Montana,
Nebraska, New Hampshire, North Dakota, Ohio, South
Carolina, South Dakota, Texas, Utah, Virginia, and West
Virginia.

Yehudah L. Buchweitz, David Yolkut, Shai Berman, and
Daniel M. Lifton, Weil Gotshal & Manges LLP, New York,
New York; Daniel Kaminetsky, Agudath Israel of America,
New York, New York; for Amicus Curiae Agudath Israel of
America.

John A. Meiser and Meredith H. Kessler, Notre Dame Law
School Religious Liberty Clinic, Notre Dame, Indiana, for
Amicus Curiae California Catholic Conference.

Joshua C. McDaniel and Parker W. Knight, III, Harvard Law
School  Religious  Freedom  Clinic,  Cambridge,
Massachusetts, for Amicus Curiae Professor Thomas
Boehm.

Mark  Chenoweth,  New  Civil  Liberties  Alliance,
Washington, D.C.; Jonathan F. Mitchell, Mitchell Law
PLLC, Austin, Texas; for Amicus Curiae New Civil
Liberties Alliance.

Christopher A. Brook, Patterson Harkavy LLP, Chapel Hill,
North Carolina, for Amici Curiae National Alliance for
Public Charter Schools and California Charter Schools
Association.

## OPINION

WARDLAW, Circuit Judge:

As part of its efforts to implement the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, the State of California contracts with certain "nonpublic schools" to provide students with disabilities a "free appropriate public education" ("FAPE"). *See* 20 U.S.C. § 1412(a)(1); Cal. Educ. Code § 56365(a). By statute, California requires that these "nonpublic schools" ("NPSs") be "nonsectarian." Cal. Educ. Code § 56365(a); *see* Cal. Code. Regs. tit. 5, § 3001(p).

Two Orthodox Jewish schools ("School Plaintiffs") and three Orthodox Jewish families allege that California's nonsectarian NPS requirement violates their rights under the Free Exercise and Equal Protection Clauses. *See* U.S. Const. amends. I, XIV. Together, Plaintiffs sue the California Department of Education and its Superintendent of Public Instruction, Tony Thurmond ("State Appellee"), as well as the Los Angeles Unified School District and its Chief of Special Education, Equity, and Access, Anthony Aguilar ("LAUSD Appellee").

In the district court, Plaintiffs sought a preliminary injunction prohibiting the State Appellee and the LAUSD Appellee from enforcing the nonsectarian requirement. After both the State Appellee and the LAUSD Appellee moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint in its entirety, the district court granted the motions to dismiss and denied Plaintiffs' request for preliminary injunctive relief. Plaintiffs appeal, challenging the district court's conclusions both as to

standing and the merits.[1]   We have appellate jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1).

We must initially determine whether any party has standing to proceed.  We affirm the district court's dismissal of the School Plaintiffs' and the Loffmans' claims for lack of standing but hold that at a minimum, Sarah and Ariel Perets and their son, N.P., have standing to challenge California's nonsectarian requirement.

Turning to the merits, we find that Parent Plaintiffs[2] have plausibly alleged that the nonsectarian requirement violates their rights under the Free Exercise Clause.  We conclude that the statute on its face burdens the free exercise rights of parents because it prohibits parents from advocating for a sectarian placement.  Because the nonsectarian requirement is not neutral to religion, strict scrutiny applies.   We conclude that the State Appellee has failed to demonstrate that California's nonsectarian requirement satisfies the applicable strict scrutiny standard of review.

We thus reverse the district court's dismissal of Parent Plaintiffs' free exercise claims seeking preliminary injunctive relief against the State Appellee, vacate the dismissal of the Parent Plaintiffs' remaining claims and the denial of the motion for preliminary injunction, and remand the case to the district court for further consideration.

---

[1] Plaintiffs do not appeal the district court's dismissal, on sovereign immunity grounds, of their claims against the California Department of Education and the Los Angeles Unified School District and the damages claims against Defendants Thurmond and Aguilar.

[2] We will refer collectively to the Peretses and Taxons as "Parent Plaintiffs."

## I.  BACKGROUND

### A.  Parties

According to the complaint, "for modern Orthodox Jews, enrolling their children in a dual curriculum Jewish day school is 'virtually mandatory.'"  Doing so aids parents in fulfilling their "duty to transmit Jewish religious beliefs and practices to their children."  Plaintiffs here include three devout Orthodox Jewish families:  Chaya and Jonathan Loffman and their 4-year-old son M.L.; Fedora Nick and Morris Taxon and their 14-year-old son K.T.; and Sarah and Ariel Perets and their 14-year-old son N.P.[3]  M.L. has been diagnosed with "high functioning autism"; K.T. with "autism, which results in pronounced academic deficiencies"; and N.P. with "autism and a WAC gene mutation that results in speech delays, behavioral issues, and learning disabilities."

The Loffmans, Taxons, and Peretses send (or, in the case of the Loffmans' infant daughter, intend to send) their non-disabled children to Orthodox Jewish private schools.  But the families face difficult choices regarding M.L., K.T., and N.P.  The Loffmans, Taxons, and Peretses believe that their faith compels them to enroll M.L., K.T., and N.P. in Orthodox Jewish religious schools.  Due to the confluence of disability services and financial resources available to each family, however, K.T. attends a public charter school in the Los Angeles Unified School District ("LAUSD"), and N.P. attends a LAUSD public school.  And while M.L. currently attends an Orthodox Jewish learning center, the Loffmans' decision to enroll M.L. in a private religious

---

[3] Each child's age is described as of the time of the filing of the complaint.

school comes at a cost, for the family cannot afford the cost of M.L.'s speech therapy and has been forced to discontinue this service. And although the Taxons and the Peretses benefit from publicly funded disability services for K.T. and N.P., religious burdens accompany these public school placements. In addition to the most obvious burden— absence of religious instruction—"K.T.'s faith imposes unique difficulties at his current public school," including extra absences due to observance of religious holidays as well as challenges maintaining his kosher diet. Similarly, the Peretses have received pushback from school staff regarding the observance of Jewish holy days and "teachers have provided non-kosher meals to N.P. despite his parents' pleas." All three families want their children to receive the full panoply of disability services for which they are eligible in public school, but in an Orthodox Jewish setting and at public expense. In this lawsuit, the Loffmans, Peretses, and Taxons allege that California's nonsectarian requirement for certified nonpublic schools prevents this, unconstitutionally burdening the families' rights.

Joining the families as plaintiffs are two Orthodox Jewish schools, Jean & Jerry Friedman Shalhevet High School ("Shalhevet") and Samuel A. Fryer Yavneh Hebrew Academy ("Yavneh"). Shalhevet "offers co-educational, Modern Orthodox education with a rigorous dual curriculum of Judaic and college preparatory studies" in order to "promote the values of Jewish heritage, to live Torah values, to stimulate Torah learning, and to develop a love of, and commitment to, the State of Israel." Yavneh "provides a rigorous modern Orthodox education alongside secular studies" with the aim of fostering "in its students a passion for Torah, learning, hard work, joy, a respect for tradition, and a desire to be positive members of the community."

Although Shalhevet and Yavneh strive to serve students with disabilities, limited funding restricts their ability to do so.

## B. The Legal Framework

The federal and state laws that combine to provide public education for students with disabilities at public expense comprise a complicated legal framework. To understand how that framework affects the Plaintiffs' religious practice, we go into some detail below.

### 1. *Individuals with Disabilities Education Act*

The IDEA was "created 'to bring previously excluded handicapped children into the public education systems of the States and to require the States to adopt procedures which would result in individualized consideration of and instruction for each child.'" *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 890 (9th Cir. 2001) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 189 (1982)); 20 U.S.C. § 1400 *et seq*. To accomplish this goal, Congress provides federal funding to states that have "in effect policies and procedures to ensure that . . . [a] free appropriate public education is available to all children with disabilities residing in the State." 20 U.S.C. § 1412(a)–(a)(1). A "free appropriate public education" or "FAPE," by definition, means:

> special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity

> with the individualized education plan
> required under [20 U.S.C. § 1414(d)].

20 U.S.C. § 1401(9).  "[S]pecial education," in turn, means
"specially designed instruction, at no cost to parents, to meet
the unique needs of a child with a disability," *id.* § 1401(29),
while "related services" are support services "required to
assist a child . . . to benefit from special education," *id.*
§ 1401(26)(A).

   "A State covered by the IDEA must provide a disabled
child with such special education and related services 'in
conformity with the [child's] individualized education
program,' or IEP." *Endrew F. ex rel. Joseph F. v. Douglas
Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390–91 (2017) (quoting
20 U.S.C. § 1401(9)(D)).  The IEP is the "centerpiece of the
statute's education delivery system." *Id.* at 391 (quoting
*Honig v. Doe*, 484 U.S. 305, 311 (1988)).  Each child's IEP
is "prepared by a child's 'IEP Team' (which includes
teachers, school officials, and the child's parents)." *Id.*; *see*
20 U.S.C. § 1414(d)(1)(B).  Among other requirements,
each child's IEP must include a statement of goals, how the
child's progress will be measured, and the nature of the
special education and related services to be provided. *See*
20 U.S.C. § 1414(d)(1)(A); 34 C.F.R. § 300.320.  When
formulating the child's IEP, the IEP team must consider "the
strengths of the child," "the concerns of the parents for
enhancing the education of their child," "the results of
the . . . most recent evaluation of the child," and "the
academic, developmental, and functional needs of the child."
20 U.S.C. § 1414(d)(3)(A).  "To meet its substantive
obligation under the IDEA, a school must offer an IEP
reasonably calculated to enable a child to make progress

appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 399.

A key overarching principle guiding the provision of services pursuant to the IDEA is the "least restrictive environment" mandate. *See* 20 U.S.C. § 1412(a)(5). The IDEA requires that "special classes, separate schooling, or other removal of children with disabilities from the regular educational environment" occur "only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* § 1412(a)(5)(A). "To the maximum extent appropriate," children with disabilities should be "educated with children who are not disabled." *Id.*

### 2. *Placement Options Under the IDEA*

The IDEA provides several different ways in which children with disabilities may receive publicly funded services, including placement by parents in a private school without an IEP but with the potential to receive "equitable services" under 20 U.S.C. § 1412(a)(10)(A); as well as placements by a public agency, either in a public school with an IEP under 20 U.S.C. § 1412(a)(1) or in a private school with an IEP under 20 U.S.C. § 1412(a)(10)(B).[4]   The obligations of states and their local educational agencies

---

[4] In addition, parents may receive tuition reimbursement for private school enrollment if a state fails to provide a FAPE. *See* 20 U.S.C. § 1412(a)(10)(C).

("LEAs")[5] as well as families' rights vary among these placements.

### a. Parentally Placed Private School Students

Parents of children with disabilities may choose in the first instance to enroll their child in private schools. *See* 20 U.S.C. § 1412(a)(10)(A). The IDEA "does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility." 20 U.S.C. § 1412(a)(10)(C)(i); 34 C.F.R. § 300.137(a) ("No parentally-placed private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school."). However, the IDEA places an affirmative obligation on LEAs to undertake a "child find" process and to spend a "proportionate amount" of IDEA funds on "equitable services" for these students. 20 U.S.C. § 1412(a)(10)(A); 34 C.F.R. §§ 300.130–300.144.

For purposes of providing equitable services, the IDEA does not differentiate between students enrolled by their parents in religious schools as opposed to secular schools. *See* 20 U.S.C. § 1412(a)(10)(A)(i)(III). However, the

---

[5] "The term 'local educational agency' means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools." 20 U.S.C. § 1401(19)(A).

funded services must be "secular, neutral, and nonideological." *Id.* § 1412(a)(10)(A)(vi).

### b. Publicly Placed Students

Many parents of children with disabilities choose to enroll their children in public schools, in which the children have an individually enforceable right to a FAPE and accompanying procedural safeguards. *See id.* §§ 1412(a)(1), 1415.

States make a continuum of placements available for the provision of a FAPE, from regular public school classrooms to separate classes, separate schools, home instruction, or instruction in hospitals and institutions. 34 C.F.R. § 300.115. Each child's placement is determined by a "group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options." *Id.* § 300.116(a)(1). Placement decisions must conform with the "least restrictive environment" requirement; they must be "based on the child's IEP"; and they must be "as close as possible to the child's home." *Id.* § 300.116(a)–(b). "Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled." *Id.* § 300.116(c).

At times, the "nature or severity" of a child's disability may require placement in a private school. 20 U.S.C. § 1412(a)(5). In such cases, children may be "placed in, or referred to" private schools or facilities "by the State or appropriate local educational agency as the means of" providing a FAPE. *Id.* § 1412(a)(10)(B). "Even if a private school or facility implements a child's IEP," however, "responsibility for compliance . . . remains with the public agency." 34 C.F.R. § 300.325(c). A representative of the

public agency must "[a]gree to any proposed changes in the IEP before those changes are implemented." *Id.* § 300.325(b)(2). And the State must ensure that private institutions chosen for an alternative placement "meet standards that apply to State educational agencies and local educational agencies and that children so served have all the rights the children would have if served by such agencies." 20 U.S.C. § 1412(a)(10)(B)(ii).

### 3. *Federal Regulations Governing Contracts with Religious Entities*

Federal regulations contemplate that states may contract with religious entities when administering education grants. "A faith-based organization is eligible to contract with grantees and subgrantees, including States, on the same basis as any other private organization," and "[i]n selecting providers of goods and services, grantees and subgrantees, including States . . . [m]ay not discriminate for or against a private organization on the basis of the organization's religious character, motives, or affiliation." 2 C.F.R. § 3474.15(b)(1)–(2); *see also* 34 C.F.R. § 76.52(a). However, federal regulations also restrict the use of federal funds for religious purposes. "No State or subgrantee may use its grant or subgrant to pay for . . . [r]eligious worship, instruction, or proselytization." 34 C.F.R. § 76.532; 2 C.F.R. § 3474.15(c)(1). Instead, "[a] private organization that applies for and receives a subgrant under a program of the Department and engages in explicitly religious activities, such as worship, religious instruction, or proselytization, must offer those activities separately in time or location from any programs or services funded by a subgrant from a State under a State-Administered Formula Grant program of the Department." 34 C.F.R. § 76.52(c)(1). Further, "[a]ttendance or participation in any such explicitly religious

activities by beneficiaries of the programs and services supported by the subgrant must be voluntary." *Id.*

### 4. *California's Implementation of 20 U.S.C. § 1412(a)(10)(B)*

As a mechanism for implementing the IDEA's provisions regarding children "placed in, or referred to, private schools by public agencies," 20 U.S.C. § 1412(a)(10)(B), California certifies "nonpublic, nonsectarian schools" or "NPSs." Cal. Educ. Code § 56365(a) (citing 34 C.F.R. § 300.146); Cal. Educ. Code § 56366 ("It is the intent of the Legislature that the role of a nonpublic, nonsectarian school or agency shall be maintained and continued as an alternative special education service available to a local educational agency and parents.").

"'Nonpublic, nonsectarian school' means a private, nonsectarian school that enrolls individuals with exceptional needs pursuant to an individualized education program and is certified by the [California] [D]epartment [of Education]." Cal. Educ. Code § 56034. Under a master contract with a local educational agency, NPSs "provide the appropriate special educational facilities, special education, or designated instruction and services required by the individual with exceptional needs if no appropriate public education program is available." *Id.* § 56365(a).

When a local educational agency places a child in an NPS, the agency is responsible for the full amount of the tuition. *Id.* § 56365(d). The master contract between a local educational agency and an NPS includes an "individual services agreement for each pupil placed by a local educational agency," which must accord with the student's IEP. *Id.* § 56366(a)(2)(A). The contract requires local

educational agencies to "oversee and evaluate placements in nonpublic, nonsectarian schools" on an ongoing basis, including by conducting an annual review of "whether or not the needs of the pupil continue to be best met at the nonpublic, nonsectarian school and whether changes to the individualized education program of the pupil are necessary, including whether the pupil may be transitioned to a public school setting." *Id.* § 56366(a)(2)(B). NPSs must use state-adopted core curriculum and instructional materials. *See id.* § 56366.10(b).

A nonpublic school seeking certification must file an application with the State Superintendent. *Id.* § 56366.1(a). The application must include, among other statutory requirements, "[a] description of the special education and designated instruction and services provided to individuals with exceptional needs"; a "list of appropriately qualified staff," with descriptions and a copy of the credential "that qualifies each staff member rendering special education or designated instruction and services to do so"; documentation attesting that the school "will train staff who will have contact or interaction with pupils during the schoolday in the use of evidence-based practices and interventions specific to the unique behavioral needs of the nonpublic, nonsectarian school or agency's pupil population"; and documentation that "the administrator of the . . . school holds or is in the process of obtaining" one of several specialized credentials in special education, social work, counseling, or psychology. *Id.* Moreover, a certified NPS remains subject to ongoing oversight. The California Education Code requires the State Superintendent to "monitor the facilities, the educational environment, and the quality of the educational program, including the teaching staff, the credentials authorizing service, the standards-based core curriculum being

employed, and the standards-focused instructional materials used, of an existing certified nonpublic, nonsectarian school or agency on a three-year cycle." *Id.* § 56366.1(j).

\*     \*     \*

At issue in this case is the California statutory requirement that an NPS be "nonsectarian" to even apply for certification. *Id.* § 56366. The State defines a "nonsectarian" entity as one which:

> is not owned, operated, controlled by, or formally affiliated with a religious group or sect, whatever might be the actual character of the education program or the primary purpose of the facility and whose articles of incorporation and/or by-laws stipulate that the assets of such agency or corporation will not inure to the benefit of a religious group.

Cal. Code. Regs. tit. 5, § 3001(p). Under this definition, no school with a religious affiliation can serve as an NPS, regardless of the content of its curriculum. Plaintiffs allege that California's nonsectarian requirement violates their free exercise and equal protection rights.

## II. STANDARD OF REVIEW

"We review a motion to dismiss for lack of standing de novo, construing the factual allegations in the complaint in favor of the plaintiffs." *Mont. Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 979 (9th Cir. 2013). In addition, "[w]e review *de novo* the district court's dismissal for failure to state a claim." *Wilson v. Lynch*, 835 F.3d 1083, 1090 (9th Cir. 2016). "Under Rule 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to set forth a set

of facts that, if true, would entitle the complainant to relief."
*Parents for Privacy v. Barr*, 949 F.3d 1210, 1221 (9th Cir.
2020) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555
(2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). "In
assessing whether a plaintiff has stated a claim, we accept as
true all well-pleaded factual allegations, and construe all
factual inferences in the light most favorable to the plaintiff."
*Id.*

## III.    DISCUSSION

### A.    Standing

We begin our analysis with the issue of whether any of
the Plaintiffs has standing to pursue their free exercise
claims. "Article III of the Constitution confines the
jurisdiction of federal courts to 'Cases' and
'Controversies.'" *FDA v. All. for Hippocratic Med.*, 602
U.S. 367, 378 (2024). "[A] citizen does not have standing to
challenge a government regulation simply because the
plaintiff believes that the government is acting illegally." *Id.*
at 381. Instead, the plaintiff must have a "personal stake" in
the case. *Id.* at 379 (quoting *TransUnion LLC v. Ramirez*,
594 U.S. 413, 423 (2021)). To establish standing, "a
plaintiff must demonstrate (i) that she has suffered or likely
will suffer an injury in fact, (ii) that the injury likely was
caused or will be caused by the defendant, and (iii) that the
injury likely would be redressed by the requested judicial
relief." *Id.* at 380. "Where, as here, a case is at the pleading
stage, the plaintiff must 'clearly . . . allege facts
demonstrating' each element." *Spokeo, Inc. v. Robins*, 578
U.S. 330, 338 (2016) (alteration in original) (quoting *Warth
v. Seldin*, 422 U.S. 490, 518 (1975)). "By requiring the
plaintiff to show an injury in fact, Article III standing screens
out plaintiffs who might have only a general legal, moral,

ideological, or policy objection to a particular government action." *All. for Hippocratic Med.*, 602 U.S. at 381.

The district court concluded that School Plaintiffs and the Loffmans failed to demonstrate an injury in fact and thus lacked standing to proceed, but held that the Peretses and Taxons sufficiently alleged the elements of standing. On appeal, all Plaintiffs contend that they have standing to pursue their claims.

### 1. *School Plaintiffs' Standing*

School Plaintiffs contend that California's nonsectarian requirement causes them an injury in fact because it denies them equal treatment in the NPS certification process, erecting a discriminatory barrier that precludes them from being considered for certification solely due to their religious affiliation.

In discriminatory barrier cases "the denial of equal treatment resulting from the imposition of the barrier" is a cognizable injury even apart from "the ultimate inability to obtain the benefit." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993) (hereinafter "*AGCA*"). To demonstrate an injury of this sort, a plaintiff "need not allege that he would have obtained the benefit but for the barrier." *Id.* Nor must a party facing such a barrier go through the futile motions of applying and inevitably being turned away. *See Gratz v. Bollinger*, 539 U.S. 244, 260–61 (2003) (rejecting claim that applicant's injury was "conjectural or hypothetical" because he did not "actually apply for admission" (internal alteration omitted)).

Recognizing these principles, Shalhevet and Yavneh contend that "[t]he identification of a discriminatory barrier

in a benefits scheme suffices to demonstrate standing." But this is not quite right. The requirement of an injury-in-fact mandates that the injury must be "concrete and particularized," as well as "actual or imminent." *Carney v. Adams*, 592 U.S. 53, 58 (2020) (internal citation omitted); *Carroll v. Nakatani*, 342 F.3d 934, 940 (9th Cir. 2003) (discriminatory barrier "accords a basis for standing only to those persons who are personally denied equal treatment" (quoting *Allen v. Wright*, 468 U.S. 737, 755 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014))). The Supreme Court has interpreted this rule in discriminatory barrier cases to require that plaintiffs are "able and ready" to pursue the opportunity at issue. *Carney*, 592 U.S. at 60. "It is a plaintiff's ability and readiness to bid that ensures an injury in fact is concrete and particular; the requirement precludes the airing of generalized grievances." *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020).[6]

In *Carney*, the Supreme Court illustrated the significance of the "able and ready" requirement. There, a Delaware lawyer sought to challenge a state constitutional provision

---

[6] Even the cases upon which School Plaintiffs rely to contend that mere identification of a discriminatory barrier is sufficient to demonstrate standing do not support their position. *AGCA* held that "a party challenging" a discriminatory barrier to contracting must both "demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." 508 U.S. at 666; *see also Bras v. Cal. Pub. Utilities Comm'n*, 59 F.3d 869, 873 (9th Cir. 1995) (same). Moreover, the "able and ready" standard was not at issue in *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 276 (1978), or in *City of Los Angeles v. Barr*, 929 F.3d 1163, 1169 (9th Cir. 2019), because the applicants in both cases had already submitted the relevant applications and been rejected.

requiring that "appointments to Delaware's major courts reflect a partisan balance." 592 U.S. at 55. The plaintiff, a "newly registered political independent," claimed that the state constitutional provision "violated his First Amendment right to freedom of association by making him ineligible to become a judge unless he rejoined a major political party." *Id.* at 56. The Delaware Governor challenged the lawyer's standing to bring suit, and the Supreme Court held that he lacked standing. *Id.* at 66. The Court examined "whether Adams established that, at the time he filed suit, Delaware's major party provision caused him a concrete, particularized 'injury in fact' over and above the abstract generalized grievance suffered by all citizens of Delaware who (if Adams is right) must live in a State subject to an unconstitutional judicial selection criterion." *Id.* at 59. To prove the kind of harm Adams alleged, the Court observed that "Adams must at least show that he is likely to apply to become a judge in the reasonably foreseeable future if Delaware did not bar him because of political affiliation" and that "he can show this only if he is 'able and ready' to apply." *Id.* at 60 (internal quotations marks and citations omitted).

Despite Adams' statements that he "would seriously consider and apply for any judicial position for which he feels he is qualified," the Court held that his failure to apply when he was registered as a Democrat weighed against an "able and ready" finding. *Id.* at 61. Further, the Court noted that Adams' decision to register as an independent and to file his constitutional challenge came closely on the heels of his encounter with a law review article "arguing that Delaware's judicial eligibility requirements were unconstitutional because they excluded independents." *Id.* at 62. Taken together, the Court observed that Adams' words "'I would

apply . . . ' stand alone without any actual past injury,
without reference to an anticipated timeframe, without prior
judgeship applications, without prior relevant conversations,
without efforts to determine likely openings, without other
preparations or investigations, and without any other
supporting evidence." *Id.* at 63. The Court thus concluded
that Adams sought to vindicate an "abstract, generalized
grievance" based upon his view of the law, "not an actual
desire to become a judge." *Id.*[7]

While Adams, litigating at the summary judgment stage,
had the burden to prove he was "able and ready" to pursue a
judgeship, School Plaintiffs here, at the motion to dismiss
stage, need only plausibly allege facts sufficient to
demonstrate ability and readiness. *See Spokeo,* 578 U.S. at
338 (explaining that at the pleading stage, "plaintiff must
clearly [] allege facts demonstrating each element" of
standing) (internal quotation marks and citation omitted);
*see also Planned Parenthood*, 946 F.3d at 1108–1109
(applying the "able and ready" standard at the pleading
stage); *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th
200, 207 (3d Cir. 2021) (same).

The School Plaintiffs have plausibly identified a
discriminatory barrier. California's nonsectarian
requirement facially disallows them from applying for
certification as nonpublic schools because they are religious
entities. But the complaint does not plausibly allege that

---

[7] The Supreme Court noted the fact-intensive nature of its decision. *See
Carney*, 592 U.S. at 64 ("We do not decide whether a statement of intent
alone under other circumstances could be enough to show standing. But
we are satisfied that Adams' words alone are not enough here when
placed in the context of this particular record.").

School Plaintiffs are "able and ready" to serve in the specialized statutory NPS role.

Shalhevet and Yavneh do not allege that they would be able and ready to satisfy the requirements to become NPSs, even if California permitted sectarian schools to apply. Although the complaint alleges, "[o]n information and belief," that other than being religious entities, each school "meets or is capable of meeting California's other certification requirements to become an NPS," conclusory allegations of this sort are "not entitled to be assumed true" at the motion to dismiss stage. *See Iqbal*, 556 U.S. at 681. As described above, an NPS plays a specialized statutory role in the spectrum of available placements for students with disabilities. The application requirements illustrate this. All NPS applicants must describe "the special education and designated instruction and services provided to individuals with exceptional needs"; include a "list of appropriately qualified staff," with "the credential, license, or registration that qualifies each staff member rendering special education or designated instruction and services to do so"; document that the NPS will "train staff" in the use of "evidence-based practices and interventions specific to the unique behavioral needs" of the student population; document that the "administrator" of the NPS holds or is in the process of obtaining one of an enumerated list of specialized credentials; and include assurances that the entity will comply with numerous state and federal laws. Cal. Educ. Code § 56366.1(a); Cal. Code Regs. tit. 5, § 3060 (listing additional requirements).

Neither School Plaintiff alleges facts sufficient to plausibly demonstrate that it is able and ready to serve in the specialized NPS role. First, neither alleges an intention to do so. Yavneh "seeks the *ability to qualify* as a certified

NPS," but the complaint does not allege that Yavneh in fact intends to apply to serve in this capacity.  And the complaint does not allege that Shalhevet intends to apply to serve as an NPS.

Moreover, the complaint contains no concrete factual allegations to plausibly suggest that Shalhevet or Yavneh is *able* to provide specialized special education or disability services of any kind.  The complaint states only that "Shalhevet believes that the Torah commands members of the Jewish community to care for the most vulnerable, including those with disabilities," and that "[f]or Shalhevet, this means working to ensure that children who are in need obtain the individualized support that each child requires." Similarly, Yavneh "strives to provide testing accommodations, small-group learning settings, behavioral specialists, assistive technology, and other resources and tools that will facilitate a child's educational progress."  But "[d]ue to its limited resources," Yavneh "cannot welcome all students with disabilities, particularly those with more complex needs."

Instead, the complaint demonstrates that School Plaintiffs wish to use IDEA funds to provide religious education to disabled students.  Shalhevet "seeks the opportunity to qualify to provide a distinctively Orthodox Jewish education to children with disabilities" and "seek[s] the ability to obtain state certification to access generally available public funds and better serve Jewish students with disabilities."  Like Shalhevet, "Yavneh seeks to qualify to provide a religious education to children with disabilities" with the benefit of "IDEA funding."  A religious entity could, of course, be as equipped to provide special education and related services as any other NPS applicant.  But Shalhevet and Yavneh's allegations suggest that they seek

public funding for *religious instruction*—something NPSs are categorically prohibited from providing pursuant to federal regulations unchallenged here.  *See* 34 C.F.R. § 76.532.  These allegations do not plausibly suggest that these schools are "able and ready" to serve in the NPS role.

Without more, we conclude that the complaint does not plausibly allege School Plaintiffs are "able and ready" to apply to serve as NPSs.[8]  We therefore agree with the district court that School Plaintiffs lack standing.

## 2. *Parent Plaintiffs' Standing*

To demonstrate an injury in fact, Parent Plaintiffs must also plead an "actual" or "imminent" injury traceable to California's nonsectarian requirement.  Parent Plaintiffs contend that the nonsectarian requirement stands in the way of M.L., K.T., and N.P. receiving the full benefits of the IDEA in the educational context that their faith compels. Although they acknowledge that local educational agencies ultimately make NPS placement decisions, Parent Plaintiffs argue that the nonsectarian requirement injures them by preventing them, at the very least, from advocating to the local educational agency that "no appropriate public education program is available," and thus that their child should be placed in an Orthodox Jewish NPS.  Cal. Educ. Code. § 56365(a).

---

[8] Plaintiffs contend this application of the "able and ready" requirement forces them to undertake futile actions in order to demonstrate standing. We disagree.  Our holding does not require School Plaintiffs to go through the futile motions of preparing or submitting an NPS application in order to gain standing.  Instead, we hold only that School Plaintiffs must plausibly allege that they are "able and ready" to pursue the opportunity to serve as NPSs.  This they have not done.

The district court analogized the families' injury here to the one faced by the families in *Carson v. Makin*, 979 F.3d 21 (1st Cir. 2020) ("*Carson I*"), *rev'd and remanded*, 596 U.S. 767 (2022).**[9]** There, the plaintiffs were three families residing in rural parts of Maine. *Id.* at 26. As permitted by Maine law, the school districts in these areas chose not to operate their own public secondary schools but instead to provide tuition assistance at certain "approved" private schools. *Id.* The families in *Carson I* were eligible to participate in the tuition assistance program, but Maine's nonsectarian requirement prohibited the families from using the funds at the religious schools they would otherwise have chosen. *Id.* The First Circuit held that Maine's nonsectarian requirement created an injury in fact for Article III standing purposes because it denied the parents the "opportunity" to "find religious secondary education for their children that would qualify for public funding." *Id.* at 30–31 (citing *Eulitt ex rel. Eulitt v. Me. Dep't of Educ.*, 386 F.3d 344, 353 (1st Cir. 2004)).

This case presents a closer question, though we ultimately reach the same conclusion as the district court, at least as to the Peretses. In *Carson I*, every secondary school student living in a qualifying area was eligible to participate in the tuition assistance program. *See id.* at 25. There was thus no question that the program's restrictions prevented the plaintiffs from placing their children in religious schools. By contrast here, although the nonsectarian requirement indeed makes it impossible for a local educational agency to place

---

[9] The Supreme Court did not revisit the First Circuit's conclusions regarding standing when it took up the case, so we draw on the First Circuit's standing analysis. *See Carson v. Makin*, 596 U.S. 767 (2022) ("*Carson II*").

any student in a religiously affiliated NPS, it is not nearly as obvious that the nonsectarian requirement for NPSs injures Parent Plaintiffs and their children, none of whom has ever been placed by their LEA in an NPS of any kind. The question we face is whether the complaint plausibly alleges facts sufficient to demonstrate that M.L., K.T., or N.P. could be placed in an NPS consistent with the statutory framework. Only if this is the case can the nonsectarian requirement— which prevents their parents from advocating for placement in a religious NPS—be said to cause the parents a concrete, particularized injury.

First, we agree with the district court that the Peretses have standing to proceed. Fourteen-year-old N.P. is currently enrolled in an LAUSD school and receives services pursuant to an IEP. After middle school, he was removed from a mainstream classroom setting and placed in a special classroom. The complaint alleges that the "limited speech therapy" he receives in his current placement has slowed his progress, in part because "LAUSD's speech therapists are prohibited from administering therapy involving physical touch." The complaint alleges that N.P. could receive "prompted speech therapy," a form of therapy involving touch cues, in private schools. Further, the Peretses "believe that the smaller class sizes available in private schools would better meet N.P.'s needs." Other allegations in the complaint suggest that the Peretses believe N.P. should be in a mainstream classroom setting, which undermines the suggestion that no appropriate placement exists in a public school. Nonetheless, drawing all inferences in Plaintiffs' favor as is required at this stage, we conclude that the allegations are sufficient to plausibly suggest that the local educational agency could, consistent with the statutory framework, place N.P. in an NPS. Therefore, the Peretses

have alleged a concrete injury stemming from the
nonsectarian requirement for NPSs and redressable by the
sought-after injunction.    California's nonsectarian NPS
requirement blocks religious schools from ever qualifying as
NPSs.  Thus, N.P., while possibly qualifying for an NPS
placement, could not, under any circumstances, be placed in
a religiously affiliated NPS.    Thus, the Peretses have
plausibly alleged an injury to their ability to advocate for
placement in a religious NPS that is fairly traceable to
California's nonsectarian requirement and redressable by the
sought-after injunction.[10]

Next, Plaintiffs argue that the district court erred by
dismissing the Loffmans' claims for lack of standing after it
concluded that the Peretses and Taxons had standing to
proceed.  Indeed, if multiple plaintiffs seek the same relief
and at least one has Article III standing, the court need not
determine whether the other plaintiffs also have standing.
*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S.
47, 52 n.2 (2006).  But nothing in this rule "*prohibit*[*s*]" a
district court "from paring down a case by eliminating
plaintiffs who lack standing or otherwise fail to meet the

---

[10] We note again that pursuant to federal regulations unchallenged here,
any NPS in which N.P. could be placed would not be free to offer
religious instruction as part of its publicly funded program. Nonetheless,
we find that removing the nonsectarian requirement would likely redress
Parent Plaintiffs' injury at least in part, for Orthodox Jewish entities
could nonetheless apply for NPS certification and obtain funds for the
disability-related services they would provide. *See All. for Hippocratic
Med.*, 602 U.S. at 380 (standing requires a showing that the injury "likely
would be redressed by the requested judicial relief").

governing jurisdictional requirements."[11]    *M.M.V. v. Garland*, 1 F.4th 1100, 1110 (D.C. Cir. 2021); *see also Thiebaut v. Colo. Springs Utils.*, 455 F. App'x 795, 802 (10th Cir. 2011) (unpublished) ("Instead, courts retain discretion to analyze the standing of all plaintiffs in a case and to dismiss those plaintiffs that lack standing.").

Moreover, we agree with the district court that the complaint contains insufficient factual allegations to plausibly demonstrate that the nonsectarian requirement has any effect on four-year-old M.L.'s educational placement. M.L. has been diagnosed with "high functioning autism" and has received "behavioral, occupational, and speech therapy." The complaint states that M.L. is enrolled in "Maor Academy, an Orthodox Jewish learning center dedicated to supporting students with disabilities."  M.L. has never been enrolled in a public school or evaluated for IDEA eligibility, nor does there exist an IEP as to him.  And the complaint does not allege facts sufficient to plausibly demonstrate that the "nature or severity" of M.L.'s disability "is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily," 20 U.S.C. § 1412(a)(5)(A), or that "no appropriate public education program is available," Cal. Educ. Code. § 56365(a).  We thus conclude that the complaint fails to plausibly allege that M.L. could be placed in an NPS consistent with the statutory framework.  On this basis, we

---

[11] While the Supreme Court described the Third Circuit's decision to sua sponte address the standing of intervenors in *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020), as "error," Plaintiffs identify no support for the premise that this principle extends to a district court's determination of a challenge to a party's standing made in a motion to dismiss for lack of jurisdiction.

affirm the district court's dismissal of the Loffmans' claims for lack of standing.

Each element of standing "must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because the Peretses have sufficiently pleaded standing, and because "the presence of one party with standing is sufficient" to permit us to reach the merits of the appeal, we decline to consider the Taxons' standing. *Rumsfeld*, 547 U.S. at 52 n.2; *see also Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009) (holding that one party had standing and declining to address other parties' standing).

3. *Plaintiffs' Standing Against the LAUSD Appellee*

LAUSD Chief of Special Education, Equity, and Access Anthony Aguilar contends on appeal that he is not a proper defendant because he lacks the requisite connection to enforcement of the nonsectarian requirement. As we have previously explained:

> Whether [particular] officials are, in their official capacities, proper defendants in the suit is really the common denominator of two separate inquiries: first, whether there is the requisite causal connection between their responsibilities and any injury that the plaintiffs might suffer, such that relief against the defendants would provide redress . . . and second, whether our jurisdiction over the defendants is proper under the doctrine of *Ex parte Young*, 209 U.S. 123, 157, 28 S. Ct. 441, 52 L.Ed. 714 (1908), which requires

> "some connection" between a named state
> officer and enforcement of a challenged state
> law.

*Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908,
919 (9th Cir. 2004).   While the district court properly
dismissed the damages claims against the LAUSD Appellee
pursuant to the *Ex parte Young* doctrine, it did not address
the related issue of whether Aguilar has a sufficient
connection to enforcement of the nonsectarian requirement
to satisfy Article III's redressability requirement for
purposes of injunctive relief.   On remand, the district court
should consider this issue in the first instance; we do not
reach it here.

### B. Free Exercise Claims

The First Amendment provides that "Congress shall
make no law respecting an establishment of religion, or
prohibiting the free exercise thereof."   U.S. Const. amend. I.
To state a free exercise claim, Parent Plaintiffs must
plausibly allege "that a government entity has burdened
[their] sincere religious practice pursuant to a policy that is
not 'neutral' or 'generally applicable.'"   *Kennedy v.
Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022); *Waln v.
Dysart Sch. Dist.*, 54 F.4th 1152, 1159 (9th Cir. 2022).
Should the Parent Plaintiffs make such a showing, "the focus
then shifts to the defendant" to demonstrate that, taking the
allegations in the complaint as true, the challenged action
survives strict scrutiny.   *Kennedy*, 597 U.S. at 524–25; *see
Waln*, 54 F.4th at 1163–64 (applying *Kennedy* analysis in the
context of a motion to dismiss).

### 1.  *Burden on Free Exercise*

First, we note that no party has questioned the sincerity of Parent Plaintiffs' religious convictions.  The complaint plausibly alleges that Parent Plaintiffs' faith requires them to enroll all of their children—including those with disabilities—in Orthodox Jewish schools.  Appellees nonetheless contend that California's nonsectarian requirement does not impose a "legally cognizable burden" on Parent Plaintiffs' religious exercise.**[12]**  We disagree.

In *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 453 (2017), the Supreme Court held that the Missouri Department of Natural Resources' "policy of categorically disqualifying churches and other religious organizations from receiving grants under its playground resurfacing program" violated the Free Exercise Clause.  In reaching this conclusion, *Trinity Lutheran* rejected Missouri's argument that the policy "[did] not meaningfully burden the Church's free exercise rights."  *Id.* at 462–63.  The Court reaffirmed its decades-old conclusion that "the liberties of religion and expression may be infringed by the

---

[12] The parties dispute the nature of the threshold burden requirement. The Supreme Court's recent free exercise decisions have not used the phrase "substantial burden," but "[w]e have not seen any indication that the Supreme Court has reversed course on requiring a showing of *a* burden, so we continue to look for this threshold showing in a free exercise claim."  *Mahmoud v. McKnight*, 102 F.4th 191, 207 n.12 (4th Cir. 2024); *see Apache Stronghold v. United States*, 101 F.4th 1036, 1051–52 (9th Cir. 2024) (en banc) (finding no cognizable burden where the government's actions had "no tendency to coerce" the plaintiffs "into acting contrary to their religious beliefs" (quoting *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988))).  We need not resolve whether "substantiality" remains part of the analysis, because for the reasons discussed below, we find that Parent Plaintiffs have alleged a substantial burden here.

denial of or placing of conditions upon a benefit or privilege." *Id.* at 463 (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)); *see Lyng*, 485 U.S. at 449 (explaining that the Free Exercise Clause prohibits government from "penaliz[ing] religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens"). Because Trinity Lutheran Church was "put to the choice between being a church and receiving a government benefit"—even one as seemingly inconsequential as recycled rubber tire chips—the law at issue "impose[d] a penalty on the free exercise of religion that must be subjected to the 'most rigorous' scrutiny." *Trinity Lutheran*, 582 U.S. at 465–66 (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 546 (1993)).

The Supreme Court applied the same reasoning in *Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020). There, "[t]he Montana Legislature established a program to provide tuition assistance to parents who send their children to private schools," granting "a tax credit to anyone who donates to certain organizations that in turn award scholarships to selected students attending such schools." *Id.* at 467–68. However, "[w]hen petitioners sought to use the scholarships at a religious school, the Montana Supreme Court struck down the program," relying on a clause in the state constitution which forbade aid to a school controlled by a "church, sect, or denomination." *Id.* at 468. The Court reversed the judgment of the Montana Supreme Court, observing that "[p]lacing such a condition on benefits or privileges 'inevitably deters or discourages the exercise of First Amendment rights.'" *Id.* at 478 (quoting *Trinity Lutheran*, 582 U.S. at 463). In short, "[t]o be eligible for government aid under the Montana Constitution, a school

must divorce itself from any religious control or affiliation."
*Id.* Further, "the no-aid provision penalize[d]" parents'
constitutionally protected choice to send their children to
religious schools "by cutting families off from otherwise
available benefits if they choose a religious private school
rather than a secular one." *Id.* at 486. Thus, Montana's
restriction "burden[ed] not only religious schools but also
the families whose children attend or hope to attend them."
*Id.* Montana's constitutional provision was determined to
burden free exercise and was therefore subject to strict
scrutiny. *Id.* at 484.

In *Carson II*, the Supreme Court again addressed a free
exercise challenge, this time in the context of Maine's
"program of tuition assistance for parents who live in school
districts that do not operate a secondary school of their own,"
which permitted families to direct payments from public
school districts to private schools so long as the schools were
"nonsectarian." 596 U.S. at 771–73. The First Circuit had
upheld Maine's program, distinguishing *Espinoza* on the
grounds that Maine's program barred the religious *use* of
funds while permitting organizations with a mere religious
*status* to participate.[13] *Id.* at 777 (citing *Carson I*, 979 F.3d

---

[13] Maine's definition of "nonsectarian" differs from the California
definition at issue here. In Maine, a school was considered "sectarian"
if it "is associated with a particular faith or belief system and which, in
addition to teaching academic subjects, promote[d] the faith or belief
system with which it is associated and/or present[ed] the material taught
through the lens of this faith." *Carson II*, 596 U.S. at 775 (internal
citation omitted). The content of this definition gave rise to arguments
in *Carson II* that the restriction was permissible because it targeted
religious *use* of government funds, not religious *status*. *See id.* at 787–
88. The Supreme Court rejected this status-use distinction. *Id.* at 788.

at 40).   Additionally, the First Circuit had distinguished
*Espinoza* on the grounds that Maine's program sought not to
provide education in general but specifically to provide "a
rough equivalent of the public school education that Maine
may permissibly require to be secular."   *Id.* (quoting *Carson
I*, 979 F.3d at 44).   The Supreme Court rejected both
distinctions, holding that the "'unremarkable' principles
applied in *Trinity Lutheran* and *Espinoza* suffice[d] to
resolve" the case.**[14]**   *Id.* at 780.   "By 'condition[ing] the
availability of benefits'" on the basis of "religious
character," "Maine's tuition assistance program—like the
program in *Trinity Lutheran*—'effectively penalize[d] the
free exercise' of religion."   *Id.* (quoting *Trinity Lutheran*,

---

This distinction would not save California's requirement in any event,
because California's more expansive definition of what it is to be
"sectarian" is status-based.   *See* Cal. Code. Regs. tit. 5, § 3001(p)
(defining "nonsectarian" with reference to ownership, operation, control
or formal affiliation, "whatever might be the actual character of the
education program or the primary purpose of the facility").

[14] The Supreme Court was unpersuaded that the benefit Maine provided
was the "rough equivalent of the public school education that Maine may
permissibly require to be secular," finding instead that "the key manner
in which the two educational experiences *are* required to be 'equivalent'
is that they must both be secular." *Id.* at 782, 784 (internal quotation
marks and citation omitted).   "The benefit is *tuition* at a public *or* private
school, selected by the parent, with no suggestion that the 'private
school' must somehow provide a 'public' education." *Id.* at 782–83.
Here, by contrast, there is a strong suggestion that the NPS must provide
"public education" because the role of an NPS is to implement the LEA-
developed IEP, employ public curriculum, and provide a FAPE, which
is, by definition, education provided under public direction and
supervision.   In our assessment, however, this issue goes not to the
burden analysis but rather to the question of whether the State has a
compelling interest in maintaining its exclusion of secular schools from
the NPS certification program.

582 U.S. at 462).  "A law that operates" to "'disqualify some private schools' from funding 'solely because they are religious' . . . must be subjected to 'the strictest scrutiny.'" *Id.* (quoting *Espinoza*, 591 U.S. at 478, 487).

The Court's interpretation of the Free Exercise Clause in these recent cases compels the same conclusion with regard to the burden analysis here.  Just as Trinity Lutheran Church was put to the choice of participating in Missouri's playground resurfacing program or retaining its religious affiliation, *see Trinity Lutheran*, 582 U.S. at 462, any religiously affiliated school seeking to enter into an NPS contract in California must choose whether to maintain its religious affiliation or to serve as an NPS eligible for consideration by the LEA in determining whether it may be in the best position to provide an IEP for an individual child. Religious entities that are equally or better qualified than secular ones to provide special education and related services are disqualified solely because they are "owned, operated, controlled by, or formally affiliated with a religious group or sect, whatever might be the actual character of the education program or the primary purpose of the facility."  Cal. Code. Regs. tit. 5, § 3001(p).  As a result, families like the Parent Plaintiffs who would otherwise advocate for placement in religiously affiliated NPSs are unable to do so—solely because of the would-be NPSs' religious affiliation.  As we have previously recognized, a statutory scheme that requires a family to "forgo a sectarian education . . . in order to receive" special education benefits otherwise available in a private school setting imposes a "burden on their free exercise rights." *Zobrest v. Catalina Foothills Sch. Dist.*, 963 F.2d 1190, 1196 (9th Cir. 1992), *rev'd on other grounds*, 509 U.S. 1 (1993); *cf. KDM ex rel. WJM v. Reedsport Sch. Dist.*, 196 F.3d 1046,

1050 (9th Cir. 1999) (finding no such burden where the statutory scheme did not force a choice).

For most parents of children with disabilities, the IDEA statutory scheme forces parents to choose either the full benefits of the IDEA or education in a religious context.[15] *See* 34 C.F.R. § 300.137(a) (parentally enrolled private school students lack "an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school"). For students eligible for NPS placement, the possibility of an Orthodox Jewish NPS—an option consistent with the federal framework—alleviates that burden. Through its nonsectarian NPS requirement, however, California removes the possibility of a religiously affiliated NPS from the placement options for which a parent may advocate in its discussions with the local educational agency. Parent Plaintiffs are required to choose between the special education benefits made available through public school enrollment (and subsequent referral to a private nonsectarian NPS) and education in an Orthodox Jewish setting. Thus, we conclude that like the programs at issue in *Espinoza* and *Carson II*, California's nonsectarian requirement burdens "not only religious schools but also the families whose children attend or hope to attend them," including Parent Plaintiffs. *Espinoza*, 591 U.S. at 486. Because this presents a "tendency to coerce" them "into acting contrary to their religious beliefs," we find that Parent Plaintiffs have alleged

---

[15] Plaintiffs do not challenge the IDEA itself, and we have no occasion to question that Congress may provide different benefits to parentally enrolled private school students and public school students on neutrally and generally applicable grounds. Indeed, the IDEA structure has previously been upheld against a free exercise challenge. *See Gary S. v. Manchester Sch. Dist.*, 374 F.3d 15, 20–21 (1st Cir. 2004).

a cognizable burden on their free exercise of religion. *Lyng*, 485 U.S. at 450.

The State Appellee resists this conclusion by arguing for a distinction between public grants and benefits—like those in *Trinity Lutheran*, *Espinoza*, and *Carson II*—and government contracting opportunities like California's master contracts with private schools in its NPS program. In support of this distinction, State Appellee cites *Teen Ranch, Inc. v. Udow*, 479 F.3d 403 (6th Cir. 2007). In that case, a faith-based provider of youth services challenged Michigan's termination of its contract after the state determined that the provider's programming incorporated religious practices. *Id.* at 406–407. The Sixth Circuit affirmed the district court's decision rejecting Teen Ranch, Inc.'s constitutional claims, distinguishing the *Sherbert v. Verner*, 374 U.S. 398 (1963) line of public benefits cases on the grounds that "a state contract for youth residential services is not a public benefit." *Id.* at 409 (internal quotation marks and citation omitted). Parent Plaintiffs counter that there is no contract-benefit distinction in the context of free exercise claims, citing *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021). In *Fulton*, the Court analyzed the City of Philadelphia's termination of its contract with a religious foster care agency due to the agency's refusal to certify same-sex couples as foster parents. *Id.* at 526–27. The Court concluded that the City's actions violated the Free Exercise Clause, reasoning that "principles of neutrality and general applicability . . . constrain the government in its capacity as manager." *Id.* at 536, 543.

Here, there is no need to distinguish between government contracting and the provision of public benefits because, unlike the entities at issue in *Teen Ranch* and

*Fulton*, Parent Plaintiffs do not seek a government contract. Instead, Parent Plaintiffs ask that a public benefit—state funding of NPS placements for disabled students—not be restricted to those seeking placement in nonsectarian schools.  Like the plaintiffs in *Espinoza* and *Carson II*, Parent Plaintiffs object to the conditioning of public funding for their children's school on that school's nonreligious character.

Separately, the State Appellee contends that the special education services offered as part of an NPS program are not publicly available benefits within the meaning of the *Trinity Lutheran* line of cases.  Indeed, in *Gary S. v. Manchester School District*, 374 F.3d 15, 19 (1st Cir. 2004), the First Circuit distinguished the public benefits cases, finding that the student in that case was "not being deprived of a *generally available* public benefit," but rather "benefits the federal government has earmarked solely for students enrolled in the nation's public schools."  But unlike in *Gary S.*, the NPS program represents the State's affirmative choice to contract with private schools to provide educational services.[16]  *See Espinoza*, 591 U.S. at 487.

Finally, the State Appellee urges us to hold that the principles set forth in the *Carson II* line of cases do not extend to this case on the grounds that "when the government appropriates funds to establish a program it is entitled to define the program's limits, and that a State's decision not to subsidize the exercise of a fundamental right

---

[16] The same distinction renders the State's reliance on *D.L. ex rel. K.L. v. Baltimore Board of School Commissioners*, 706 F.3d 256 (4th Cir. 2013), unpersuasive.  There too, the Fourth Circuit addressed disparate benefits offered in public as opposed to private schools rather than a program that affirmatively involves contracting with private schools.

does not equate to an infringement of that right." But as the Supreme Court observed in *Carson II*, "'the definition of a particular program can always be manipulated to subsume the challenged condition,' and to allow States to 'recast a condition on funding' in this manner would be to see 'the First Amendment . . . reduced to a simple semantic exercise.'" 596 U.S. at 784 (alteration in original) (quoting *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 215 (2013)).

For the reasons described, we conclude that Parent Plaintiffs have plausibly alleged that California's nonsectarian NPS requirement burdens their free exercise of religion. *Iqbal*, 556 U.S. at 678.

### 2. *Neutral or Generally Applicable Policy*

Finding that Parent Plaintiffs have alleged a cognizable burden, we turn to the question of whether the nonsectarian requirement is "neutral [and] generally applicable." *Emp. Div. v. Smith*, 494 U.S. 872, 881 (1990). Here, we easily conclude that the nonsectarian requirement fails the neutrality test. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17 (2020) (per curiam) (a law fails the neutrality test when it "single[s] out" religious entities "for especially harsh treatment"). And because "[f]ailing either the neutrality or general applicability test is sufficient to trigger strict scrutiny," *Kennedy*, 597 U.S. at 526, we need not reach Parent Plaintiffs' alternative contention that the nonsectarian requirement also fails the general applicability test.

### 3. *Strict Scrutiny*

Parent Plaintiffs have plausibly alleged "that a government entity has burdened [their] sincere religious

practice pursuant to a policy that is not 'neutral' or 'generally applicable,'" so the focus "shifts to the defendant" to show that the challenged action survives strict scrutiny. *Id.* at 524–25. Under the strict scrutiny standard, "a law restrictive of religious practice must advance 'interests of the highest order' and must be narrowly tailored in pursuit of those interests." *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 546 (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)). The State Appellee has failed to demonstrate that the nonsectarian requirement survives this stringent level of review. LAUSD Appellee makes no effort to do so.

The State Appellee argues that California has a compelling interest in maintaining neutrality toward religion. As Parent Plaintiffs emphasize, however, the *Carson II* line of cases soundly rejects the premise that a state has a compelling interest in being more protective of anti-establishment interests than the federal constitution itself requires. *See Trinity Lutheran*, 582 U.S. at 466 (concluding that "Missouri's policy preference for skating as far as possible from religious establishment concerns" did not constitute a compelling interest); *Espinoza*, 591 U.S. at 484–85 ("Montana's interest in separating church and State 'more fiercely' than the Federal Constitution" "'cannot qualify as compelling' in the face of the infringement of free exercise here.") (citations omitted); *Carson II*, 596 U.S. at 781.

The State Appellee contends that the nonsectarian requirement is necessary to avoid a violation of the federal constitution, highlighting that the prospect of a religious entity serving in the NPS role gives rise to Establishment Clause questions distinct from those posed by the programs at issue in *Trinity Lutheran*, *Espinoza*, and *Carson II.* It is true that if religious schools become eligible to become

certified NPSs, the funds that they will receive must be expended on State-directed and State-supervised education and services specified in the LEA-developed IEP to benefit the eligible child whose family has chosen the State's free public education.  As such, public placement of students in, and extensive supervision of, religious NPSs distinguishes this case from the programs at issue in *Espinoza* and *Carson II*.[17]  *See Carson II*, 596 U.S. at 787 (observing that government scrutiny of "whether and how a religious school pursues its educational mission" would "raise serious concerns about state entanglement with religion").

Parent Plaintiffs respond by highlighting the State Appellee's failure to grapple with the Supreme Court's decision in *Kennedy v. Bremerton School District*, which held that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'"  597 U.S. at 535(quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)).  We have indeed previously observed that in light of its methodological mandate, *Kennedy* "has called into doubt much of our Establishment Clause case law." *Sabra v. Maricopa Cnty. Comm. Coll. Dist.*, 44 F.4th 867, 887 (9th Cir. 2022).  We need not resolve whether the State Appellee has a compelling neutrality interest at stake, however, because the State Appellee has failed to show that California's nonsectarian requirement is narrowly tailored to serve that interest.  Specifically, the State Appellee fails to address "by reference to historical practices and understandings," why the applicable federal regulations that govern religious entities performing government contracts

---

[17] We note that no party has argued that NPSs are state actors.  *Cf. Drummond ex rel. State v. Okla. Statewide Virtual Charter Sch. Bd.*, --- P.3d ----, 2024 WL 3155937 (Okla. 2024).

are insufficient to address the State's neutrality concerns. *Kennedy*, 597 U.S. at 535 (quotation marks and citation omitted); *see* 34 C.F.R. § 76.532 ("No State or subgrantee may use its grant or subgrant to pay for… [r]eligious worship, instruction, or proselytization."); 34 C.F.R. § 76.52(c)(1) (requiring religious entities who receive IDEA funding to offer any "worship, religious instruction, or proselytization" activities "separately in time or location from any programs or services funded by a subgrant" and specifying that "[a]ttendance or participation in any such explicitly religious activities by any beneficiaries of the programs and services supported by the subgrant must be voluntary"). The State Appellee does not present any historical analysis to support its position that California's nonsectarian requirement is narrowly tailored. *See Kennedy*, 597 U.S. at 536 ("An analysis focused on original meaning and history, this Court has stressed, has long represented the rule rather than some 'exception' within the Court's Establishment Clause jurisprudence." (quotation marks and citation omitted)).

As such, even if the State Appellee could demonstrate a compelling interest in neutrality here, it has failed to demonstrate that the nonsectarian requirement is narrowly tailored to serve that interest. Thus, we conclude that the State Appellee fails to demonstrate that the nonsectarian requirement satisfies strict scrutiny.

## IV.  CONCLUSION

We affirm the district court's dismissal of School Plaintiffs' claims and the Loffmans' claims for lack of standing. We reverse the dismissal of the remaining plaintiffs' free exercise claims. Moreover, because the district court dismissed the equal protection claims as

"predicated on the same theory of discrimination against religion as their Free Exercise Claims," we also reverse the dismissal of the equal protection claims and remand to the district court to consider the viability of these claims anew.

We likewise vacate the district court's denial of Plaintiffs' motion for preliminary injunction. Based upon its dismissal of the Plaintiffs' claims in their entirety, the district court found that "a fortiori, Plaintiffs have failed to make" the clear showing of entitlement to relief necessary to merit a preliminary injunction under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). "[B]ecause a preliminary injunction is an extraordinary remedy never awarded as of right, and the grant of a preliminary injunction is a matter committed to the discretion of the trial judge, we remand this case to the district court for consideration of all the *Winter* factors in the first instance." *Epona, LLC v. County of Ventura*, 876 F.3d 1214, 1227 (9th Cir. 2017) (internal quotation marks, alterations, and citations omitted).

**AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, and REMANDED IN PART.[18]**

---

[18] The parties shall bear their own costs on appeal.